# **Annex 16**

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

CATHLEEN COLVIN, *et al.*,

                *Plaintiffs*,

    v.

SYRIAN ARAB REPUBLIC,

                *Defendant*.

Civil No. 1:16-cv-01423 (ABJ)

**EXPERT REPORT OF EWAN BROWN**

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................... 1
    A.  QUALIFICATIONS ......................................................................................... 1
    B.  SUMMARY OF OPINIONS ............................................................................. 3
    C.  BASIS FOR EXPERTISE ................................................................................ 8

II. OVERVIEW OF THE SYRIAN UPRISING AND THE SYRIAN REGIME'S
    RESPONSE (2011–2012) ................................................................................. 10

III. THE MILITARY AND SECURITY STRUCTURES OF THE SYRIAN REGIME
    (2011–2012) ...................................................................................................... 14
    A.  PRESIDENT BASHAR AL-ASSAD .............................................................. 15
    B.  CENTRAL CRISIS MANAGEMENT CELL (CCMC) ................................... 18
    C.  NATIONAL SECURITY BUREAU (NSB) .................................................... 22
    D.  SECURITY/INTELLIGENCE DEPARTMENTS ............................................ 25
    E.  ARMY AND ARMED FORCES ..................................................................... 39
    F.  GOVERNORATE SECURITY COMMITTEES ............................................. 49
    G.  GOVERNORATE MILITARY AND SECURITY CHIEFS ............................ 54
    H.  REGIME LOYALIST FORCES ...................................................................... 61

IV. THE SYRIAN REGIME'S RESPONSE TO OPPOSITION ACTIVITY:  SECURITY
    OPERATIONS IN HOMS AND THE ATTACK ON BABA AMR ............................ 67
    A.  SECURITY RESPONSE TO OPPOSITION ACTIVITY (FEBRUARY – AUGUST 2011) ........... 67
    B.  SECURITY RESPONSE TO OPPOSITION ACTIVITY (AUGUST – NOVEMBER  2011) ........ 79
    C.  SECURITY OPERATIONS IN HOMS (NOVEMBER 2011 – JANUARY 2012) ................... 85
    D.  ATTACK ON BABA AMR (FEBRUARY 2012) ............................................ 96
        1.  *Overview* ................................................................................... 96
        2.  *Homs Military and Security Chief* ........................................... 96
        3.  *Syrian Army Forces* ................................................................ 108
        4.  *Homs Governorate Intelligence/Security Branches* .............. 111
        5.  *Armed Opposition Activity (October 2011–February 2012)* ... 116
        6.  *Baba Amr Offensive (4–28 February 2012)* ......................... 118

V.  CONCLUDING REMARKS ............................................................................... 126

I, Ewan Brown, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

# I.    INTRODUCTION

1.      I am a consulting analyst and investigator, and former British Army officer, specialising in the analysis and investigation of violations of international criminal law.  I currently provide consulting services in the analysis and investigation of human rights abuses and potential breaches of international criminal law that has included to companies, governments, international governmental organizations and non-governmental organizations, including the Commission for International Justice & Accountability (CIJA), which specialises in the investigation of international crimes in the ongoing conflict in the Syrian Arab Republic (Syria).  I have been asked by Plaintiffs in the above-captioned matter to provide an expert opinion on the structure of the military and security forces of Syria and operations carried out by such forces during the attacks on Homs and Baba Amr in 2011 and 2012.  My qualifications, summary of opinions, and basis for expertise are set forth in greater detail below.  All opinions rendered herein are based on my own independent analysis.

## A.    QUALIFICATIONS

2.      This Report is informed by my extensive career as an analyst and investigator of violations of international criminal law, my service in the British Army and my academic background.  In particular, my work with CIJA over the past few years renders me qualified to assess the structure and operations of the Syrian military and security forces, as detailed further below.  Collectively, these experiences allow me to present the expert opinions set out in this Report.

3.      ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████ .

    4.    ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ .

    5.    ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

    6.    ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ .

7.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ .  Since ████ I have been

retained as a consultant by the CIJA.  The CIJA is an internationally funded non-governmental

foundation involved in the investigation of violations of international criminal law in the current

Syrian conflict.  My consulting work with CIJA focuses on the collection and objective analysis of

information and evidence on the operations, structures, and activities of individuals within the

Syrian military, police, intelligence/security and paramilitary structures.  The purpose of this work

has been the provision of analytically driven investigation files for use in any future judicial process.

Attached as **Exhibit A** is my curriculum vitae, which sets forth additional details on my background

including a complete list of all cases in which I have testified as an expert at trial or by deposition.  I

have not authored any publications.

8.     The Plaintiffs are not compensating me for my work as an expert witness.  I will be

reimbursed for reasonable travel and out-of-pocket expenses incurred while fulfilling my role as an

expert.

**B.     SUMMARY OF OPINIONS**

9.     The Plaintiffs requested that I address the following topics:

  1) The organisation, command and control system and activity of the Syrian
     military and security forces during the Syrian uprising which began in 2011,

and the extent to which the Syrian Regime[1] used these forces to repress political opposition in response to the uprising; and

2) Whether and to what extent the Syrian military and security forces were engaged in armed operations during the attacks on Homs and Baba Amr in 2011 and 2012.

10.     This report is a product of a consideration of the topics set and a study of identified documentation.  In presenting this analysis, it is important to note that the attack on Baba Amr in February 2012 did not sit in isolation but should be viewed within the wider conflict in Syria and set in the context of events that preceded and surrounded it.  The Regime structures used to deal with the deteriorating security situation in the country, decisions taken by the individuals within these structures, the actions and results that followed, as well as the actions of the opposition itself had a relevance to and impacted on events in Homs.   For these reasons, this Report concentrates significantly on issues that sit more widely than simply the Baba Amr attack in an attempt to place this incident in an appropriate context.

11.     Having reviewed the identified documentation in support of this Report, my conclusions are as follows:

12.     *First*, the Syrian Regime (under the leadership of the President and, in particular, the direction of the Central Crisis Management Cell (CCMC) and the National Security Bureau (NSB), presented in Section III.A–C of this report) formulated and ensured the implementation of policies to forcefully suppress opposition activity that began in early 2011 and continued throughout 2011/2012.    These national-level bodies planned, organised, directed, co-ordinated and disseminated instructions to State security structures in order to crush dissent and opposition

---

[1]  The term 'Regime' is used in this Report to refer to political structures within Syria including President Bashar al-Assad, the Central Crisis Management Cell (CCMC), the National Security Bureau (NSB), the Ba'ath Party, the security agencies, the Security Committees, the military and civilian police forces, and the army.

activity.  Notably, the CCMC (a high-level *ad-hoc* national-level security body) brought together senior political, security, intelligence, military and Ministry of Interior figures who formulated policy and co-ordinated the security and military response of the Regime to opposition organisations, groups, demonstrators and other individuals deemed a threat and (later) the actions of armed opposition groups (Section III.B).

13.      ***Second,*** the Syrian Regime mobilised, and deployed elements from of all of its security forces (the Military Intelligence, Air-Force Intelligence, General Intelligence, Political Security, the police, the army, and loyalist groups (including those of the Ba'ath Party)), outlined in Section III.D–E and H) to confront and repress the political opposition and prevent the spread of anti-Regime activity, in order to maintain its exclusive control of the State.  It exercised effective command and control of the security forces through the CCMC, NSB, security and military structures and the governorate Security Committees down to subordinated branches and units (Section III.A–F and H).  Command and control was maintained through the use of directives, circulars, instructions, reports and visits made by senior figures to governorates (Section III.A–F and H and Section IV.A–C).

14.      ***Third,*** the security operations against opposition groups and individuals began immediately after the outbreak of demonstrations in February/March 2011 and escalated significantly as opposition activity spread (Section II and Section IV.A).  Regime security operations targeted those who participated in or supported demonstrations, opposition activists and those who organised, funded or disseminated materials to or had contact with media outlets (Section II and Section IV.A–B).  Regime operations resulted in mass arrests and detentions in security/intelligence run detention centres, the deaths of demonstrators, and the increasing use of the military in security

operations including their deployment into opposition held areas.  This resulted in a hardening of the response of the opposition leading to the establishment of armed opposition groups, the takeover of territory, engagement with Regime security forces and, at times, the targeting of infrastructure. This, in turn, elicited further increasing armed responses by the Regime and their security forces including the continued targeting of identified groups (Section IV.A–B).  The security measures adopted by the Regime did not succeed in suppressing the opposition activity but further hardened anti-Regime feeling fuelling the support for and the actions of the armed opposition (which included attacks on Regime forces) (Section IV.A–B and D.5).  In the late summer and autumn months of 2011 the Regime further militarised the conflict.  This involved changing key leadership personnel, such as the Head of the CCMC and the Minister of Defence (Section IV.B) and the eventual establishment of Military and Security Chiefs (Section III.G), appointed to tense governorates to take charge of all security elements in those governorates.  A senior army officer was appointed as the Military and Security Chief in Homs governorate along with an Assistant from Military Intelligence (Section IV.D.2).  The militarisation of the conflict involved the increasing use of the army in joint operations and sweeps and attacks into opposition held areas often with the use of ground forces and the use of tanks and artillery (Section IV B–D).

15.     ***Fourth,*** the Regime specifically targeted identified groups within the opposition. This included demonstrators, co-ordinators, funders and those who used the media to publicise activity within the country (Section II and III.A–B).  A key instruction in early August 2011 from the CCMC and disseminated by the NSB to governorate Security Committees directed that joint military/security operations were to be mounted against clearly identified groups (Section IV.B). This included those who were inciting demonstrations, financiers of demonstrations, members of

opposition coordination committees and those who communicated with people abroad in order publicise demonstrations or 'tarnish the image' of Syria in the foreign media and within international organisations.   As the opposition developed armed elements (including after its establishment, the Free Syrian Army), these also became a focus for the Regime and were targeted (Section IV.A–B and D.5).   One group identified by the Regime from the outset of the conflict were activists who communicated with the media (including the foreign media) or utilised social media in order to publicise events within the country (Section II, Section III.D and Section IV.A–B).   The Regime used its security bodies to monitor media sites, arrest individuals involved with media activity, monitor communications of activists and opposition supporters, collect and disseminate information (including to the military) on individuals who were communicating with and using media outlets in order to take measures against them (Section III.D and Section IV. A–B and D.2).

16.     ***Fifth,*** the Syrian Regime pursued a military/security strategy to confront the uprising in the city of Homs in response to escalating demonstrations and protest, and the eventual emergence of an armed opposition (Section IV.5).     This strategy initially utilised intelligence/security elements but as the security situation deteriorated, it militarised its response by relying significantly on the use of army units (particularly from the autumn of 2011) (Section IV.A– C).   This also involved the establishment of the Homs Military and Security Chief (Section IV.D.2). This militarisation culminated in February 2012 with the launch of a large-scale military operation against the district of Baba Amr in Homs, an area held by opposition forces.   This operation involved the prolonged shelling of civilian areas in Baba Amr through much of that month leading to significant numbers of civilian deaths and destruction of property.   The area of Baba Amr was retaken by ground forces at the end of February 2012 (Section IV.D.6).

C.     BASIS FOR EXPERTISE

17.     In preparing this Report, I relied on my extensive educational and professional experience in the field of international criminal investigations and analysis, as well as my review of the sources cited herein.   I utilised recognised analytical processes of selection, collation, and objective analysis of documentary sources.   I utilised similar practices in the production of expert reports for the ICTY.

18.     The Report is based predominantly on an analysis of selected contemporaneous Syrian government documents obtained by the CIJA through their fieldwork and processed and translated by CIJA personnel.   These references are currently in the possession of the CIJA.[2]   The documents utilised in this Report have been provided by the CIJA for analysis and review purposes only.   All issues relating to the initial collection, handling, processing, primary analysis and storage of CIJA-held materials remain within the sole purview of the CIJA and are not within the scope of and do not form part of this Report.   These topics are addressed in the Declaration of Chris Engels, Deputy Director for Investigation and Operations for the CIJA, attached as **Exhibit B**, compiled by him independently from this Report and provided to me by the CIJA.

---

[2]  The CIJA documents used in this report are identified using a CIJA referencing system. Documents are identified with a three letters followed by a numeric code (*e.g.* SYR.D0035.029.058).  The last three digits refer to the page number of an identified document. Where a document consists of multiple pages or a set of connected documents, a range is given (*e.g.* SYR.D017.026.001-002 is a two page document).  To differentiate between the Arabic document and the English translation, the same reference code is used except that "_ET" is annotated on the translation (*e.g.* SYR.D017.026.001-002 is the Arabic copy and SYR.D017.026.001-002 _ET is the corresponding English translation).  Due to the nature of document translation, occasionally the English version of a document features more pages than the Arabic original.  As an example, SYR.D0043.001.181 (the Arabic original) is a single page.  The corresponding English translation SYR.D0043.001.181_ET is a two-page document.  For the purposes of this report, the English translations (*i.e.* _ET versions) were used.

19.     In compiling this Report, I was granted complete access to the archive of CIJA-held materials, however, as I am not an Arabic speaker and due to the volume of materials, I was not able to personally review all the original Arabic references held by the CIJA.  I was, however, given full access to documents that the CIJA have processed and reviewed during the conduct of their work as these were readable materials to me.  These particular references that I reviewed form a part of the overall CIJA archive.  I was also given access to a significant number of English translations compiled by CIJA staff.  Furthermore, I was able to request the translation of a number of documents I had identified from metadata searches as potentially relevant to this Report.  All the CIJA-held documents referenced in this Report have been selected by myself based on the topics I was asked to consider and drawing on my professional experience in the analysis and investigations of the violations of international criminal law.

20.     The research and analysis of references that forms the basis of the Report is based on the English translations provided by Arabic-speaking staff at the CIJA.[3]  Attached as **Exhibits C-1 to C-193** are true and correct copies of the Arabic-language documents as well as English translations that were provided by the CIJA.

21.     The analysis in this Report is based on documents I was able to review and those I selected from the CIJA archive, within a temporal scope from 2011 to 2012.  It should be noted that although I have had access to CIJA-held documentation, this material and the references cited in this Report do not constitute or reflect the complete archive of documents of the Syrian military and security forces.  Furthermore, the CIJA and other entities continue to investigate allegations of abuses perpetrated in Syria that may likely provide additional reference materials or add to the

---

[3] As I am not an Arabic speaker, my analysis is based on the English translations provided by fluent Arabic-speaking staff at the CIJA.

understanding of the events of the conflict.  The CIJA is also continuing a review of the materials within its archive.  As a result of these processes and any new materials that may fall from them, I reserve the right to amend and/or supplement the analysis and conclusions contained in this Report.

22.      In addition to the contemporaneous Syrian government documents I was able to review and analyse from the CIJA collection, I reviewed open source materials including news articles and reports of UN bodies such as the Independent International Commission of Inquiry on the Syrian Arab Republic (CoI).

23.      It is my expert view that the documentary sources I have been able to review and that I selected and analysed appear to be authentic documents of the Syrian Arab Republic, based on certain characteristics, content and the circumstances of their collection (as explained by the CIJA). They provide a sound basis to identify and assess the organizational structures of the Syrian security forces; their command, control, and communications processes, key personnel, tasks, routine practices; as well as details on certain operations.

## II.   OVERVIEW OF THE SYRIAN UPRISING AND THE REGIME'S RESPONSE (2011–2012)

24.      The development of the crisis in Syria was set against the 'Arab Spring'; the wave of opposition demonstrations, protests, riots and coups that began in Tunisia in December 2010 and swept through a number of Middle East states.[4]

25.      Against a backdrop of escalating protests against authoritarian governments, the Syrian Regime used its security forces (the Military Intelligence, Air-Force Intelligence, General Intelligence, Political Security, the police, the army and Ba'ath Party and other loyalists) to monitor, confront, detain and interrogate protesters, supporters and members of opposition groups.  These

---

[4] The documentary sources substantiating this overview are cited and discussed in detail below.

measures were designed to break up and repress the opposition and prevent the spread of anti-Regime activity.  By doing so, the Regime calculated that it could maintain its exclusive control of the State and remain in power.

26.     Demonstrations began in Syria in late January/early February 2011 calling for democracy, enhanced freedoms, an end to corruption and the release of detainees (including in this very early period a group of children arrested in Dar'a for allegedly writing anti-Regime graffiti).  These protests grew quickly both in terms of geographic spread, size and intensity.  The Regime quickly realised the severity of the security problem it was facing and the threat that it posed and, in response, on or about 27 March 2011 they established the Central Crisis Management Cell (CCMC).[5]  This new, *ad hoc,* national-level security body was comprised of the most senior political, military, and intelligence/security officials of the state.  It was responsible for planning, organising, directing, co-ordinating and disseminating instructions and information related to the security response, opposition protests and activity and the general deteriorating situation in the country.

27.     The CCMC received information (from which it then formulated the overall security response) from the intelligence/security bodies, military, police and the governorate level joint security bodies (called Security Committees).[6]  It then disseminated decisions and directives back down various chains of command, principally through the National Security Bureau (NSB),  the Regional Command of the Ba'ath Party, the Ministry of Interior and the Ministry of Defence.

28.     As the demonstrations grew in intensity they were met with a significant suppressive response from the Regime, including the violent break-up of protests with the co-ordinated use of the police, intelligence/security agents and Ba'ath Party loyalists.  On numerous occasions this

---

[5]  The CCMC is discussed in detail below in Section III.B.
[6]  The governorate Security Committees are discussed below in Section III.F.

response included the shooting and killing of demonstrators and mass wide-scale arrests.   On 31 March 2011, in his first address to the nation in the wake of the protests, President Bashar Al-Assad characterised the demonstrations as part of an international conspiracy against Syria, and their suppression as a patriotic duty.

29.     From its establishment, the CCMC received reports on the security situation in the country and responded to the activity of the protests and opposition activity through increasing security measures.   In a series of key meetings, in particular between 18–20 April 2011, the CCMC examined closely the political and security situation in the country, concluded that the period for tolerance and compromise was over and issued instructions that significantly escalated their hard-line response.   They increased the co-ordination between security agencies, called for the use of further force against the opposition, continued the arrests of protesters, enhanced use of Ba'ath Party and other loyalists in confronting demonstrators and proposed the use of the military to assist, where necessary.

30.     In Homs, the situation followed a similar pattern to other key governorates with the security situation deteriorating quickly after the initial outbreak of anti-Regime demonstrations. Some of the protests became notable for their violent suppression.   Only a day after a key meeting of the CCMC on 18 April, for example, a violent (and now notorious) attack on a protest in Homs occurred in which a number of protesters were shot and killed by security forces.

31.     As the summer developed, the security situation continued to deteriorate.   The increasingly violent response of the Regime inflamed the opposition, leading to additional protests and the emergence of an armed opposition.   This initially appeared as armed elements protecting demonstrations but then developed into more formal armed groups, culminating in the

establishment of the Free Syrian Army, that began to defend selected areas and launch armed attacks against Regime security elements, checkpoints, convoys and infrastructure.

32.     An important meeting of the CCMC, on 05 August 2011, saw a further ratcheting up of the Regime's security response.  This meeting advanced additional plans to target selected groups in joint military/security operations.  These groups included funders and organisers of demonstrations and media activists who communicated with foreign media outlets.  Those arrested were to be processed through newly established Joint Investigation Committees.

33.     The result of this policy was the enhanced co-ordination of all security bodies, the increased deployment of the army, and the systematic targeting of demonstrators, supporters, co-ordinators, funders, media activists, and armed groups leading to their further mass arrests.  Many were detained for prolonged periods and were subjected to intimidation, physical violence, and torture, which at times resulted in death.

34.     Despite these additional measures, the security situation still continued to deteriorate.  The armed opposition began to strengthen (particularly with the defection of large numbers of security force members).  Areas within governorates began to be lost to opposition control and armed opposition groups began to launch attacks against military personnel, checkpoints and infrastructure.  In response, in October and November 2011 the Regime significantly militarised its response to the crisis.  It appointed a new Head of the CCMC, appointed military officials to take charge of all security organs in key governorates and conducted large-scale military operations against opposition held areas.

35.     In Homs governorate, a Military and Security Chief[7] was appointed and a number of '*inspection*' operations were conducted in the later months of 2011.   These included the establishment of checkpoints around the city, the shelling of civilian areas of Homs city and raids and attacks on opposition held areas.   In late December, as a result of international pressure, the Arab League dispatched a monitoring force in an attempt to observe and report on the situation in key areas of the country (including in Homs).   Although this led to a brief lull in fighting, the mission collapsed and after their withdrawal attacks and operations resumed.

36.     In February 2012, the Regime launched a significant military operation against the district of Baba Amr in Homs, an area that the opposition forces had earlier taken control of.   This operation involved the prolonged shelling of civilian areas in Baba Amr through much of that month leading to significant numbers of civilian deaths and destruction of property.   Despite attempts by the International Committee of the Red Cross (ICRC) to negotiate a ceasefire, the shelling continued.   Late in February the Regime launched a large military ground operation that was successful in retaking the area in a matter of days.   There were reports of killings by Regime forces after the area was secured.

## III.     THE MILITARY/SECURITY STRUCTURES OF THE SYRIAN REGIME (2011–2012)

37.     The Syrian Regime responded to the uprising by mobilising their complex military and security apparatus under the control of President Bashar al-Assad.   This included utilising the Ba'ath Party and the key security organs to suppress opposition activity and dissent.   This Section examines the structures, authority and functions of individuals and institutions within this apparatus, beginning with (A) the President.   It then addresses two important coordinating bodies –

---

[7]  The creation of Governorate Military and Security Chiefs is addressed below in Section III.G.
The role of the Homs Military and Security Chief is examined below in Section IV.D.2.

– (B) the Central Crisis Management Cell (CCMC) and (C) the National Security Bureau (NSB) —
before examining (D) the Security/Intelligence Departments, (E) Army and Armed Forces, (F)
Governorate Security Committees, (G) Governorate Military and Security Chiefs, and (H)
Paramilitary Forces.

### A.    PRESIDENT BASHAR AL-ASSAD

38.    Under the 1973 Constitution (in particular prior to the new 2012 Constitution), the
President of the Republic, Bashar Al-Assad had (and still retains) extensive authority.  The powers
vested in him under the 1973 Constitution included power to set state policy and oversee its
implementation,[8] appoint and dismiss civilian and military employees,[9] and the power to pass
decrees, decisions and orders.[10]

39.    President Al-Assad is also the Regional Secretary of the Ba'ath Party and oversees the
activity of the Regional Command.[11]  Although the term 'Regional Command' is used by the Ba'ath
party, this term in fact denotes the national-level ruling political organ that directs the functioning of
the executive and other bodies of the Syrian Arab Republic.  This includes the security agencies that
operate through the NSB, a component structure of the Regional Command of the Ba'ath Party.

40.    As well as being the Regional Secretary of the ruling Ba'ath Party, the President is
also the General Commander of the Army and Armed Forces.[12]  As such, he is the *de jure*

---

[8]    Article 94, Constitution of the Syrian Arab Republic of 1973, available at
http://www.refworld.org/docid/44d8a4e84.html (hereinafter "Syrian Constitution"); Article 98,
Syrian Constitution of 2012, available at http://www.refworld.org/docid/5100f02a2.html.
[9]  Article 109, Syrian Constitution of 1973; Article 106, Syrian Constitution of 2012.
[10]  Article 99, Syrian Constitution of 1973; Article 101, Syrian Constitution of 2012.
[11]  Comrade President Bashar al-Assad President of the Republic Regional Secretary of the BASP
[Socialist Arab Baath Party], http://www.baath-
party.org/index.php?option=com_content&view=category&layout=blog&id=314&Itemid=332&lan
g=en (accessed 7 Jan. 2018).
[12]  Article 103, Syrian Constitution of 1973; Article 105, Syrian Constitution of 2012.

commander of all military formations including regular army units, the Military Intelligence and Air-Force Intelligence. As President and General Commander of the Army and Armed Forces, Al-Assad has the authority to declare war with the approval of the People's Assembly,[13] and the power to take immediate emergency measures in cases of grave danger threatening national unity and safety of the '*homeland*.'[14] In 2017, Al-Assad emphasised that:

> ...*the Syrian Army is a regular army, it's not a militia. It's a regular army, it has hierarchy, it has very clear way of orders, so this kind of "rough personnel tried to do something against the will of the leadership of the army" never happened during the last six years of the war in Syria.*[15]

41.     As General Commander of the Army and Armed forces, President Al-Assad directly exercised, and continues to exercise, control over the military. Decrees and instructions were issued in his name, including the ordering of promotions,[16] appointment orders,[17] and the dissemination of circulars.[18] President Al-Assad also praised the actions of the army in the Weekly Political Bulletin of the General Command of the Army and Armed Forces.[19]

---

[13] Article 100, Syrian Constitution of 1973; Article 102, Syrian Constitution of 2012.

[14] Article 113, Syrian Constitution of 1973; Article 114, Syrian Constitution of 2012.

[15] 'Bachar El Assad - Entrevue de l'AFP (13/04/2017)', available at https://www.youtube.com/watch?v=ABSuGvLakGQ (English language interview with President Bashar Al-Assad, quoted at 13:11 to 13:33.

[16] *See, e.g.* Ex. C-138, General Command of the Army and Armed Forces, Officers' Affairs Administration promotion list, dated 31 December 2011, SYR.D0220.041.007-008_ET at 008.

[17] *See, e.g.* Ex. C-136, Appointment order, dated 22 July 2012, SYR.D0220.002.002-003_ET at 002.

[18] *See, e.g.* Ex. C-10, Circular concerning security measures for the use of wireless and other communication devices, dated 26 July 2012, SYR.D0015.039.003_ET at 003.

[19] *See, e.g.* Ex. C-29, Weekly Political Bulletin of the General Command of the Army and Armed Forces, dated 25 April 2011, SYR.D0035.029.074-076_ET at 076; Ex. C-28, Weekly Political Bulletin of the General Command of the Army and Armed Forces, dated 09 May 2011, SYR.D0035.029.058_ET at 058.

42.     In his public statements, President Al-Assad made little secret that he was General

Commander, confirming in the media his control over the most important military decisions.   In

September 2013, for example, he was interviewed by Chinese State television and was asked:

*Interviewer:*

*Do you take any "executive decisions" in military operations and state policies?*

*President Bashar Al-Assad:*

*According to the Constitution, the President's prerogatives are clear – he is the supreme commander of the army and armed forces.  Therefore, he is the "first decision-maker" in "moving" and commanding the armed forces in Syria.  At the same time, the President has an essential role in the foreign policy. So, he first bears the responsibility of the foreign policy. According to these prerogatives, yes, he is "exercising them completely", before and during the crisis.*[20]

43.     In a 2015 BBC interview, when it was suggested that he could order his generals to

cease indiscriminate attacks, Al-Assad did not deny this, and instead emphasised his duty to defend

the country.[21]   When pressed on whether he would order his generals to stop carrying out specific

---

[20]  Ex. C-2, Translation of Interview of the President Al-Assad with the Central Chinese CCTV dated 22 September 2013, SYR.A0472.093, original available at: https://www.youtube.com/watch?v=5pCvYZww0fM.  Also note, in October 2013, an interviewer for *Der Spiegel* put it to Al-Assad that '*your troops and intelligence services are responsible for a part of these horrors.  That is your responsibility.*'  Al-Assad replied that '*we . . . have to fight terrorism to defend our country.  I admit that mistakes were made during the implementation of this decision.*' He further stated: '*There were personal mistakes made by individuals. We all make mistakes. Even a president makes mistakes.  But even if there were mistakes in the implementation, our decisions were still fundamentally the right ones.*'  Dieter Bednarz and Klaus Brinkbäumer, *Interview with Bashar Assad: 'In the End, a Lie Is a Lie'*, Der Spiegel, 7 Oct. 2013, http://www.spiegel.de/international/world/spiegel-interview-with-syrian-president-bashar-assad-a-926456.html.
[21]  *Syria conflict: BBC exclusive interview with President Bashar al-Assad*, BBC News, 10 Feb. 2015, at 10:40, http://www.bbc.com/news/av/world-middle-east-31327153/syria-conflict-bbc-exclusive-interview-with-president-bashar-al-assad.  *See also ibid.* at 23:57 (Bowen [interviewer]: '*Syria is in ruins, there are hundreds of thousands of people dead. You've been the commander, you must bear command responsibility for some of that.*'  Assad: '*Yes, according to the constitution and according to the ethics of your job, it is to protect your country when it's under attack, not to flee and run away, and that's what we've been doing.*').

attacks, Al-Assad countered that he had a duty to fight terrorism.[22]  Al-Assad did not deny that he

had the power to command the military to stop using certain weapons.

      B.    **CENTRAL CRISIS MANAGEMENT CELL (CCMC)**

44.    As a result of the developing crisis in Syria, the Regime established a high-level co-
ordinating body from which it planned, directed and managed the security response to opposition
activity.  This key body, the CCMC, was used to gather and centralise information from all the
governorates in the country and to task and monitor the work of the military and security agencies
used in response to opposition activity.

45.    The CCMC was established on or around 27 March 2011[23] and was an *ad hoc*
creation of Regional Command of the Ba'ath Party.  It appeared to have neither an identifiable
predecessor nor any clear basis in law.  Its primary function was to formulate and co-ordinate the
security and military response of the Regime to the challenges posed by opposition organisations,
demonstrators, individuals deemed a threat and (later) the actions of armed opposition groups.

46.    Evidence indicates that that CCMC was, for the period of its existence, the senior
security decision-making body of the Regime.  On its establishment, the Head of the CCMC was
Mohammad Said Bekheitan (the Assistant Regional Secretary of the Command of the Ba'ath
Party).[24]  Bekheitan was replaced in late October 2011 by *Imad*[25] Hassan Turkomani (a former

---

[22] *Ibid.*
[23] Ex. C-78, Minutes of Meeting of the Security Committee for Deir-ez-Zor, dated 14 April 2011, SYR.D0080.051.117-121_ET at 118.
[24] *See, e.g.* Ex. C-88, Letter from the Ba'ath Party Regional Command, dated 04 October 2011, SYR.D0097.060.003_ET at 003 (signed by Mohammad Said Bekheitan, noting he was '*Assistant Regional Secretary*'); Ex. C-174, Minutes of the CCMC, dated 04 September 2011, SYR.E0001.015.017-018_ET at 017 (noting that the meeting was chaired by the '*Assistant Regional Secretary*' of the Ba'ath Party (*i.e.* Bekheitan).
[25] The term '*Imad*' is a military rank of a senior commander in the Syrian and the Lebanese armies which is the equivalent to the rank of Lieutenant General as used in the Egyptian, Saudi Arabian and

Minister of Defence and Member of the Regional Command of the Ba'ath Party).[26]   The transfer

between Bekheitan and Turkomani as Head of the CCMC appears to have occurred between 18-22

October 2011.[27]   Turkomani remained as Head until he was killed in an explosion on 18 July 2012,

along with a number of other members of the CCMC.[28]   Other key members of the CCMC

included:[29]

1) *Imad* Dawoud Rajiha: Minister of Defence/Chief of Staff of the Army and Armed Forces[30] (from August 2011).
2) Assef Shawkat: Deputy Minister of Defence.
3) Muhammad Al Shaar: Minister of Interior.
4) Hisham Ikhtiar: The Head of the National Security Bureau (NSB).
5) The four Heads of the Intelligence and Security Departments: Ali Mamluk (General Intelligence Directorate), Jamil Hassan (Air Force Intelligence Directorate), Abdel-Fatah Qudsiyeh (Military Intelligence Department) and Muhammed Dib Zeitoun (Political Security Department).

47.     The CCMC met on a regular basis[31] and was briefed on the security situation in the

country through the receipt of information *via* various channels.   Firstly, the very composition of the

---

Iraqi armies, for example.   It is a rank above Major-General and below General.   It is the second
highest rank in Syria's Air Force.   The rank of *Imad* could be held by the Minister of
Defence/Deputy General Commander of the Army and Armed Forces, the Chief of Staff or his
Deputy(ies).

[26] *See, e.g.* Ex. C-176, Minutes of Meeting of the CCMC on 22 October 2011, dated 23 October
2011, SYR.E0001.015.022-023_ET at 022;   Ex. C-178, Minutes of Meeting of the CCMC on 24
October 2011, dated 25 October 2011, SYR.E0001.015.024-026_ET at 024.

[27] CIJA provided documents indicate that Turkomani became the Head of the CCMC at some
point between 18 and 22 October 2011.   Compare Ex. C-176, Minutes of Meeting of the CCMC
on 18 October 2011, dated 19 October 2011, SYR.E0001.015.020-021_ET at 020 (referencing the
Assistant Regional Secretary (i.e. Bekheitan) as Head) with Ex. C-176, Minutes of Meeting of the
CCMC on 22 October 2011, dated 23 October 2011, SYR.E0001.015.022-023_ET at 022
(referencing meeting headed by Turkomani as Head).

[28] BBC Report entitled 'Syria Crisis: Profiles of security and defence chiefs killed in Damascus blast',
dated 20 July 2012 at http://www.bbc.co.uk/news/world-middle-east-18889030.

[29] Ex. C-129, Minutes of Meeting of the CCMC of 22 April, dated 23 April 2011,
SYR.D0183.015.018-020_ET at 018-020.

[30] The Syrian Army and Armed Forces are discussed in detail below in Section III.E.

CCMC is indicative of the type of information it was able to receive.  It was composed of the most senior members of the security structures of the Syrian state (the Army and Armed Forces, the Ministry of Interior, the various Intelligence and Security Departments and the Ba'ath Party).  This allowed information gathered through these structures to be disseminated up through these respective chains and be consolidated and discussed within the CCMC as a whole.

48.     Information and reports from the various governorate Security Committees were also disseminated to the CCMC where they were combined into a daily report on the security situation and used to brief CCMC members.[32]  The Head (or Chairman) of the various governorate Security Committees was normally the key Ba'ath Party functionary (the Assistant Secretary of the Ba'ath Party in the governorate)[33] and this allowed for the Ba'ath Party political chain to also be utilised in disseminating information up to the CCMC.

49.     As well as receiving information in order to produce a regular report on the security situation, the CCMC also drafted minutes of their meetings.  CIJA provided documented references indicate that the CCMC meetings consisted of significant internal discussions, a review of previous

---

[31]  Ex. C-130, Minutes of the CCMC Meeting of 20 April, dated 21 April 2011, concluded that the CCMC 'will meet daily to address the situation and give instructions.'  SYR.D0183.015.021-022_ET at 021.

[32]  *See, e.g.* Ex. C-150, CCMC report on the Security Situation, dated 12 April 2011, SYR.E0001.006.064-067_ET at 064.  This report notes that in Homs, the Security Committee *'confirmed that pre-emptive measures will be taken in order to prevent any negative demonstration from happening next Friday'*.  The Security Committee also *'recommended to track and arrest rioters in Bab Amr, Joret Elarayes, Bab al Sabaa, and Ashirah'*.

[33]  *See, e.g.* Ex. C-78, Minutes of meeting of the Security Committee for Deir-ez-Zor, dated 14 April 2011, SYR.D0080.051.117-121_ET at 118.

decisions taken, an analysis of the political and security situation based on information provided, discussions on specific incidents followed by a record of the agreed decisions made.[34]

50.     Documentary references demonstrate that the CCMC not only received information through the intelligence/security and Security Committee chains but, critically, it also formulated policy and disseminated decisions back down through the respective security and Ba'ath Party chains for action.   This was to be expected as the CCMC was the senior security body of the Regime and the members of the CCMC were also (concurrently) the most senior officials or commanders in their respective military, political and intelligence/security organisations.

51.     Decisions appear to have been formulated, agreed and noted in CCMC minutes or a summary of decisions taken was drafted that was later disseminated.[35]   In addition, where necessary, the CCMC issued specific, documented decisions including instructions for specifically directed operations in identified governorates.[36]   The discussions and decisions noted in documented minutes or summaries from or relating to the CCMC dealt with an array of security and other related topics. Most often, they included general security and operational instructions for implementation by the various security bodies.

---

[34]  *See, e.g.* Ex. C-184, Minutes of the CCMC, dated 24 July 2011, SYR.E0013.002.020-022_ET at 020-022.  Also note Ex. C-170, CCMC Agenda for meeting scheduled for 14 December 2011, SYR.E0001.014.020_ET at 020.

[35]  *See, e.g.* Ex. C-128, Minutes of the CCMC meeting of 20 April 2011, SYR.D0183.003.012-013_ET at 012-013; Ex. C-127, Military Intelligence Branch 294 Circular, dated 20 April 2011 disseminating the summary of decisions of a CCMC meeting around 18 April 2011.  This report was disseminated through the Head of the Military Intelligence down to the various Military Intelligence Branches throughout the country, SYR.D0183.003.010-011_ET at 010-011.

[36]  *See, e.g.* Ex. C-181, Decision No: 3413 of the CCMC, dated 18 July 2011, SYR.E0001.017.001_ET at 001 (commissioning the Security Committee in Homs governorate to initiate security inspections of neighbourhoods in Homs in order to arrest wanted individuals; tasking the Head of the NSB (Hisham Ikhtiar) to oversee, monitor and offer assistance for their implementation; and stating that the CCMC decision itself was to be '*communicated to all competent bodies for implementation*').

52.     At critical times, the CCMC also instructed that visits be made by members of the CCMC to the field in order to pass on instructions, keep briefed on the situation and/or oversee security operations.[37]   In the autumn of 2011, documentary references note that the CCMC specifically tasked senior Regime officials to go to key governorates in order to take charge of the security situation there (rather than simply report on it).   On 22 October, for example, the CCMC held a meeting (one of the first with Hassan Turkomani as Head of the CCMC) in which new methods and work plans were discussed.[38]   In this wide-ranging meeting, the CCMC discussed the issue of the positive effect of fieldwork and the need for the CCMC to move to crisis areas for a '*day or two to study the field situation and radically solve the problem*'.[39]   The Head of the NSB presented a report on how to tackle the situation in Homs and measures that should be implemented by '*comrades as well as by security agencies*'[40] in order to solve the crisis.   Various decisions were taken including the need to intensify the meetings of the CCMC and that:

> *The Crisis Management Cell is to carry out field visits to supervise the implementation of tasks in the governorates; crosscheck the received reports to have a clear picture of the situation; and amend the plans and implemented measures.*[41]

---

[37]   *See, e.g.* Ex. C-186, Minutes of the CCMC, dated 14 August 2011, SYR.E0013.002.023-024_ET at 024 ('*assign[ing] heads of security agencies to visit the hottest zones to lead the branches of agencies on the ground. They shall propose measures to control the situation in the governorates once the army implements its mission*'); Ex. C-176, Minutes of the CCMC meeting of 18 October 2011, dated 19 October 2011, SYR.E0001.015.020-021_ET at 020-021 (discussing a visit by the Head of the NSB (Hisham Ikhtiar) and Minister of Interior (Muhammad Al Shaar) to Homs and tasking the Head of the NSB to '*prepare a study on the tangible adverse issues in the governorate of Homs and the best ways to solve these, on how to end violations and take measures to isolate armed individuals from their nurturing environment in collaboration with prominent figures, as well as ways to win them over to our side.*').
[38]   Ex. C-176, Minutes of Meeting of the CCMC on 22 October 2011, dated 23 October 2011, SYR.E0001.015.022-023_ET at 022.
[39]   *Ibid.*
[40]   *Ibid.* at 022-023.
[41]   *Ibid.* at 023.

### C.   NATIONAL SECURITY BUREAU (NSB)

53.      The National Security Bureau (NSB) was a long-standing, state-security body of the

Ba'ath Party Regional Command, the existence of which predated the current conflict.[42]   The NSB

was, in effect, the national co-ordinating body of the four intelligence/security agencies of the Syrian

state (the Air-Force Intelligence, Military Intelligence, General Intelligence and Political Security).

The NSB was comprised of the Head of the NSB and the heads of the four Intelligence/Security

Departments.   Between March 2011 and July 2012 these were as follows:

1) Major-General Hisham Ikhtiar (Head of the NSB)
2) Major-General Abdel-Fatah Qudsiyeh (Head of the Military Intelligence Department)
3) Major-General Jamil Hassan (Head of the Air-Force Intelligence Directorate)
4) Major-General Ali Mamluk (Head of the General Intelligence Directorate)[43]
5) Muhammad Dib Zeitoun (Head of the Political Security Department)

54.      The roles of the NSB from the beginning of the current conflict until July 2012

(when a number of members of the CCMC and the Head of the NSB were killed in a bombing in

Damascus)[44] were to be the co-ordinating body for all the intelligence/security agencies and to act as

a conduit between the CCMC and the very same intelligence/security bodies.   Critically, the

members of the NSB were concurrently members of the CCMC, a feature that significantly

simplified chains of command and communications lines.

---

[42]  *See, e.g.* Ex. C-3, Circular, dated 12 March 2008, SYR.D0003.120.002_ET at 002.   This references a meeting of the NSB about a plan of coordination between the police and different security bodies in case of a terrorist incident in one of the security sectors in Damascus or the other governorates.

[43]  The General Intelligence Directorate is often also referred to as State Security Department, both in official documentation as well as by Syrian civil society.  *See, e.g.* Violations Documentation Centre in Syria, Report on Khateeb Branch, State Security, August 2013, at http://www.vdc-sy.info/index.php/en/reports/khatibbranch#.V3e6B_krLmg.

[44]  BBC Report entitled 'Syria Crisis: Profiles of security and defence chiefs killed in Damascus blast', dated 20 July 2012 at http://www.bbc.co.uk/news/world-middle-east-18889030.

55.     In the period prior to the establishment of the CCMC (late March 2011), the NSB

passed instructions through to the intelligence/security bodies for action.[45]   After March 2011,

however, documented references indicate that the NSB sat between the CCMC and the governorate

intelligence/security branches, overseeing the implementation of CCMC instructions and

decisions.[46]  Information and instructions issued by the CCMC were disseminated *via* the NSB to

the various intelligence/security departments down through these various chains of command, to the

branches, detachments and sections at the governorate, district, and sub-district levels.[47]   The

intelligence/security agencies were also able to send information back to the NSB through the same

intelligence/security chains.[48]

56.     Being a part of the Regional Command of the Ba'ath Party also allowed for a chain

to run from the NSB to the wider governorate level security apparatus *via* the governorate Security

---

[45]  *See, e.g.* Ex. C-6, Report from Ras Al Ain Detachment to Military Intelligence Branch 222, dated 14 February 2011 in response to Circular from Head of Military Intelligence Branch 222, dated 13 February 2011 and Circular from Military Intelligence Branch 222, dated 03 February 2011, SYR.D0010.075.001-007_ET at 003.   This passes on a decision of the Head of the Military Intelligence Department (based on a NSB decision) to intensify '*visits to website[s], particularly Facebook, by all security agencies . . . with the aim of flooding the website's pages which call for organising demonstrations in Syria*'.

[46]  *See, e.g.* Ex. C-70, Circular from the NSB, dated 03 February 2012, SYR.D0077.030.007-008_ET at 008.   This Circular was copied to the Head of the CCMC (for information), Minister of Interior, Head of Intelligence Department (Military Intelligence), Head of General Intelligence Directorate, Head of the Political Security Department, Head of the Air-Force Intelligence Directorate.   It was also to be disseminated down the various branches within the Political Security Department.

[47]  *See, e.g.* Ex. C-81, Circular from the NSB, dated 13 February 2012, SYR.D0087.056.005_ET at 005.   This was copied to the Head of the CCMC (for information), Minister of Interior, Head of Intelligence Department (Military Intelligence), Head of General Intelligence Directorate, Head of the Political Security Department, Head of the Air-Force Intelligence Directorate.   This NSB circular was also forwarded on 14 February by the Political Security Department to the Heads of Political Security branches in the '*centre*' and in the governorates).

[48]  *See, e.g.* Ex. C-54, Communication from Branch 227 to Branch 294, dated 29 April 2012, SYR.D0058.188.002-003_ET at 003.

Committees.[49]  The NSB passed information and instructions to the Security Committees[50] and from there it was discussed by the representatives of the various governorate-level security bodies present on the Security Committees and passed further down to the security branches and formations in the governorate.[51]

###### D.    SECURITY/INTELLIGENCE DEPARTMENTS

57.    The Syrian Regime operates a large and extremely pervasive intelligence and security apparatus divided into four key bodies: Military Intelligence, Air-Force Intelligence, General (sometimes referred to as 'State') Intelligence and Political Security.[52]

58.    In 2011-2012, the Head of Military Intelligence Department was Major-General Abdel-Fatah Qudsiyeh.[53]  The Head of the Air-Force Intelligence Department from the beginning of

---

[49] *See, e.g.* Ex. C-40, Communication from Military Intelligence Branch 294, dated 17 August 2011 attaching Communication from NSB to Secretary of the Ba'ath Party (Heads of Security Committees) in Hama, Damascus Countryside, Deir ez-Zor, Homs, Idleb and Dar'a governorates, dated 06 August 2011, SYR.D0043.004.093-094_ET at 094.  The Security Committees are discussed at length below in Section III.F.

[50] Ex. C-32, Communication from Military Intelligence Branch 243 to all Military Intelligence Sections and Detachments, dated 18 January 2011, SYR.D0043.002.009_ET at 009.

[51] *See, e.g.* Ex. C-82, Circular from the Head of NSB, dated 10 February 2012, SYR.D0087.080.001_ET at 001 (the Head of the Political Security Department forwards this to all Heads of Political Security Branches); Ex. C-32, Communication from Military Intelligence Branch 243 to all Military Intelligence Sections and Detachments, dated 18 January 2011, SYR.D0043.002.009_ET at 009; and Ex. C-46, Communication from Branch 243 to all Sections and Detachments, dated 12 March 2011, SYR.D0043.004.236_ET at 236.

[52] The words 'Security' and 'Intelligence' are sometimes used interchangeably in regard to the Syrian security structures.  For the purpose of this Report the terms Military Intelligence, Air-Force Intelligence, General Intelligence and Political Security will be used.  In identified documentation, for Military Intelligence and Political Security the term 'Department' is used for the senior headquarters of those particular branches e.g. Military Intelligence 'Department' (Arabic *'shu'bah'*). For the Air-Force Intelligence and General Intelligence the term 'Directorate' (Arabic *'idara'*) is used.

[53] Also transliterated in English as 'Abd Al-Fatah Qudsiyah'.  *See* European Council Implementing Regulation (EU) No 504/2011 of 23 May 2011 implementing Regulation (EU) No 442/2011 concerning restrictive measures in view of the situation in Syria published in the Official Journal of the European Union, dated 25 May 2011 at: http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:136:0045:0047:EN:PDF.

the current conflict was Major-General Jamil Hassan.[54]  Both Qudsiyeh and Hassan are on the

European Union list of persons and entities against whom restrictive measures have been in place

since May 2011[55] and are also subject to sanctions by the United States Office of Foreign Asset

Control.[56]

59.     From June 2005 until around December 2013, the General Intelligence Directorate

was headed by Major-General Ali Mamluk, a long serving and trusted aide to the Regime.[57]  The

Head of the Political Security Department from 2009 onwards was Major-General Mohammed Dib

Zeitoun.[58]  Both Mamluk and Zeitoun are also on the European Union sanctions list and subject to

sanctions by the United States Office of Foreign Asset Control for their participation in human

rights abuses.[59]

60.     In terms of organisation and structure, the various intelligence and security agencies

shared many features.   They all maintained a Department (or Directorate)[60] headquarters in

Damascus and had subordinate branches represented in the various governorates of the country.

---

[54]  *See* European Council Implementing Regulation (EU) No 504/2011 of 23 May 2011
implementing Regulation (EU) No 442/2011 concerning restrictive measures in view of the
situation in Syria published in the Official Journal of the European Union, dated 25 May 2011 at:
http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:136:0045:0047:EN:PDF.
[55]  *Ibid.*
[56]  US Department of the Treasury, Office of Foreign Assets Control, Specially Designated Nationals
and Blocked Persons List, dated 5 Jan. 2018, at 416 (Hassan), 714 (Qudsiyeh),
https://www.treasury.gov/ofac/downloads/sdnlist.pdf.
[57]  *See* European Council Implementing Regulation (EU) No 504/2011 of 09 May 2011
implementing Regulation (EU) No 442/2011 concerning restrictive measures in view of the
situation in Syria published in the Official Journal of the European Union, dated 24 May 2011 at
http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:136:0045:0047:EN:PDF
[58]  *Ibid.*
[59]  *Ibid;* US Department of the Treasury, Office of Foreign Assets Control, Specially Designated
Nationals and Blocked Persons List, dated 5 Jan. 2018, at 593 (Mamluk), 940 (Zeitoun),
https://www.treasury.gov/ofac/downloads/sdnlist.pdf.
[60]  In reporting the phrases 'Department' and 'Directorate' are sometimes used interchangeably.  For
the purposes of this brief Military Intelligence Department, Air-Force Intelligence Directorate,
General Intelligence Directorate and Political Security Department will be used.

Military Intelligence, for example, was organised in this formal hierarchical manner.  At the senior level, Major-General Qudsiyeh had his own inner office entitled the Bureau of the Head of the [Military] Intelligence Department. [61]  The subordinate governorate branches were linked to Qudsiyeh often through the work of Military Intelligence Branch 294 in Damascus.[62]  This Branch appeared to perform something of a headquarters or clearing-house function in the dissemination and receipt of instructions, circulars, information and requests throughout the Military Intelligence Department more widely.  Examples include references to the passing on of specific CCMC or NSB instructions,[63] requests to search for named individuals,[64] instructions to identify, arrest and send individuals to identified Military Intelligence Branches, [65] and the passage of information or

---

[61]   Ex. C-38, Communication from the Head of Military Intelligence Branch 294 to Heads all Branches and also addressed to '*Bureau of the Head of Intelligence Department*', dated 02 September 2011, SYR.D0043.004.079_ET at 079.

[62]   *Ibid.*

[63]   *See, e.g. ibid* at 079 (referencing a meeting of the CCMC in which the results of the security branches work was discussed).  The CCMC members requested a series of measures to be taken in order to improve the collection of information and the undertaking of searches for wanted person, including '*planting informers and sources within the armed groups and coordination committees*'.  *See also* Ex. C-39, Circular from Military Intelligence Branch 294 to the Offices of the Head and Deputy Head and all Branches of the Intelligence Department, dated 19 August 2011, SYR.D0043.004.088_ET at 088.  This references a letter from the Head of the NSB (pursuant to a CCMC meeting) instructing that official uniforms were to be provided to police and members of the riot police, support was to be given to the police and riot police by allocating security agents who were to be dressed in police uniforms, completed investigations were to be shared in all governorates and care was to be taken not to shed blood in dispersing peaceful demonstrations).

[64]   *See, e.g.* Ex. C-5, Circular from Military Intelligence Branch 294, dated 14 December 2011, SYR.D0006.008.006_ET at 006.  This lists 21 individuals to be searched for and when arrested brought to Branch 227 (Damascus).

[65]   *See, e.g.* Ex. C-9, Communication from Military Intelligence Branch 294, dated 25 April 2012, SYR.D0015.014.140_ET at 140 (instructing various senior and Branch level addressees to search for and arrest an individual and bring him to Military Intelligence Branch 227 (Damascus)).

intelligence throughout the wider intelligence and security apparatus.[66]   Other specialist branches of Military Intelligence were also located in Damascus.

61.     At the subordinate level were the various Military Intelligence branches in the various governorates of the country.   These branches were of critical importance to the functioning of the Military Intelligence Department as a whole.   Each governorate branch was identified with a unique identifying number (for example, the Military Intelligence branch in Homs was identified as Branch 261).[67]   The Military Intelligence Branches themselves were composed of subordinate detachments, units and sections.[68]   Detachments appeared to cover key geographic areas within the governorate with sections being represented in towns or sections of cities.   Sections within the Branches appeared to fulfil specific specialised functions (such as the Investigations Sections of the Branches).[69]

62.     The Air-Force Intelligence also maintained a similar structure with a headquarters in Damascus (the Air-Force Intelligence Department) and subordinate Air-Force Intelligence Branches, Sections or units.   Unlike the other intelligence/security agencies, which were structured around the

---

[66]   *See, e.g.* Ex. C-40, Communication from Military Intelligence Branch 294, dated 17 August 2011 attaching Communication from NSB to Secretary of the Ba'ath Party (Heads of Security Committees) in Hama, Damascus Countryside, Deir ez-Zor, Homs, Idleb and Dar'a governorates, dated 06 August 2011, SYR.D0043.004.093-094_ET at 093-094 sent to all Branches to continue to discover and arrest members of co-ordination committees.

[67]   *See, e.g.* Ex. C-99, Intelligence report from Military Intelligence Branch 261 (Homs) to *Imad* Abdullah Ali Ayoub, Deputy Chief of Staff, the General Military and Security Chief in the Homs Governorate, dated 28 March 2012, SYR.D0124.013.004_ET at 004.

[68]   *See, e.g.* Ex. C-4, Instruction from the Head of Military Intelligence Branch 243 (Ar-Raqah and Deir-ez-Zor) to subordinate Sections and Detachments, dated 23 February 2012, SYR.D0006.002.017_ET at 017.

[69]   *See, e.g.* Ex. C-41, Military Intelligence Branch 243 instruction, dated 09 May 2011, SYR.D0043.004.177_ET at 177.   This requests Branch Sections and Detachments to comply with a series of instructions relating to arrests.   This includes informing the Head of the Intelligence Department of the detention of any person even before he is brought to the Branch, verifying any piece of information before arresting an individual or not, refraining from summoning a person before obtaining approval of the Branch Head, and the writing of a report by arresting agents explaining the details of the arrest.   Annotation on the document indicates that the Investigation Section of the Branch was to be sent this instruction for compliance.

geographical areas of governorates, the subordinate Air-Force Intelligence units appeared to have been structured around military commands.  The Syrian Army and Armed Forces operated a series of geographical military zones or commands throughout the country.  These were called 'Regional Commands'.[70]  These commands appear not to have equated exactly to single geographical governorate boundaries but could cover parts of a number of governorates.  The Air-Force Intelligence had subordinate branches that covered these regional military commands.[71]  For example, Military Intelligence Branch 261 covered Homs governorate, whereas the equivalent Air-Force Intelligence Branch (named the Air-Force Branch in the Central Region) covered the Central Region military command (which encompassed a wider area than just Homs governorate).[72]

63.     Both Military Intelligence and Air-Force Intelligence were nominally linked to the General Command of the Army and Armed Forces (as indicated in the annotation in the address blocks on their documentation)[73] but *de facto* the key subordination for the Branches, sections, detachments and personnel within these agencies came via their Heads (e.g. the Head of Military Intelligence or the Head of the Air-Force Intelligence) and through their positions in the NSB/CCMC.  It should be noted that both the Head of Military Intelligence and the Head of Air-

---

[70]  The 'Regional Commands' of the Syrian Army and Armed Forces, which denote geographic military commands are not to be confused with the 'Regional Command' of the Ba'ath Party, which denotes the Syrian senior or national-level party/political leadership.

[71]  Ex. C-83, Air-Force Intelligence Directorate Investigation Branch report to various Branches and units of the Air-Force Intelligence, dated 13 August 2011, SYR.D0088.009.015_ET at 015.

[72]  *See, e.g.* Ex. C-92, Branch 261 instruction to all army units in the Central Region, dated 21 February 2012 [sic] attaching a Communication from the Air-Force Intelligence Branch in the Central Region to the Homs Security Chief, dated 20 March 2012 [sic], SYR.D0124.008.001-002_ET at 002 (note that the discrepancy in dates is presumably a typographic error); Ex. C-111, Communication from the Air-Force Intelligence Branch in the Central Region to the Homs Military and Security Chief, dated 28 May 2012, SYR.D0124.027.002-003_ET at 002.

[73]  *See, e.g.* Ex. C-83, Air-Force Intelligence Directorate Investigation Branch report to various Branches and units of the Air-Force Intelligence, dated 13 August 2011, SYR.D0088.009.015_ET at 015.

Force Intelligence were members of the CCMC (alongside the Head of the NSB and the Deputy General Commander of the Army and Armed Forces/Minister of Defence) further highlighting their importance.[74]

64.     The General Intelligence Directorate appeared to be structured on similar lines to the other agencies with a headquarters and specialist branches located in Damascus and subordinate branches operating in the governorates.   Analysed documents have indicated that, in a similar manner to Military Intelligence, the subordinate branches had a numeric reference identifier.   These included, for example, Branch 331 (Idleb),[75] Branch 315 (Dar'a),[76] and Branch 318 (Homs).[77]   In a similar manner to Military Intelligence, the governorate branches themselves consisted of a series of Branch Sections and Detachments within the governorate Branch.[78]   In a similar manner to the Heads of Military and Air-Force Intelligence, the Head of the General Intelligence was a member of the CCMC.[79]

65.     Political Security also had its Department head in Damascus with subordinate branches within the governorates.   Unlike Military and General Intelligence, which utilised numeric references for their subordinate branches, Political Security simply referred to the branch in the

---

[74]  Ex. C-129, Minutes of Meeting of the CCMC of 22 April, dated 23 April 2011, SYR.D0183.015.018-020_ET at 019-020.

[75]  *See, e.g.* Ex. C-86, Report from General Intelligence Branch 331 (Idlib) to the police, dated 23 July 2011, SYR.D0091.023.008_ET at 008.

[76]  *See, e.g.* Ex. C-62, Report from Branch 315 (Dar'a) sent to the Commander of the Security Group in Dar'a, dated 23 August 2011, SYR.D0065.002.011_ET at 011.

[77]  *See, e.g.* Ex. C-112, Branch 261 report to all army units in Homs governorate, dated 31 March 2012, attaching Branch 318 report sent to the *'Imad Deputy Chief of Staff of the Army and Armed Forces, the Security and Military Chief in the Homs Governorate'*, dated 13 March 2012, SYR.D0124.027.004-005_ET at 005.

[78]  *See, e.g.* Ex. C-37, Minutes of the Tal Abyad Security Committee, dated 10 October 2011, SYR.D0043.004.031-032_ET at 031-032.   It notes the presence of the Head of the Tal Abyad State Security Section, Haytham Mashhour on the Committee.

[79]  Ex. C-129, Minutes of Meeting of the CCMC of 22 April, dated 23 April 2011, SYR.D0183.015.018-020_ET at 019.

governorate in which it was based.  As an example, the Homs Political Security branch was referred to in this manner in official correspondence.[80]  As an organisation, Political Security fell within the internal security forces of the Ministry of Interior,[81] however, as noted for the other three agencies, the NSB/CCMC *de facto* oversaw the work of Political Security with the Head of Political Security also being a member of the CCMC.[82]

66.     The various intelligence and security formations, branches, sections and units carried out a wide range of tasks.  In general they collected and disseminated security and intelligence information that they then passed up and down their respective chains and on to other security bodies.[83]  The information they collected and passed on dealt with an array of individuals and groups deemed as a threat to the Regime, external threats and information on a variety of individual citizens and organisations within the country.  From the very beginning of the current crisis, the information collected was notably wide ranging and particularly related to individuals who were suspected of being members of or connected to opposition groups, demonstrators, members of opposition co-ordination committees,[84] media activity[85] and/or those sending material to media channels or

---

[80]  *See, e.g.* Ex. C-101, Communication from the Homs Political Security Branch to the General Military and Security Chief in Homs, dated 29 May 2012, SYR.D0124.017.004_ET at 004.

[81]  *See, e.g.* Ex. C-80, Instruction from the Head of the Political Security Department to all Heads of Security Branches in the governorates, dated 18 March 2011, SYR.D0081.033.005_ET at 005.

[82]  Ex. C-129, Minutes of Meeting of the CCMC of 22 April, dated 23 April 2011, SYR.D0183.015.018-020_ET at 019.

[83]  *See, e.g.* Ex. C-73, Instruction from Military Intelligence Branch 243, dated 21 July 2012, SYR.D0079.109.011_ET at 011.  This was sent to all Branch Sections and Detachments passing on instructions from a CCMC meeting.

[84]  Ex. C-33, Report from Tal Abyad Military Intelligence Detachment to Branch 243, dated 13 October 2011, SYR.D0043.003.036-037_ET at 037.  This responds to a request to supply a list of the names of persons who were involved in anti-government political activities including '*incitement, funding, coordination committees, carrying arms and resisting patrols*'.

[85]  *See, e.g.* Ex. C-6, Report from Ras Al Ain Detachment to Military Intelligence Branch 222, dated 14 February 2011 in response to Circular from Head of Military Intelligence Branch 222, dated 13 February 2011 and Circular from Military Intelligence Branch 222, dated 03 February 2011,

communicating with media deemed as hostile to the Regime.[86]  As an exampled of the importance

that the Regime placed on media activity, later in the conflict a '*Special Task Force*' within Military

Intelligence appeared to have been established to specifically target Facebook users in order to collect

information on opposition activity.[87]

  67. As noted earlier in this Report, the members of security and intelligence branches not

only reported through their own respective chains but Heads of governorate branches were key

members of governorate Security Committees.  Documented examples of minutes of Security

Committee meetings note that the functioning of these bodies allowed for high-level decisions to be

passed down to lower levels and the co-ordination of work by all security, political and military

personnel to occur in respective governorate areas.[88]

  68. It is important to note that intelligence and security bodies were not simply passive

collectors or disseminators of information but were also very much involved in the active conduct of

---

SYR.D0010.075.001-007_ET at 003.  Branch 222 passes on a decision of the Head of the
Intelligence Department (based on an NSB decision) to intensify visits and flood the websites that
call for the organisation of demonstrations in Syria.

[86] *See, e.g.* Ex. C-36, Report form Military Intelligence Branch 243 to subordinate detachments,
dated 20 October 2011, SYR.D0043.004.010_ET at 010.  This stated that there was '*a marked
trend among the armed gangs to take advantage of assemblies*' with the aim '*to film these demonstrations
and send the pictures via satellite channels*'.  It instructed that '*inciters*' were to be monitored and
arrested in co-ordination with '*the Directorate of Education, political party officials and the police in
order to prevent such demonstrations*'; Ex. C-116, Report sent from Military Intelligence Branch 290
to the Head of the Military Intelligence (via Branch 291), dated 20 September 2011,
SYR.D0175.008.002-003_ET at 002-003.  This provided details of 12 individuals who had been
arrested including those alleged to have demonstrated, posted comments on Facebook, incited others
to provide a live broadcast of a demonstration, and being of security interest by having a laptop with
clips of demonstrations.

[87] Ex. C-117, Military Intelligence '*Special Task Force*' report to the Head of Military Intelligence,
dated 20 September 2011, SYR.D0175.010.017_ET at 017.  This makes reference to information
gained from the monitoring of an activist who was using Facebook through using an account the
Special Task Force themselves had established.

[88] *See, e.g.* Ex. C-79, Minutes of the Deir ez-Zor Security Committee, dated 11 May 2011,
SYR.D0080.051.225-227_ET at 225.  This makes reference to the presence of all the Heads of the
governorate intelligence/security branches at this Security Committee meeting.

security operations.   This included monitoring demonstrations and demonstrators, operating and manning checkpoints, mounting joint operations with other security agencies or the military to control specific areas, and arresting, interrogating and processing detainees.   Documentation indicates that the information that the intelligence/security bodies were able to obtain came from an array of different sources.   This included informants (sources) [89] information gained from interrogations,[90] having a presence on checkpoints,[91] the interception of communications,[92] and the monitoring of the media.[93]

---

[89]  Ex. C-91, Branch 261 cover letter, dated 08 April 2012, attaching a cover letter from Branch 318 of the General Intelligence Directorate sent to '*the Military Intelligence Branch in Homs, [t]he Air Force Intelligence Branch in the Central Region [and] [t]he Political Security Branch in Homs*', dated 24 March 2012 and Branch 318 report to the '*Deputy Chief of Staff of the Army and the Armed Forces, Security and Military Chief of Homs Governorate*', dated 20 March 2012, SYR.D0124.006.001-003 at 001-003; Ex. C-95, Instruction from Military Intelligence Branch 261, dated 21 April 2012, attaching General Intelligence Branch 318 report, dated 05 April 2012, sent to '*Major General Security Chief in Homs Governorate, Assistant to the Military Commander*', SYR.D0124.011.005-006 at 005-006; Ex. C-38, Communication from the Head of Military Intelligence Branch 294 to the Heads of all Branches and also to the '*Bureau of the Head of the Intelligence Department*', dated 02 September 2011, SYR.D0043.004.079_ET at 079.

[90]  *See, e.g.* Ex. C-72, Instruction from the Head of the NSB to the Head of the Political Security Department, dated 23 May 2011, SYR.D0077.209.009_ET at 009; Ex. C-34, Military Intelligence Branch 243 instruction, dated 08 August 2011, SYR.D0043.003.286_ET at 286.

[91]  *See, e.g.* Ex. C-121, Military Intelligence Branch 271 Report, dated 14 June 2011, SYR.D0179.001.023-024_ET at 023-024.   This gave details on the arrest and detention of an individual at a checkpoint in Idleb.   The individual was interrogated and admitted participating in demonstrations.

[92]  *See, e.g.* Ex. C-118, Report from Military Intelligence Branch 261 to Branch 271, dated 26 September 2011, SYR.D0175.011.039_ET at 039.   This details information gained '*through the objective monitoring of the telephone calls*' of a named '*target*'; Ex. C-94, Branch 261 report to various military units, dated 21 April 2012 attaching Branch 318 report to the '*Deputy Chief of Staff of the Army and Armed Forces[;] The Security and Military Chief in the Homs Governorate*', dated 03 April 2012, SYR.D0124.008.005-006_ET at 006.   This document references information gained through '*monitoring phone calls between suspects in Homs*'.

[93]  *See, e.g.* Ex. C-80, Instruction from the Head of the Political Security Department to all Heads of Security Branches in the governorates, dated 18 March 2011, SYR.D0081.033.005_ET at 005. This notes information gained and posted on Facebook and other websites calling for a protest on 17/18 March 2011.

69.      A critical function of the security agencies from the very beginning of the conflict was the active monitoring of and dealing with demonstrations.   Documented references note personnel directly involved in gathering information on demonstrations[94] and the arrest of individuals who had demonstrated or were seen as opposition supporters.[95]

70.      The intelligence and security agencies were also involved in disseminating to branches wanted lists of individuals to be arrested and interrogated.[96]  As a result of this, a large number of individuals were arrested, sent to and processed through the intelligence and security branches from the beginning of the current conflict.

---

[94]  CIJA documentation notes numerous contemporaneous references on monitoring and collection of information on demonstrators and opposition groups or individuals.  *See e.g*, Ex. C-79, Minutes of the Deir ez-Zor Security Committee, dated 11 May 2011, SYR.D0080.051.225-227_ET at 226. This notes the Head of the Political Security Branch briefed the Committee on the situation, including about protesters, and recommended the increase in agents in response to information about a particular demonstration.

[95]  *See, e.g.* Ex. C-74, Political Security Department, Special register for names of individuals arrested during the security military campaign in Deir ez-Zur since 7/8/2011, SYR.D0080.048.001_ET and Ex. C-75, Names of Investigation Section detainees for Monday 2/1/2012, dated 02 January 2012, SYR.D0080.048.010-011_ET at 010.  This register includes a series of reports from the Investigations Department of the Deir ez-Zor Political Security to the Head of the Branch listing names of persons arrested in the investigations department.  One report, Ex. C-75, SYR.D0080.048.010-011_ET at 010, lists 30 individuals arrested for a variety of reasons including for being member of a coordination committee, '*[p]articipation in protests*', '*[p]rotesting and filming protests in order to send it to agenda-driven channels*', '*filming protests and public order units*', and participation in armed attacks).  *See also* Ex. C-121, Report from Military Intelligence Branch 271, dated 14 June 2011, SYR.D0179.001.023-024_ET at 023, regarding the arrest and detention of an individual at a checkpoint in Idleb (the individual was interrogated and admitted participating in demonstrations).

[96]  *See, e.g*. Ex. C-5, Circular from Military Intelligence Branch 294, dated 14 December 2011 SYR.D0006.008.006_ET at 006.  It lists 21 individuals to be searched for and when arrested brought to Branch 227 (Damascus).  *See also* Ex. C-59, Request from Military Intelligence Branch 265 to the Commander of the 1st Corps, dated 13 December 2011, SYR.D0063.012.119_ET at 119, requesting the arrest of twelve individuals to be brought to the Branch (their details were to be disseminated at checkpoints).

71. Other operational activity of the intelligence and security branches included the establishment and manning of checkpoints.[97] Although checkpoints served an obvious security function they were also very much linked to the issue of arrests. Intelligence and security agents were used directly in the field for this task and were utilised to stop and check vehicles, to monitor those on wanted lists[98] and arrest and detain individuals at checkpoints, which they ran themselves or jointly with others.[99]

72. Members from intelligence and security branches were also involved in active operations including raids, searches and joint-operations with the military. One CIJA provided documentary reference is an exemplar of this type of activity. On 11 September 2011, the Political Security Section in Abu Kamal (in Deir-ez-Zor governorate) wrote a report to the Branch Head of Political Security in Deir-ez-Zor reporting on a joint operation involving all security agencies '*with the support of the army*'.[100] The operation '*tracked wanted individuals and militants*', searching for these individuals by raiding '*potential locations*' based on information they had. The security forces arrested a large number of individuals who had allegedly taken part in attacking government

---

[97] *See, e.g.* Ex. C-35, Branch 243 Circular, dated 21 October 2011, SYR.D0043.004.009_ET at 009. This requests that all heads of sections and detachments '*activate the work of joint military security checkpoints*'.

[98] *See, e.g.* Ex. C-62, Report from General Intelligence Branch 315 (Dar'a) to Commander of the Security Group in Dar'a, dated 23 August 2011, SYR.D0065.002.011_ET at 011. This calls for the distribution to all security bodies and checkpoints instructions to remove from the wanted lists two individuals who had been held by Branch 315 but had pledged not to take part in demonstrations, riots or vandalism.

[99] *See, e.g.* Ex. C-35, Branch 243 Circular, dated 21 October 2011, SYR.D0043.004.009_ET at 009. This requests that all heads of sections and detachments '*[a]ctivate the work of joint military security checkpoints … in terms of sweeps and searches for wanted persons and suspects*'. *See also* Ex. C-121, Report from Military Intelligence Branch 271, dated 14 June 2011, SYR.D0179.001.023-024_ET at 023. Notes the arrest and detention of an individual at a checkpoint in Idleb. The individual was interrogated and admitted participating in demonstrations.

[100] Ex. C-89, Report from the Abu Kamal Political Security Section to the Head of the Deir-ez-Zor Political Security, dated 11 September 2011, SYR.D0100.008.015-016_ET at 015.

buildings and detachments in the area.  Military Intelligence '*fired to disband citizens*' leading to the

death of a woman and the injury to a 10 year old girl.  Also of significance, the report referenced that

the:

> … [H]ead of Military Intelligence Mr. Major-General Abdel Fattah Qudsiyeh, and Deir
> ez-Zor governor Mr. Samir Al Sheikh, visited Abu Kamal and supervised the mission of
> the patrols.  They met with the area's officers and praised the remarkable job they did on
> that day.  They encouraged them to double the work and exert effort to complete the
> implementation of the mission and arrest all wanted individuals and militants within 48
> hours.

The report also noted that Qudsiyeh:

> … reward[ed] Colonel Ghassan Abu Azzam, the Head of the Military Intelligence
> Detachment in Abou Kamal, with a bonus of fifty thousand Syrian pounds, and . . .
> reward[ed] the members of the detachment with a bonus of one hundred thousand Syrian
> pounds.[101]

73.     The intelligence and security agencies were also actively involved in the passage of

information and intelligence in order for further action to be taken, either by other intelligence

branches or the military.[102]  Some documentation from the intelligence/security bodies did not

necessarily specify the precise nature of the action that subordinate units, other branches or

recipients were to take (based on the provided intelligence).  Some reports were evidently simply for

information ('*be informed*').  Others noted phrases such as '*take the necessary precautions*',[103] take the

---

[101]  *Ibid.* at 016.

[102]  *See, e.g.* Ex. C-95, Instruction from Military Intelligence Branch 261, dated 21 April 2012,
attaching General Intelligence Branch 318 report sent to '*Major General Security Chief in Homs
Governorate, Assistant to the Military Commander*', SYR.D0124.011.005-006 at 005.  The Branch
261 instruction with the attachment was being dispatched to various military units in Homs.

[103]  *See, e.g.* Ex. C-92, Branch 261 instruction to all army units in the Central Region, dated 21
February 2012 [sic] attaching a Communication from the Air-Force Intelligence Branch in the
Central Region to the Homs Security Chief, dated 20 March 2012 [sic], SYR.D0124.008.001-
002_ET at 002.

required or '*necessary security and military measures*' [104] or '*act accordingly*' [105] without further expansion.  This could indicate a degree of prior understanding on what action was to be undertaken or the initiative expected on the part of the recipient without necessarily a need for precise details.

74.     Many other references, however, were more specific, emphatic or instructive with regard to the action to be taken.  Instructions were often clear in their need to be followed with phrases such as '*abide by the content*',[106] '*full compliance*'[107], '*implement*' [108] or '*comply*'[109] being noted. From early on in the crisis and prior to the establishment of the Military and Security Chiefs in key governorates in late 2011,[110] the process of dissemination particularly involved the passage of information on demonstrations and the action to be taken against protesters,[111] targeted individuals and groups,[112] information regarding wanted lists,[113] arrests[114] and information of a general

---

[104]   *See, e.g.* Ex. C-94, Branch 261 report to various military units, dated 21 April 2012 attaching Branch 318 report to the '*Deputy Chief of Staff of the Army and Armed Forces[;] The Security and Military Chief in the Homs Governorate*', dated 03 April 2012, SYR.D0124.008.005-006_ET at 006.
[105]   *See, e.g.* Ex. C-91, Branch 261 cover letter, dated 08 April 2012, attaching a cover letter from Branch 318 sent to the '*the Military Intelligence Branch in Homs, [t]he Air Force Intelligence Branch in the Central Region [and] [t]he Political Security Branch in Homs*', dated 24 March 2012 and Branch 318 report to the '*Deputy Chief of Staff of the Army and Armed Forced[;] Security and Military Chief of Homs Governorate*', dated 20 March 2012, SYR.D0124.006.001-003_ET at 001.
[106]   *See, e.g.* Ex. C-127, Military Intelligence Branch 294 Circular, dated 20 April 2011, SYR.D0183.003.010-011_ET at 011.
[107]   *See, e.g.* Ex. C-32, Communication from Military Intelligence Branch 243 to all Military Intelligence Sections and Detachments, dated 18 January 2011, SYR.D0043.002.009_ET at 009.
[108]   *See, e.g.* Ex. C-26, Circular from the Operations Administration of the General Command of the Army and Armed Forces, dated 19 July 2011, SYR.D0021.001.013-014_ET at 014.
[109]   *See, e.g.* Ex. C-41, Military Intelligence Branch 243 instruction, dated 09 May 2011, SYR.D0043.004.177_ET at 177.
[110]   The creation of Governorate Military and Security Chiefs is addressed below in Section III.G. The role of the Homs Military and Security Chief is examined below in Section IV.D.2.
[111]   *See, e.g.* Ex. C-127, Military Intelligence Branch 294 Circular, dated 20 April 2011, SYR.D0183.003.010-011_ET at 010-011.
[112]   *See, e.g.* Ex. C-9, Communication from Military Intelligence Branch 294, dated 25 April 2012 to various senior and Branch level addressees to search for and arrest an individual and bring them to Military Intelligence Branch 227 (Damascus), SYR.D0015.014.140_ET at 140; Ex. C-116, Report sent from Military Intelligence Branch 290 to the Head of the Military Intelligence (via Branch

intelligence/security nature.  It also included the dispatch of names to military units in order for them to arrest individuals and pass them on to the intelligence branches.[115]  The passage of information was either achieved through the dissemination and sharing of information between the various intelligence agencies or through the governorate Security Committees in which the Head of governorate intelligence branches were members.[116]

75.    With the further militarisation of the conflict in the autumn of 2011, Military and Security Chiefs were appointed in tense governorates (including in Homs).  These senior military officers appeared to have been placed in charge of all security elements in these governorates.[117]  The Military and Security Chief would consider recommendations from the intelligence/security Branches prior to authorisation for further action.

76.    Documentary references indicate that in Homs, the intelligence and security branches would pass information and intelligence to the Homs Military and Security Chief making

---

291), dated 20 September 2011, SYR.D0175.008.002-003_ET at 002-003; Ex. C-40, Communication from Military Intelligence Branch 294, dated 17 August 2011 attaching Communication from NSB to Secretary of the Ba'ath Party (Heads of Security Committees) in Hama, Damascus Countryside, Deir ez-Zor, Homs, Idleb and Dar'a governorates, dated 06 August 2011, SYR.D0043.004.093-094_ET at 093 sent to all Branches to continue to discover and arrest members of co-ordination committees.

[113] *See, e.g.* Ex. C-59, Military Intelligence Branch 265 to the Commander of the 1st Corps, dated 13 December 2011, SYR.D0063.012.119_ET at 119.  Instructs to arrest eleven wanted individuals and bring them to the Branch.  Their details were to be disseminated at checkpoints,

[114] *See, e.g.* Ex. C-5, Communication from Military Intelligence Branch 294, dated 14 December 2011, SYR.D0006.008.006_ET at 006.  Lists 21 individuals to be searched for and when arrested brought to Branch 227 (Damascus).

[115] *See, e.g.* Ex. C-63, Request from Military Intelligence Branch 265 to the Commander of the 1st Corps, dated 22 August 2011, SYR.D0065.002.092_ET at 092.  Provides details of a named individual.  It was requested that the information to be circulated at military checkpoints and, if arrested, the individual was to be transferred '*alive*' the Branch 265.

[116] *See, e.g.* Ex. C-78, Minutes of meeting of the Security Committee for Deir-ez-Zor, dated 14 April 2011, SYR.D0080.051.117-121_ET at 118-120.

[117] Ex. C-120, Appointment order from the General Command of the Army and Armed Forces, dated 26 November 2011, SYR.D0178.001.007_ET at 007.

recommendations for action in this manner.    As well as making the kind of generic recommendations that were observed in many other (earlier) intelligence documents (e.g. '*take the necessary measures*', '*be informed*', '*act accordingly*' etc.), a number of Homs related references note recommendations to disseminate intelligence to other intelligence and security branches as well as military units.[118]    A small number of identified references from Homs later in 2012 also note recommendations by the governorate Military Intelligence branch for military action to be taken based on the provided intelligence including the setting up of ambushes[119] and the use of artillery on identified targets.[120]

### E.    ARMY AND ARMED FORCES

77.    The Syrian Armed Forces are the main military forces of the Syrian state consisting of the Syrian Arab Army, the Syrian Navy, the Syrian Air Forces and the Syrian Air-Defence Forces. In accordance with the Syrian Constitution, the President, Bashar al-Assad, is the General Commander of the Armed Forces.[121]

---

[118]   *See, e.g.* Ex. C-112, Branch 261 report to all army units in Homs governorate, dated 31 March 2012, attaching Branch 318 report sent to '*Imad Deputy Chief of Staff of the Army and Armed Forces The Security and Military Chief in the Homs Governorate*', dated 13 March 2012, SYR.D0124.027.004-005_ET at 005.

[119]   Ex. C-109, Branch 261 Report to the Homs Military and Security Chief, dated 28 March 2012, SYR.D0124.024.004_ET at 004.

[120]   Ex. C-93, Report from Branch 261 to the 11th Tank Division, dated 06 July 2012, attaching a report from Branch 261 to the Homs Military and Security Chief, dated 26 June 2012, SYR.D0124.008.003-004_ET at 004; Ex. C-97, Branch 261 report sent to the Homs Military and Security Chief, dated 27 June 2012, SYR.D0124.013.002_ET at 002.

[121]   Article 103, Syrian Constitution of 1973; Article 105, Syrian Constitution of 2012.

78.     According to the Syrian Constitution, the Minister of Defence is appointed and removed by Presidential decree.[122]   The Minister of Defence is concurrently the Deputy General Commander of the Army and Armed Forces.[123]

79.     Directly subordinate to the Deputy General Commander of the Army and Armed Forces /Minister of Defence is the Chief of Staff of the Army and Armed Forces.[124]   Directly subordinate to the Chief of Staff are a number of deputies (*i.e.*, Deputy Chiefs of Staff).  Along with a series of departments, administrations, and branches, these officers and their staff make up the General Command of the Army and Armed Forces.  Subordinate to the General Command are all the units, formations, training establishments and departments of the Army and Armed Forces.

80.     At the beginning of the current conflict in Syria (*i.e.*, from early 2011), the Deputy General Commander of the Army and Armed Forces/Minister of Defence was *Imad* Ali Habib Mahmoud[125] and the Chief of Staff was *Imad* Dawoud Abdallah Rajiha.[126]   One of Rajiha's Deputies (i.e. a Deputy Chief of Staff) was *Imad* Munir Adanof.  In April 2011, Adanof was sent to Homs as a result of the deteriorating security situation there and appeared to operate as a senior Regime military representative working closely with the Homs Security Committee.  As part of this role, it

---

[122]   *See* Article 109, Syrian Constitution of 1973; Article 106, Syrian Constitution of 2012 (vesting appointment and removal power in President).
[123]   *See, e.g.* Ex. C-8, Circular No. 4, dated 26 February 2011, SYR.D0014.004.001_ET at 001. Note the signature block of *Imad* Ali Muhammad Habib Mahmoud '*Deputy General Commander of the Army and Armed Forces —Minister of Defence*'
[124]   *See, e.g.* Ex. C-11, Instruction, dated 09 June 2011, SYR.D0017.026.001-002_ET at 002. References Lieutenant-General Dawoud Abdullah Rajiha as being the Chief of Staff of the Army and Armed Forces.
[125]   *See, e.g.* Ex. C-8, Circular No. 4, dated 26 February 2011, SYR.D0014.004.001_ET at 001. Notes the signature block of *Imad* Ali Muhammad Habib Mahmoud '*Deputy General Commander of the Army and Armed Forces — Minister of Defence*'.
[126]   *See, e.g.* Ex. C-11, Instruction, dated 09 June 2011, SYR.D0017.026.001-002_ET at 002. References Lieutenant-General Dawoud Abdullah Rajiha as being the Chief of Staff of the Army and Armed Forces.

was noted that he was engaged in negotiations with opposition figures as well as assisting in the response of the Regime to the escalating security problems and demonstrations in the governorate.[127]

81.     *Imad* Ali Habib Mahmoud held the position of Minister of Defence/ Deputy General Commander of the Army and Armed Forces until 08 August 2011 around the time of significant changes in the senior leadership of the Army and Armed Forces.   On 08 August, Mahmoud was replaced by *Imad* Dawoud Rajiha who, as referenced above, had been the Chief of Staff.[128]  In essence, Rajiha was simply promoted up on the removal of Mahmoud.  *Imad* Fahd Jasim al-Freij, was promoted to replace Rajiha the Chief of Staff.[129]   Munir Adanof, who had been a Deputy Chief of Staff was also removed around the same time that Lieutenant General Ali Habib Mahmoud was removed as Minister of Defence/Deputy General Commander of the Army and Armed Forces (August 2011).   Major-General Ali Abdullah Ayoub, was appointed as a Deputy Chief of Staff, most likely to replace Adanof.[130]   Prior to this, Ayoub had been Commander of the Syrian Army 1st Corps (which had operated in the south of Syria, in particular in the Dar'a area where elements had been deployed against demonstrators and opposition groups).[131]   A little later, two

---

[127]  Ex. C-145, CCMC Report on the Security Situation, dated 01 May 2011, SYR.E0001.006.014-016_ET at 014.

[128]  The earliest documentary reference to Rajiha as Minister of Defence currently identified in CIJA held documentation is Ex. C-68, Circular from the Operations Commission of the General Command of the Army and Armed Forces, dated 21 August 2011, SYR.D0071.026.009_ET at 009. The last identified reference to Mahmoud in that position is Ex. C-20, Circular from the Operations Commission of the General Command of the Army and Armed Forced from 02 July 2011, SYR.D0018.071.005-004_ET [sic] at 004.  Also note report in Reuters, dated 08 August 2011, '*Syria's Assad replaces Defence Minister*' at https://www.reuters.com/article/us-syria-assad-minister/syrias-assad-replaces-defense-minister-idUSTRE7773KX20110808.

[129]  Ex. C-12, Administrative instruction, dated 22 August 2011, SYR.D0017.027.001_ET at 001. This deals with the punishment of an officer and is signed by '*Imad Fahd Jasem al-Freij, Chief of General Staff of the Army and Armed Forces*'.

[130]  Ex. C-57, Appointment order, dated 10 August 2011, SYR.D0063.010.008_ET at 008.

[131]  Ex. C-64, Letter from the Ministry of Local Administration in Dar'a, dated 12 May 2011, SYR.D0065.002.096_ET at 096.

other Deputy Chiefs of Staff were also appointed. These were Major-General Ibrahim Ahmad Husein and Major-General Talal Mustafa Talas.[132] A diagram of these command positions from 2011-2018 (including changes and promotions) is noted at Fig. 1 below:



Fig. 1.

82.    The headquarters of the General Command of the Army and Armed Forces was located in Damascus. The most important department was the Operations Commission that was headed (at least in the early part of the conflict in 2011) by Major-General Amin Mahmoud

---

[132] Ex. C-58, Appointment order, dated 27 September 2011, SYR.D0063.010.015_ET at 015.

Zeidan.[133]  It is unclear exactly when Zeidan relinquished this position but it is evident that at some

time in either late 2011 or early 2012 he was replaced by Major-General Ibrahim Jasim al-Ghabn.[134]

Al-Ghabn had been the Commander of the Northern Region Command prior to this.[135]

83.       As its name would suggest, the Operations Commission was the key branch of the

General Command that dealt with the operational matters of the Army and Armed Forces.   It

disseminated instructions, information and circulars from the senior commanders to subordinate

levels and units.   This included instructions referencing decisions of the President,[136] those signed

directly by the Minister of Defence/Deputy General Commander of the Army and Armed Forces[137]

---

[133]  *See*, *e.g.* Ex. C-25, Circular from the General Command of the Army and Armed Forces, dated 23 July 2011, SYR.D0021.001.012_ET at 012.

[134]  Ex. C-27, Instruction to the Commands of the Central, Northern and Coastal Regions from the Operations Commission of the Army and Armed Forces, dated 29 May 2012, SYR.D0021.024.023_ET at 023.   This references al-Ghibn as the Head of the Operations Commission of the General Command; also note Ex. C-18, Proposal from the Acting Commander of the Northern Region Command (Major-General Nazeer Sulieman Nouman), dated 17 January 2012, SYR.D0018.021.004-005_ET at 005.   From these references it appears that at some time between 21 December 2011 and 17 January 2012, al-Ghibn moved to become Head of the Operations Commission at the General Command of the Army and Armed Forces.

[135]  *See, e.g.* References to al-Ghibn as Commander of the Northern Region Command in Ex. C-24, Instruction from the Command of the Northern Region on the provision of daily reports, dated 08 May 2011, SYR.D0020.090.004_ET at 004; Ex. C-7, Instruction from the Command of the Northern Region, dated 21 December 2011, SYR.D0012.007.003-004_ET at 004.

[136]  *See, e.g.* Ex. C-65, Administrative Order from the Strategic Operational Planning Department of the Operations Commission, dated 10 April 2011, SYR.D0067.003.046_ET at 046.

[137]  *See, e.g.* Ex. C-19, Circular, dated 24 July 2011 signed by *Imad* Ali Mohammed Habib Mahmoud, then Deputy General Commander of the Army and Armed Forces and Minister of Defence, SYR.D0018.071.001_ET at 001 and Ex. C-66, Circular, dated 21 August 2011 signed by *Imad* Dawoud Rajiha, (who took over from Mahmoud in August 2011), SYR.D0069.029.001_ET at 001.

and the Chief of Staff[138] as well as documents signed by the Head of the Operations Commission himself.[139]

84.     The General Command also consisted of a series of other specialist staff branches, administrations, commands or departments.   Examples of this included the Organisation and Administration Department,[140] Officers' Affairs Administration,[141] Special Forces Command[142] and the Artillery and Rocket Forces.[143]   These specialist bodies dealt with aspects of their relevant competency and would disseminate instructions to the lower formations within their specialisation.[144]

85.     The General Command not only disseminated instructions and circulars to subordinate units through the Operations Commission/Administration, it also initiated a process by

---

[138]   *See, e.g.* Ex. C-23, Circular, dated 13 January 2012 signed by *Imad* Fahd Jasem al-Freij, Chief of Staff of the Army and Armed Forces, SYR.D0020.053.019_ET at 019 and Ex. C-113, Circular, dated 24 April 2012, SYR.D0124.028.001_ET at 001.

[139]   *See, e.g.* Ex. C-25, Circular from the General Command of the Army and Armed Forces, dated 22 July 2011, SYR.D0021.001.012_ET at 012.

[140]   *See, e.g.* Ex. C-12, Administrative instruction, dated 22 August 2011, SYR.D0017.027.001_ET at 001.

[141]   *See, e.g.* Ex. C-138, General Command of the Army and Armed Forces, Officers' Affairs Administration promotion list, dated 31 December 2011, SYR.D0220.041.007-008_ET at 007.

[142]   *See, e.g.* Ex. C-55, General Command of the Army and Armed Forces, Special Forces Command instruction to the 46th Special Forces Regiment, dated 01 April 2012, SYR.D0061.003.001_ET at 001.

[143]   *See, e.g.* Ex. C-140, Circular from the General Command of the Army and Armed Forces, Artillery and Rocket Forces sent to the Commanders of Formations and Units, dated 22 August 2012, SYR.D0234.021.014_ET at 014.

[144]   *See, e.g.* Ex. C-139, Circular from the Commander of the Artillery and Rocket Forces to the Heads of Artillery of Corps, Divisions and Independent Regiments, dated 09 December 2012, SYR.D0234.021.005-006_ET at 005-006.

which daily reports were to be compiled by subordinate units and disseminated back up the chain of command to the General Command.[145]

86.    One example, on 07 May 2011, noted the General Command issuing an instruction that units were to provide a daily report in writing on the situation up until 1800hrs that day.[146] The report was to cover the situation in the area, activities carried out by the unit, losses (in detail including injured, killed and equipment losses), details of opposition activity (including demonstrations, acts of vandalism and disorder, shootings as well as information on opposition members injured, killed and detained).  Accuracy was requested and units were to bear responsibility in cases of delay.[147]

87.    In another instance, an instruction of 15 January 2012, issued by *Imad* Dawoud Rajiha (then Deputy General Commander of the Army and Armed Forces/Minister of Defence) stated that all heads of commissions, departments and administrations and commanders of forces, troops, legions, formations and units were '*requested to immediately report any emergency personally to the General Command of the Army and Armed Forces - Operations Commission through the orderly officer*'.[148]  A detailed report of the incident was to be sent later.  The General Command also disseminated circulars requesting details on those who had been killed.[149]

88.    Taken together, these types of instructions point to a General Command exercising command authority in order to ensure that it was kept informed through a daily reporting process

---

[145] *See, e.g.* Ex. C-17, Instruction from the Northern Region Command, dated 08 May 2011, to subordinate units based on an instruction of the General Command of the Army and Armed Forces of 07 May 2011, SYR.D0018.019.001_ET at 001.

[146] *Ibid.*

[147] *Ibid.*

[148] Ex. C-22, Circular from the General Command of the Army and Armed Forces, dated 15 January 2012, SYR.D0018.071.014_ET at 014.

[149] *See, e.g.* Ex. C-21, Circular from the General Command of the Army and Armed Forces, dated 20 November 2011, SYR.D0018.071.008_ET at 008.

from all its subordinate units.  It should also be remembered that the Deputy General Commander of the Army and Armed Forces/Minister of Defence was a key member of the CCMC and he would most likely use these daily reports (that he expected to be provided by the subordinate military units) to brief the other members of the CCMC on a regular basis.

89.    Subordinate to the General Command of the Army and Armed Forces were all the various formations, headquarters, units, training establishments and facilities of the military.  By far the largest components were the formations and units of the army.  The Syrian Army is comprised of a series of corps, divisions and independent brigades, the key operational formations of the army.[150]

90.    The three corps of the army at the beginning of the current conflict were the 1st Corps, the 2nd Corps and the 3rd Corps.  In relation to Homs, the 3rd Corps covered the governorate. At the end of 2011, the 3rd Corps consisted of three Divisions: the 11th Tank Division, the 18th Tank Division and the 17th Mechanised Division.  Elements of the 3rd Corps were actively engaged in military operations in Homs, in particular the inspection operations that took place in 2011, the establishment and operation of checkpoints in and around the city of Homs, the shelling of the city and the main attack on the Baba Amr neighbourhood in February 2012.

91.    A separate Special Forces Command existed (part of the General Command of the Army and Armed Forces) and the Commander of the Special Forces in 2011 and into early 2012 was Major General Fuad Ahmad Hammouda.[151]

---

[150]  *See, e.g.* Ex. C-137, Undated annex, SYR.D0220.004.009-012_ET at 009-012; Ex. C-19, Circular, dated 24 July 2011, SYR.D0018.071.001_ET at 001; Ex. C-27, Instruction to the Commands of the Central, Northern and Coastal Regions from the Operations Commission of the Army and Armed Forces, dated 29 May 2012, SYR.D0021.024.023_ET at 023.
[151]  *See* Ex. C-55, Special Forces Command instruction to the 46th Special Forces Regiment, dated 01 April 2012, SYR.D0061.003.001_ET at 001.

92.    The Special Forces as a whole appeared to have consisted of two Special Forces divisions (the 14th Division[152] and the 15th Division[153]) as well as a number of independent Special Forces regiments.[154]

93.    The Special Forces appear to have been deployed countrywide as individual units (or sub-units) and where this happened they seem to have been placed under the command of the senior military commander of the area of their deployment.  One example of this is in Homs, where evidence indicates that in early 2012 the elements of the 41st and 554th Special Forces Regiments were deployed, although they came under the command of the Homs Military and Security Chief.[155]

94.    Aside from the three key Corps and the units of the Special Forces Command, two other important units should be referenced.  These are the 4th Tank Division[156] and the Republican Guard.[157]  The 4th Tank Division has historically been seen as an elite unit of the army and is regarded as having some of the best equipment available.  The Division is based in Damascus.

---

[152]  *See* Ex. C-122, Military Intelligence Branch 271 letter, dated 25 June 2012, SYR.D0179.004.050_ET at 050.  This makes reference to the movement of '*Battalion /963/ of Regiment /556/ Division /14/Special Forces*' to Idleb.

[153]  *See, e.g.* Ex. C-146, CCMC report on the Security Situation, dated 03 May 2011, SYR.E0001.006.020-023_ET at 023.  This noted that in Dar'a security forces, along with units from the 15th Special Forces Division and the 7th Mechanised Division, were inspecting farms and arresting wanted individuals.

[154]  Ex. C-56, Document from the 46th Special Forces Regiment, dated 03 January 2012, SYR.D0061.028.114_ET at 114.  This document is annotated '*Extract from the Commands and Formations Code Manual*' and gives the communications codes for the various Regional Commands and Special Forces units; Ex. C-108, Military Intelligence Branch 261 letter, dated 03 April 2012, SYR.D0124.024.003_ET at 003.

[155]  *Ibid.*

[156]  Ex. C-16, Letter from the 4th Tank Division to the Infantry Training School, dated 30 October 2011, SYR.D0018.014.026_ET at 026; Ex. C-15, List of officers from the 4th Tank Division selected to attend a platoon commander's course, dated 13 November 2011, SYR.D0018.013.005_ET at 005.

[157]  *See, e.g.* Ex. C-104, Branch 261 report sent to '*Mr. Major General Naim Jassem Suleiman*

95.     The Republican Guard is a formed division of the Army and Armed Forces that historically has the role of protecting the capital and the key government facilities in the city.  It has a reputation of being one of the most elite and trusted military units in the Armed Forces.  The key operational formations of the Army and Armed Forces in 2011 - 2012 are represented in the simplified diagram at Figure 2 below.



Fig. 2.

96.     Syria was also divided into five military Regional Commands.  These were the Southern, Northern, Eastern, Central and Coastal Region Commands.[158]   The Central Region

---

*The General Military and Security Chief in the Homs Governorate*', dated 22 May 2012, SYR.D0124.021.002_ET at 002.  This notes the Republican Guard Command on the distribution list.
[158]  Ex. C-56, Document from the 46th Special Forces Regiment, dated 03 January 2012, SYR.D0061.028.114_ET at 114.  This document is annotated '*Extract from the Commands and*

Command covered the governorates of Homs and Hama.  In terms of the function of the Regional Commands, it appears that they generally fulfilled (at least in part) a garrison, administrative or logistic/support function to the operational units stationed within their area.

### F.       Governorate Security Committees

97.       A critical body utilised by the Syrian Regime from the beginning of the current conflict was the governorate-level Security Committees.[159]  The Security Committees were not a new phenomenon, having existed before the current crisis.   These were, in fact, long-standing Ba'ath Party bodies that brought together senior representatives from all the key political, military, police and intelligence/security branches within the governorate in order to discuss, plan, co-ordinate and disseminate information on security related matters.

98.       The Security Committee provided an important mechanism by which the Regime could ensure that information was sent to and disseminated from the governorates, that plans and directives could be sent from the national leadership (the CCMC and NSB) and that these plans and decisions were implemented by all the relevant governorate-level security bodies.   The Security Committees also facilitated a flow of information between the various intelligence/security, political

---

*Formations Code Manual*' and gives the communications codes for the various Regional Commands and Special Forces units.

[159]   The governorate Security Committees, which were well-established prior to the 2011 crisis, should not be confused with the *ad hoc* structures that were formed later in 2011 in a number of tense governorates as part of the Regime's militarisation of the conflict.  Unlike the regular Security Committees, these *ad hoc* structures were headed by a senior military official with a deputy (normally from an intelligence agency).  They were called by a variety of names like the 'General Military and Security Chief in the Homs Governorate' or simply 'Military and Security Chief' (*See, e.g.* Ex. C-99, Intelligence report from Military Intelligence Branch 261 to *Imad* Ali Abdullah Ayoub, Deputy Chief of Staff –The General Military and Security Chief in the Homs Governorate, dated 28 March 2012, SYR.D0124.013.004_ET at 004) or in Idleb, the 'Head of the Security and Military Committee' (*See, e.g.* Ex. C-126, Communication from the Security and Military Committee in Idleb, dated 13 February 2012, SYR.D0181.056.025_ET at 025).  These *ad hoc* bodies are discussed below, in Section III.G.

and military bodies within the governorate by acting as a key co-ordinating body for all security related issues.

99.     Documentary evidence indicates that the Security Committees within the various governorates operated along similar lines.  The governorate Ba'ath Party Secretary was normally the Head (or Chairman) of the Security Committee with additional representation from the political leadership normally being added through the presence of the Governor.  The Heads of the various governorate security/intelligence branches and the chief (or head) of the governorate police were members and often some military representation was noted.[160]

100.     Homs governorate operated a Security Committee in much the same manner as other areas.  One early reference to the existence of the Homs Security Committee is dated 12 April 2011.[161]  This composite security report of the CCMC noted that the Homs Security Committee '*confirmed that pre-emptive measures*' were going to be taken in order to prevent any '*negative demonstration*' from taking place.  It recommended to the CCMC the tracking and arrest of rioters in various areas in Homs (including Bab Amr).[162]

101.     The tasks of the governorate Security Committees were notably varied but their primary function was to co-ordinate the general security response of all the security elements in the governorate.  Tasks identified in contemporaneous documentation included co-ordinating and

---

[160] *See, e.g.* Ex. C-78, Communication from Deir ez-Zor Branch of the Ba'ath Party, dated 15 April 2011 attaching minutes of meeting of the Security Committee for Deir-ez-Zor held on 14 April 2011, SYR.D0080.051.117-121_ET at 117-121.
[161] Ex. C-150, CCMC Report on the Security Situation, dated 12 April 2011, SYR.E0001.006.064-067_ET at 064.
[162] *Ibid.*

mobilising of Ba'athist or loyalist groups,[163] dealing with the arrest[164] or summoning of '*instigators*' and demonstrators[165] and planning for and overseeing inspection or security operations.[166]

102.    The Security Committees were closely linked to the highest levels of the Regime through their relationship with the CCMC and the NSB.  The Security Committees allowed for the passage of information and instructions to and from these national level bodies and as the crisis developed in Syria, the Security Committees provided an important mechanism by which the CCMC/NSB collected information about developments in each of the governorates and were able to disseminate back decisions and plans for implementation at the local level.  References in CCMC reports clearly indicate that information from the governorate Security Committees was being received by the CCMC with the regular reports on the security situation compiled in governorate order summarising the security information from these specific areas.[167]

103.    Other CCMC reports also note that specific requests were made by Security Committees to the CCMC for a decision and authority and subsequently acted upon.  A series of references from Homs in July 2011 clearly demonstrates a communication process between the CCMC and the Homs Security Committee.  As the situation in Homs deteriorated through the summer months of 2011, the Homs Security Committee both received instructions from and

---

[163]  *See, e.g.* Ex. C-78, Communication from Deir ez-Zor Branch of the Ba'ath Party, dated 15 April 2011 attaching minutes of meeting of the Security Committee for Deir-ez-Zor held on 14 April 2011, SYR.D0080.051.117-121_ET at 120.

[164]  *Ibid.*

[165]  *See, e.g.* Ex. C-124, Report from the Head of the Security Committee in Idleb to the NSB, dated 23 April 2011, SYR.D0180.039.036_ET at 036; Ex. C-184, Minutes of Meeting of the Security Committee for Ar-Raqqa of 09 May 2011, dated 10 May 2011, SYR.E0006.001.007-008_ET at 008.

[166]  *See, e.g.* Ex. C-171, Minutes of a CCMC Meeting held on 20 July 2011, dated 21 July 2011, SYR.E0001.015.003-004_ET at 003.

[167]  *See, e.g.* Ex. C-149, CCMC report on the security situation in the region, dated 11 May 2011, SYR.E0001.006.061-063_ET at 063.

suggested plans back to the CCMC for more aggressive security operations.[168]  On 17 July 2011, the CCMC met and after '*examining the security situation, the developments in current and expected events*' and '*appropriate methods to handle the situations*' tasked:

> . . . the [S]ecurity [C]ommittee in the governorate of Homs to implement the following:
>
> - *Conduct inspection in the city districts that need to be urgently inspected;*
> - *Start immediately from the eastern city districts and arrest the wanted persons;*
> - *Search for the perpetrators of crimes and hand them over to the judiciary[.]*[169]

104.    Based on this, it is evident that the Homs Security Committee had received the tasking and submitted proposals back to the CCMC for its execution.  On 20 July 2011, the CCMC again discussed the situation in Homs.[170]  It noted that:

> *The situation in the city of Homs was examined alongside the chances of the situation evolving and the security violations perpetrated in the city. Available means for controlling the situation, enforcing state authority and catching instigators, offenders and perpetrators of terrorist acts were reviewed. Propositions submitted by the Homs Governorate Security Committee were studied.*
>
> *[. . .]*
>
> *The importance of all security agencies and committees committing to the implementation of decisions issued by the leadership was underlined, in addition to holding accountable neglecters and non-compliers with specified missions and the importance of changing the members of some security committees and agencies.*[171]

One of the decisions taken at the CCMC meeting was to:

> *Assign[ ] Comrade Head of the National Security Bureau and Comrade Minister of [the] Interior to meet with the Homs Governorate Security Committee to discuss their propositions submitted on 20/7/2011 on the ground, arrive at and proceed with*

---

[168]  These operations were often referred to as '*inspection*' operations.  *See, e.g.* Ex. C-181, CCMC Decision No 3413, dated 18 July 2011, SYR.E0001.017.001_ET at 001.  This instructs the Homs Security Committee to '*conduct inspection in the neighbourhoods that need to be urgently inspected*'.

[169]  *Ibid.*

[170]  Ex. C-171, Minutes of a CCMC Meeting held on 20 July 2011, dated 21 July 2011, SYR.E0001.015.003-004_ET at 003-004.

[171]  *Ibid.* at 003-004.

*implementing the best decisions, and identify the actual needs of military units necessary for completing all missions.*[172]

105.    On 24 July, the CCMC assigned the Head of the NSB and the Minister of Interior to visit Homs and '*discuss the plan of the [S]ecurity [C]ommittee in the governorate to address the security situation on the ground*' and '*to study the possibility of launching dialogue with community figures in the city to achieve security and stability there and finalize the implementation of the balanced inspection plan of its city districts*'.[173]

106.    A few days after this, the CCMC reported that an inspection operation was underway in neighbourhoods of Homs[174] and that on 01 August 2011, an inspection operation in al-Bayada neighbourhood had resulted in the arrest of forty-one individuals.[175]

107.    Despite the activity of the CCMC, NSB and the Security Committees in suppressing the opposition during the spring and summer months of 2011 the security situation in Syria was not resolved, in fact it significantly worsened.  Attacks on demonstrators, large scale arrests of opposition members, media activists and co-ordinators as well as the implementation of forceful military and security operations led to a hardening of opposition support and the gradual growth and escalation of armed opposition activity to defend opposition areas and attack security elements.  In turn, the Regime ratcheted up their own response.

108.    The period around the appointment of Hassan Turkomani as the Head of the CCMC in October 2011 was a pivotal point that further escalated the direct engagement of the

---

[172]  *Ibid.* at 004.
[173]  Ex. C-172, Minutes of a CCMC Meeting held on 23 July 2011, dated 24 July 2011, SYR.E0001.015.005-007_ET at 007.
[174]  Ex. C-143, CCMC Report on the Security Situation in the country, dated 29 July 2011, SYR.E0001.005.024-025_ET at 024.
[175]  Ex. C-141, CCMC Report on the Security Situation in the country, dated 01 August 2011, SYR.E0001.001.003-005_ET at 003.

national leadership and significantly militarised the Regime's response.  The role of the Security Committee as the key focal point in the governorates began to shift (in particular in the tense governorates of Idleb, Homs, Hama and Dar'a where opposition activity was particularly strong).  In essence, in these governorates the role of the regular governorate Security Committee changed around the autumn of 2011 with the appointment of senior military officials to command the security forces in the governorate.  It appeared that the senior leadership of the Regime believed that the Security Committees had not been able to fully control the worsening security situation and there was a need to further militarise the response.  These new Military and Security Chiefs were appointed as an attempt to better co-ordinate all the security operations in the governorate, especially in response to the growth and activity of armed opposition groups.

### G.    GOVERNORATE MILITARY AND SECURITY CHIEFS

109.    In the autumn of 2011, responding to the worsening crisis, the national leadership significantly tightened their control and began implementing a series of measures to further suppress opposition activity and defeat armed groups that were being formed and beginning to grow.  These measures included the appointment of senior military officers ('Military and Security Chiefs')[176] in order to take charge of security operations in tense governorates and better co-ordinate the work of all security, intelligence and military bodies in these areas.

110.    A key period in the establishment of the Military and Security Chiefs appeared to be around late October 2011, following the appointment of Hassan Turkomani as Head of the CCMC.  The minutes of the CCMC meeting of 22 October previously referenced in this report

---

[176]  The term in Arabic that appears in the documents for this particular position is *mas'ul*.  A literal translation would be '*the person responsible for*' as in '*the person responsible for the Military and Security*'.  An accepted translation for this word in English would be '*Chief*' or '*Official*'.  In order to have a succinct translation for this particular position, for the purposes of this brief the word '*Chief*' will be used although '*Official*' would also be acceptable.

discussed a series of wide-ranging issues including detailed instructions to plan for the '*next phase*' of their work.[177]   Turkomani stressed that problems would be meticulously and objectively studied, that every issue would be '*soundly analyzed*', solution-oriented conclusions reached, decisions taken and recommendations would be raised to the President for ratification.[178]   New work mechanisms would be presented and the implementation of decisions and plans would be followed by '*intervention*' when dysfunction was noted.   The importance of seeking to '*create a welcoming environment for implementing elements*', methods '*to win the public opinion*' and '*render residents cooperative*' was discussed.[179]

111.    Discussions at this meeting also centred on the weaknesses of the security apparatus and the '*importance of binding security agencies to fully and seriously implement*' the tasks of the CCMC.[180]   The value of fieldwork was studied and the need for the CCMC to move to some crisis areas '*for a day or two to study the field situation and radically solve the problem*' was highlighted.[181]

112.    The CCMC made several decisions at this key meeting including that: CCMC personnel were to carry out field visits to supervise the implementation of tasks; circulars and written orders were not to be considered sufficient in the implementation of instructions; tasks were to be clearly specified; and '*implementing elements*' were to set work plans, file follow-up reports and monitor the implementation of plans.[182]   The clear message from this particular meeting was of a CCMC, under a new chairman, attempting to control a deteriorating security situation by tightening procedures and further gripping the security response.

---

[177]   Ex. C-176, Minutes of Meeting of the CCMC on 22 October 2011, dated 23 October 2011, SYR.E0001.015.022-023_ET at 022.
[178]   *Ibid.*
[179]   *Ibid.*
[180]   *Ibid.*
[181]   *Ibid.*
[182]   *Ibid.* at 023.

113.     As part of this tightening of control, a few days later the CCMC decided to more closely monitor the work of the governorate Security Committees by placing a '*commander*' to supervise their work.[183]   The minutes of a CCMC meeting on 26 October note:

> *The role and importance of implementing decisions made by [S]ecurity [C]ommittees were examined, and a commander was nominated to be in charge of supervising the implementation of these decisions by security agencies and military units according to the content of each decision.[184]*

114.     References at this meeting also note that the members of the CCMC were beginning to implement the decision they had taken days earlier with regard to field visits and the enhanced role of individuals within the CCMC.  It was specifically noted, for example, that Major-General Muhammad Dib Zeitoun, the Head of the Political Security Department was to '*command security agencies and armed forces units*' in Homs governorate.[185]  This appeared to have enhanced Zeitoun's role as he had, in early September, been tasked simply '*to follow up on the mission assigned to him in the governorate of Homs*'.[186]

115.     In November, an important series of discussions and decisions in the CCMC indicated clearly that the leadership believed additional measures were needed to further strengthen the command and control of security bodies in key governorates.   On 19 November 2011, a discussion took place within the CCMC regarding the '*positive effect of replacing or transferring some heads of security and police sections or agencies who have fallen short of fulfilling their professional*

---

[183]  Ex. C-178, Minutes of CCMC Meeting on 26 October 2011, dated 27 October 2011, SYR.E0001.015.028-030_ET at 028.

[184]  *Ibid.*

[185]  *Ibid.* at 029.

[186]  Ex. C-174, CCMC Minutes of the Meeting, dated 04 September 2011, SYR.E0001.015.017-018 at 018.

*duties.'*[187] Taken together with the earlier decision to have a senior figure from the CCMC to command the Security Committees, the implication here was that the leadership was unhappy with the leadership at governorate level in tackling effectively the security situation.

116.     Two days after the 19 November discussion, further enhancements were proposed with the CCMC considering:

> *the positive impact of appointing military commanders with recognized competence and experience to command operations, especially in hot governorates; vesting them with the power to command all superiors and heads of civil, military and security agencies in the district; and the importance of coming up with creative solutions to end the crisis*[.][188]

117.     Reinforcing that the commanders being considered were to be military (i.e. army) personnel (rather than civilian or intelligence/security officials), the Minister of Defence (*Imad Dawoud Rajiha* – who was concurrently the Chief of Staff of the Army and Armed Forces) was tasked to '*propose the appropriate commanders for operations in hot governorates: Idleb – Hama – Homs… etc'.*[189]

118.     This decision is of critical importance in marking a shift in the command and control of security operations from the civilian/intelligence/security bodies to the military (at least in the governorates that were destabilising and witnessing significant security problems).  The national leadership clearly believed that the measures taken in the previous months had not been fully successful and the bodies tasked with controlling the situation had been unable to achieve the aim of suppressing and defeating opposition activity.  The situation had evidently deteriorated to such a degree that experienced military commanders needed to take charge.

---

[187] Ex. C-179, CCMC Minutes of the Meeting on 19 November 2011, dated 20 November 2011, SYR.E0001.015.043-045_ET at 044.
[188]  Ex. C-180, Minutes of the CCMC Meeting on 21 November 2011, dated 22 November 2011, SYR.E0001.015.046-048_ET at 047.
[189]  *Ibid* at 048.

119.     It is clear that the Minister of Defence did as he was tasked in proposing commanders as, on 23 November (i.e. within two days), the CCMC instructed him to issue special orders to '*appoint the commanders with the powers to command the operations in the tense governorates*'.[190]   This instruction was, in turn, seemingly actioned by the Minister of Defence as documentary references note that in Idleb, Hama and Homs, military commanders were appointed to take charge of security operations in those governorates.

120.     An important piece of documentary evidence identifying the appointment process of a senior army commander (as instructed by the CCMC) comes from Idleb governorate.  Three days after the CCMC meeting of 23 November in which the Minister of Defence was tasked to appoint commanders, an order was issued, authorised by the President and signed by the Deputy General Commander of the Army and Armed Forces/Minister of Defence (Rajiha), appointing Major General Fuad Hammouda (who at that time was the Commander of the Special Forces) to command all security forces (military, intelligence/security and civilian bodies) in Idleb governorate.[191]   The appointment order essentially centralized all civilian, military and security personnel under Hammouda's command, making him the most important security commander in Idleb.  The order specified that Hammouda was to be:

> … *charged with the command of all military units and formations, the different security forces, the internal security forces and the government and party authorities in Idleb Governorate and is considered head of the [S]ecurity [C]ommittee*'.[192]

---

[190] Ex. C-189, Minutes of the CCMC Meeting on 23 November 2011, dated 24 November 2011, SYR.E0013.002.058-059_ET at 059.
[191] Ex. C-120, Administrative Order from the General Command of the Army and Armed Forces, dated 26 November 2011, SYR.D0178.001.007_ET at 007.  That President Bashar Al-Assad appears in the signature block of Hammouda's appointment order indicates the high level of decision-making that this appointment entailed.
[192] *Ibid.*

121.     This order effectively delegated the powers of the Security Committee to Hammouda and made him the commander of all the security elements in Idleb.  After this date, documentary references noted the intelligence/security branches sending information reports to the *'Major General, Head of the Security Committee'*[193] (i.e. Hammouda) and what was known in Idleb as the *'Head of the Security and Military Committee'*.[194]

122.     The order appointing Hammouda to command all security bodies in Idleb was dispatched to the Ministry of Interior, Heads of the Intelligence/Security agencies in Damascus, the CCMC, and the Special Forces Commander.[195]  This wide distribution was presumably because the various organisations needed to be informed in order to ensure that the order was complied with particularly because these security bodies were not usually under the command of the army.

123.     It is of note that the order also stipulated that a daily report was to be compiled containing *'all activities'* carried out in the governorate and was to be sent to the Operations Commission of the General Command of the Army and Armed Forces.[196]  This would appear to again underscore the primacy of the army in Idleb from this point onwards.

124.     The establishment of a security body headed by a senior military officer was not limited to Idleb governorate.  The CCMC decisions that discussed the issue of placing military

---

[193]  *See, e.g.* Ex. C-125, Communication from Branch 331 to '*Major General, Head of the Security Committee of the Governorate of Idleb*', dated 10 February 2012, SYR.D0181.053.027_ET at 027.
[194]  *See, e.g.* Ex. C-126, Communication from the Security and Military Committee in Idleb, dated 13 February 2012, SYR.D0181.056.025_ET at 025.  This reference is signed by '*Paratrooper Major General Fuad Ahmad Hammouda[,] Commander of the Special Forces[,] Head of the Security and Military Committee in the Governorate of Idleb*'.
[195]  Ex. C-120, Administrative Order from the General Command of the Army and Armed Forces, dated 26 November 2011, SYR.D0178.001.007_ET at 007.
[196]  *Ibid.*

commanders in charge focussed on the '*hot governorates*' of '*Idleb – Hama – Homs*'.[197]   Documented references note that along with Idleb and despite being referred to by slightly different titles, military commanders were indeed appointed in Homs,[198] and Hama[199] governorates.   Furthermore, earlier in 2011 a '*high-level political and military committee*' was established in Dar'a to deal with the demonstrations that had erupted in the early months of the conflict.[200]   It is very possible that the model from Dar'a, involving the establishment of some form of joint military/security structure was simply adopted later in the year as the security situation deteriorated in the other tense governorates.

125.    Two points underscore the importance of the Military and Security Chiefs: firstly, the discussion and decision-taking that resulted in the establishment of Military and Security Chiefs in key governorates occurred at the highest level at the CCMC.   Secondly, the individuals appointed to these positions had significant seniority.   As noted above, in the initial discussions at the CCMC, it was proposed to appoint military commanders '*with recognised competence and experience to command operations*'.[201]   In Idleb, the appointed military official was the Head of the Special Forces, Fuad Hammouda, who had been operating in that governorate since the summer of 2011.   In Homs, the individual appointed was a Deputy Chief of Staff of the Army and Armed Forces, Major General Ali bin Abdullah Ayoub.[202]   Not only was the position that Ayoub held significant (one of

---

[197]  Ex. C-180, Minutes of the CCMC on 21 November 2011, dated 22 November 2011, SYR.E0001.015.046-048_ET at 048.

[198]  *See, e.g.* Ex. C-99, Report from Military Intelligence Branch 261 to the '*General Military and Security Chief in the Homs Governorate*', dated 28 March 2012, SYR.D0124.013.004_ET at 004.

[199]  *See, e.g.* Ex. C-30, General Intelligence Branch 320 report to the '*Security and Military Chief in the Hama Governorate*', dated 29 November 2012, SYR.D0035.053.029_ET at 029.

[200]  Note the Ex. C-129, Minutes of Meeting of the CCMC of 22 April, dated 23 April 2011, referencing that a '*high-level political and military committee will be established to command action in the governorate of Dar'a*', SYR.D0183.015.018-020_ET at 020.

[201]  Ex. C-180, Minutes of the CCMC on 21 November 2011, dated 22 November 2011, SYR.E0001.015.046-048_ET at 047.

[202]  Ex. C-57, Appointment Order, dated 10 August 2011, SYR.D0063.010.008_ET at 008.

the most senior army officers of the Regime), but he had been involved in security tasks in Dar'a earlier in 2011.[203]

### H.   REGIME LOYALIST FORCES

126.    Although the Syrian Regime predominately utilised the formal security structures (the security and intelligence agencies, army and police) to suppress anti-Regime demonstrations and organisations and to confront the growing armed opposition groups, its security response also featured the mobilisation and use of pro-Regime loyalist (or paramilitary) groups.   As discussed below, documentary evidence indicates that such groups were mobilised, utilised and worked with or were folded directly into the formal security apparatus from the outset of the Syrian conflict. Evidence indicates that such groups were used in security operations that included the suppression of demonstrations, the guarding of facilities, employment on checkpoints and operationally securing territory taken back from the opposition control.

127.    The term routinely utilised to reference such paramilitary groups is '*shabbiha*'.   This has, to a degree, become a common colloquial and, at times, ill-defined or 'catch-all' label used to reference an array of organised groups especially where their identity may be unclear.   In essence, *shabbiha* can be a potentially unhelpful phrase that can mask a number of recognised pro-Regime groups.   These can include mobilised pro-Regime loyalists, Ba'athist supporters, village defence forces, tribal groups, Regime Popular Committees and other paramilitary groups.[204]

---

[203]  Ex. C-64, Letter from the Ministry of Local Administration in Dar'a, dated 14 May 2011, SYR.D0065.002.096_ET at 096.

[204]  As a term, *shabbiha* has generated something of its own momentum in the Syrian conflict.   It has been utilised heavily by the opposition, routinely used by the media and international actors but does not always assist in understanding the context, nuance, variety or development of key defined Regime loyalist or paramilitary groups nor their link to the formal security structures.   It is also not a phrase routinely utilised by the Syrian authorities in their own documentation.   For the purposes of this report, the term, *shabbiha* will not be used preferring, where possible, to identify the specific

128.     Documentary references indicate that pro-Regime loyalist groups were mobilised and utilised from the very early stages of the conflict.   Initially such groups were used as a means of detecting opposition activity and as additional eyes and ears for the Regime.[205]   As demonstrations and opposition activity spread, however, the Regime enhanced the activity of many loyalist supporters and groups.   Not only were they used as a means of reporting or intelligence gathering but they were further mobilised or placed on a high alert[206] and their activity streamlined.[207]   They were engaged directly in the monitoring of mosques and opposition activity[208] and they reported on or directly confronted the actions of opposition supporters.[209]   Such groups included Ba'athist loyalists, trade unionists, loyal student groups, local 'popular' or partisan organisations, community leaders and influential dignitaries.[210]

---

groups linked to the Regime itself or using the more generic term pro-regime 'loyalist' or 'paramilitary groups'.

[205]   *See, e.g.*, Ex. C-48, Military Intelligence Branch 243 (Deir-ez-Zor and ar-Raqqah) instruction, dated 02 March 2011, SYR.D0043.004.250_ET at 250.   This instructs to '*mobilise and activate all security personnel, informers, sources, political party divisions, popular organizations, leaders of National Progressive Front parties and all friends who should be mobilised to detect any graffiti, publications or assemblies within their work areas.*'

[206]   Ex. C-45, Instruction from Tal Abyad Military Intelligence Branch, dated 30 March 2011, SYR.D0043.004.214_ET at 214.   This instructed that (after a meeting of the local Security Committee) '*Baathist comrades, popular organisations and community leaders*' were to be placed on a state of high alert and they were instructed '*to be vigilant to detect any movement that attempts to disrupt security*'.

[207]   Ex. C-52, Report from Tal Abyad Military Intelligence Branch, dated 08 April 2011, SYR.D0043.005.107_ET at 107.

[208]   Ex. C-43, Military Intelligence Branch 243 instruction, dated 31 March 2011, SYR.D0043.004.210_ET at 210.   This instructed subordinate detachments and sections that the '*party apparatus – active members and supporters –*' should be mobilised and '*urged to be present at mosques in large numbers*'.

[209]   *See, e.g.* Ex. C-42, Military Intelligence Branch 243 instruction to all sections and detachments, dated 06 April 2011, SYR.D0043.004.203_ET at 203.

[210]   *See, e.g.* Ex. C-77, Minutes of the Security Committee in Deir-ez-Zor, dated 25 March 2011, SYR.D0080.051.090-094_ET at 091-092; Ex. C-51, Military Intelligence Branch 243 instruction, dated 11 April 2011, SYR.D0043.005.100_ET at 100.

129. The Ba'ath Party was clearly able to provide the most convenient and effective structure to draw upon and Ba'athist loyalists became quickly (and heavily) utilised by the Regime in tackling the demonstrations as they grew in size and intensity. The Ba'ath Party already had a functioning organisation with party branches, divisions and sub-divisions and contemporaneous documents identify that this party structure was used by local and governorate Security Committees allowing them to more easily mobilise pro-Regime Ba'athist members,[211] and organise their activity.[212]

130. In addition to the existing Ba'ath Party structures, the Regime also established a new organisation to assist in confronting the opposition: the Popular Committees. Popular Committees were, most likely, formed around the end of March or early April 2011, utilizing the Ba'ath Party apparatus and, to a significant part, Regime loyalists.[213] In many ways, the Popular Committees became another formalised organisation within the wider local Ba'ath Party structure, which was itself under the instruction and tutelage of the local Security Committees, intelligence agencies and police.[214] It appears that the Popular Committees were formed out of general loyalist 'popular organisations', mobilised early in the conflict and used to confront demonstrations and opposition activity, particularly after mosque prayers. One reference in April 2011, from Military Intelligence Branch 243 (Deir-ez-Zor and ar-Raqqah governorates), noted the role of both the mobilised

---

[211] *See, e.g.* Ex. C-76, Minutes of the Deir-ez-Zor Security Committee, dated 04 May 2011, SYR.D0080.050.003-006_ET at 003.

[212] Ex. C-87, Instruction for an '*Armed Ba'athist Faction*' course the, dated 14 June 2011, SYR.D0097.048.010_ET at 010.

[213] *See, e.g.* Ex. C-44, Instruction from Head of Military Intelligence Branch 243 to subordinate sections and detachments, dated 30 March 2011, SYR.D0043.004.212-213_ET at 212. This noted that the level of readiness of the '*party apparatus*' and '*popular and trade union organisations*' was to be raised in order to confront opposition demonstrators who were planning activity on Friday 01 April. The party, popular organisations and trade unionists were to be deployed to mosques and used as a reserve force to be held at Ba'ath Party offices.

[214] *Ibid.*

Ba'athists and Popular Committees in tasking the subordinate sections and detachments of the Branch to:

> … *mobilize members of the Ba'ath Party in every district and form the so-called [P]opular [C]ommittees in every district so as to protect towns and defend public departments as well as confront anti-government elements and criminal gangs. Such committees should be supervised by partisan subdivisions and divisions in the said districts, and their work shall be streamlined by the [S]ecurity [C]ommittee in the districts and under your personal supervision in coordination with Ba'ath party officials.*[215]

131.    The existence of the Popular Committees was acknowledged directly by President Bashar al-Assad in a public address on 20 June 2011, where he stated that Popular Committees had been established by young people to protect the country.[216]

132.    In Homs governorate, the authorities mobilised loyalist and partisan groups in seemingly the same manner as in other governorates.  For example, on 27 April 2011, Dr. Yasser Houriyya (a member of the Regional Command of the Ba'ath Party), Subhi Harb (Head of the Homs Security Committee) and the Homs Governor met with '*members of the Party divisions commands and popular organisations in the district of Al-Qusayr'*.[217]  The purpose was to meet '… *with the popular dignitaries and the religious men and focus[] on nipping sedition in the bud and fending off the conspiracy.*'[218]

133.    On 11 May 2011, a CCMC report noted the visit of the then Assistant Regional Secretary of the Ba'ath Party, Mohammad Said Bekheitan, (*i.e.*, the Head of the CCMC) and

---

[215]  Ex. C-51, Military Intelligence Branch 243 Instruction, dated 11 April 2011, SYR.D0043.005.100_ET at 100.

[216]  Ex. C-90, Speech by President Bashar al-Assad at Damascus University, dated 20 June 2011, SYR.D0123.003.001-022_ET at 021.

[217]  Ex. C-154, CCMC Report on the Security Situation, dated 27 April 2011, SYR.E0001.006.182-185_ET and 183.

[218]  *Ibid.*

Hassan Turkomani (who later became Head of the CCMC) to Homs. [219]   The report referenced that they met with loyalist groups (*members of the Party's popular commands, and heads of popular organizations*) and it agreed that '*Ba'athist comrades*' should assist in dealing with the opposition. The city was to be divided into departments, each supervised by a leading member of the intelligence/security branch.   Loyalists were to be used when needed to assist in dealing with demonstrators.

134.    As the security situation throughout the country began to deteriorate and the armed opposition grew, the role of the Popular Committees, Ba'athists, pro-Regime defence groups and loyalist supporters become more militarised.   Not only did they maintain a role in confronting demonstrations or protecting government facilities but critically these groups were given the wider task of assisting in securing territory once taken back from opposition control.

135.    As discussed below in Section IV.A, a key instruction issued by NSB (as a result of CCMC discussions) in August 2011 highlights the role that pro-Regime groups were to be given in this regard.   On 05 August, the CCMC met and discussed issues to better co-ordinate the work of the security agencies in dealing with the security situation throughout the country.   The following day (06 August), the NSB passed instructions, based on these prior CCMC discussions, to governorate level Secretaries of the Ba'ath Party (*i.e.*, the Heads of governorate Security Committees (including in Homs)). [220]   The NSB instructed the Security Committees to conduct daily joint military/security operations, to arrest wanted individuals from clearly targeted groups, and to set up

---

[219]  Ex. C-149, CCMC Report on the Security Situation, dated 11 May 2011, SYR.E0001.006.061-063_ET at 061.
[220]  Ex. C-40, Communication from Military Intelligence Branch 294, dated 17 August 2011 attaching Instruction from the Head of the NSB to the Secretaries of the Ba'ath Party in Hama, Damascus Countryside, Deir-ez-Zor, Homs, Idleb and Dar'a governorates, dated 06 August 2011, SYR.D0043.004.093-094_ET at 094.

Joint Investigation Committees to process detainees.  In regards to loyalist paramilitary groups, the

CCMC/NSB also instructed that after the launching of such security operations and in areas

*'cleansed of wanted persons'* control was to be maintained in co-operation with the pro-Regime loyalist

groups.  The NSB specifically instructed that:

> *Once each sector has been cleansed of wanted persons, you are requested to maintain*
> *control of the sector by organizing security and party presence in the sector in cooperation*
> *with the city district committee, popular organizations, dignitaries, and influential*
> *supporters, so that no wanted person can seek shelter there again.*[221]

136.    In essence, this key instruction demanded that pro-Regime groups (clearly meaning

Popular Committees, Ba'athists, loyalists, defence groups and Regime supporters generally) were to

be used, alongside security bodies, to control territory on the completion of security operations.

Subsequent documents show that the CCMC/NSB instruction targeting the specified groups was

disseminated, not only through the Security Committees but also down the intelligence chain,

clearly emphasising its importance.[222]

137.    Giving the pro-Regime paramilitary groups the clearly defined role and responsibility

(authorised from the highest national levels of the Regime) of assisting in the control of territory is

critical to understanding why such groups ('*shabbiha*' as they are often referenced in public accounts)

were noted as being present during or after operations undertaken by the Syrian security forces.  This

is also an issue directly relevant to operations undertaken in Homs (and Baba Amr in particular)

where paramilitary groups were identified as being present and committing offences in

neighbourhoods that had been earlier secured by regular armed forces.

---

[221]  *Ibid.*

[222]  *See, e.g.* Ex. C-34, Military Intelligence Branch 243 instruction, dated 08 August 2011,
SYR.D0043.003.286_ET at 286; Ex. C-71, Political Security Department instruction, dated 16
August 2011, SYR.D0077.191.001_ET at 001.

## IV.    THE SYRIAN REGIME'S RESPONSE TO OPPOSITION ACTIVITY: SECURITY OPERATIONS IN HOMS AND THE ATTACK ON BABA AMR

138.    Having analysed the key institutions of the Syrian Regime's security apparatus in the previous Sections, this Report now presents a chronology of events culminating in the Syrian Regime's attack on the Baba Amr district in Homs city in February 2012.   After reviewing the Regime's general and nationwide response to opposition activity in Sub-Sections A and B, Sub-Section C focuses on the Regime's security operations in Homs from 2011 until January 2012.  Sub-Section D outlines the attack on Baba Amr in February 2012.

### A.    SECURITY RESPONSE TO OPPOSITION ACTIVITY (FEBRUARY – AUGUST 2011)

139.    From around February 2011 onwards, and in response to the emergence and rapid spread of anti-Regime demonstrations calling for greater freedoms, economic and social improvement and an end to corruption, the Syrian authorities implemented a series of repressive security measures to identify and curtail anti-Regime activity.   These measures initially began with the monitoring of opposition activity, the collection of information on incidents of relatively low-level protest (graffiti, small-scale acts of vandalism and localised demonstrations), the identification of participants and instigators, and the arrest of those involved.[223]

140.    From the very outset of these protests, the Regime viewed opposition activity through the lens of the problems afflicting neighbouring Arab states, where there had been a general call (particularly from the young) for change and greater personal freedoms.  A report disseminated

---

[223]  *See, e.g.* Ex. C-50, Circular from Military Intelligence Branch 243, dated 07 February 2011, SYR.D0043.004.263_ET at 263.  This makes reference to a wave of '*abusive*' graffiti on walls that was an '*insult to the reputation of security bodies in the region*'.   Subordinate sections are '*instructed to streamline the work of sources, informers, Ba'ath Party members, joint security patrols and the police to suppress these activities and arrest those responsible for organizing it*'.

by a Military Intelligence Branch on 12 March 2011 to its subordinate sections illustrates this.[224]
The Branch referenced information that had been discussed at the national level (*i.e.*, the NSB) and
noted:

> *Based on what transpired in the meetings of the National Security Bureau regarding the*
> *disturbances and events in some Arab countries witnessing youth revolutions calling for*
> *change, democracy, freedoms and reforms aimed at creating job opportunities for young*
> *men, improving living standards and fighting corruption, there have been attempts made*
> *by the opposition in Syria, civil society committees, human rights organisations inside and*
> *outside Syria and other suspicious parties to create similar conditions in Syria through*
> *mobilising and inciting the youth in Syria against the government. Such attempts were*
> *made using social networking sites, graffiti, distributions of bulletins and leaflets and*
> *other secret mechanisms to urge the youth to organise demonstrations and sit-ins in Syria*
> *under false pretexts which, if ignored, may lead the youth to take to the streets.*[225]

141.    This report, in particular, indicated knowledge within the NSB of the general
demands of freedom, democracy, and anti-corruption that had been something of a hallmark of the
Arab Spring movement in other States and a belief that this phenomenon was now spreading to
Syria.  Rather than considering the legitimacy of these articulated grievances, the national leadership
blamed this unrest on opposition and human rights groups, who they believed were inciting the
youth against the government with mobilisation occurring through social networking sites, graffiti
and the distribution of leaflets urging the organisation of demonstrations and sit-ins.  The report did
instruct the Military Intelligence and civil administrators not to provoke citizens, as this would '*serve*
*the purposes of Syria's enemies*' and it reflected the provision of detailed guidelines that the security
agencies were to abide by on the summoning and the detention of citizens.  Nonetheless, this report
was accompanied by an instruction to all sections and detachments as follows:

---

[224]  Ex. C-46, Military Intelligence Branch 243 Instruction to subordinate Sections and
Detachments, dated 12 March 2011, SYR.D0043.004.236_ET at 236.
[225]  *Ibid.*

*You are requested to intensify the work of informers, sources, Ba'ath Party members, and youth organisations in the collection of information concerning persons who distribute leaflets and write offensive graffiti for taking necessary action against them.*[226]

142.     The report and instruction appear to encapsulate the context of the Regime's initial response to the security situation that it faced in the early months of 2011.  As illustrated by the documents discussed below, the very groups referenced by the NSB as being a threat (those writing graffiti, utilising social media or participating in demonstrations) became some of the first directly targeted by the security and intelligence agencies for surveillance, arrest, and suppression.  Identified documentation in the possession of the CIJA from February onwards make reference to the collection of information on, and action to suppress and arrest members of, these particular groups.

143.     The monitoring of the media, especially the Internet and social media, was a particular focus.  On or around 04 February 2011, the NSB issued a decision, disseminated through the Military Intelligence, following calls over websites for demonstrations scheduled to take place on 04-05 February 2011.  This decision instructed all security bodies to intensify visits to websites, particularly Facebook, with the aim of flooding those sites that called for demonstrations in Syria.[227]  Other documents from this period demonstrate the existence of an active policy of monitoring opposition websites,[228] attempting to disrupt them and summoning, interrogating and prosecuting individuals deemed to be inciting others over the Internet.[229]

---

[226]  Ex. C-47, Instruction from Military Intelligence Branch 243 to subordinate Sections and Detachments, dated 12 March 2011, SYR.D0043.004.237_ET at 237.
[227]  Ex. C-53, Instruction from Military Intelligence Branch 243, dated 13 February 2011, SYR.D0043.005.142_ET at 142.
[228]  Ex. C-80, Instruction from the Head of the Political Security Department to all Heads of Security Branches in the governorates, dated 18 March 2011, SYR.D0081.033.005_ET at 005.  The instruction referenced information posted on Facebook and other websites calling for a protest on 17/18 March 2011.
[229]  Ex. C-6, Report from Ras Al Ain Detachment to Military Intelligence Branch 222, dated 14 February 2011 in response to Circular from Head of Military Intelligence Branch 222, dated 13

144.    On 13 February 2011, Military Intelligence Branch 243 (the Branch covering ar-Raqqah and Deir-e-Zor governorates) issued a report to its subordinate sections and detachments referencing an earlier NSB-issued letter.[230]  The NSB letter had clearly disseminated information regarding Al Jazeera TV.  The NSB alleged that Al Jazeera were frustrated because of a failed call for a '*day of wrath*' that had been planned for 04/05 February.  They further alleged that Al Jazeera was '*planning to organize other days of wrath and filming an instigating program about unemployment in Syria.*'  According to the NSB, the channel had failed to obtain a license for filming and was trying to task people living in Syria with filming for them without official permission.  It was indicated that '[*t*]*he channel may rely on human rights activists and unknown Syrian journalists*'.  The Head of the Military Intelligence Branch instructed subordinate sections and detachments that '[*t*]*his is for your information and taking necessary action against any media activity that did not obtain official permits and report the results to us*'.[231]

145.    The authorities particularly took action against the escalating number of demonstrations that quickly spread throughout the country.  They identified a need to forcefully suppress protests by confronting and disrupting them, and arresting participants and their leaders. This involved the co-ordinated action of the governorate Security Committees, the security agencies, police and (later) the military.

146.    On 30 March 2011, three days after the creation of the CCMC, President Al-Assad delivered a speech before the National Assembly, in which he signalled a significant policy directive

---

February 2011 and Circular from Military Intelligence Branch 222, dated 03 February 2011, SYR.D0010.075.001-007_ET at 004.
[230] Ex. C-49, Military Intelligence Branch 243 circular to sections and detachments, dated 13 February 2011, SYR.D0043.004.256_ET at 256.
[231] *Ibid.*

with respect to the developing protests.[232]  He warned that Syria was facing '*a great conspiracy whose tentacles extend to some nearby countries and far-away countries, with some inside the country*'.   He added that this conspiracy involved '*support groups*' in more than one governorate, including '*media groups, forgery groups and groups of eye-witnesses*'.   Al-Assad accused protest organisers of sedition and stated that '*all those involved intentionally or unintentionally in [protesting] contribute to destroying their country*'.   According to the President, there was '*no compromise or middle way in this.  What is at stake is the homeland and there is a huge conspiracy*'.   Although there had already been significant security activity in dealing with protests and opposition activity, including the violent suppression of demonstrations and the arrest of opposition demonstrators, this speech signalled a very public hardening of attitude by the Regime leadership in dealing with the opposition it faced.

147.   It is evident that the initial response of the Regime to the unrest in the country in February and March did not have the desired effect of reducing opposition activity.  In fact, the size, geographic spread and extent of the demonstrations and general protest significantly increased.  With the announcement by the President of a toughening of response and the establishment of the CCMC at the end of March, the period from April 2011 onwards was noted by a significant and considerable escalation and a hardening of the security measures undertaken by the Regime against all forms of opposition activity.

148.   This period was marked by the increasingly forceful suppression and breaking up of demonstrations, the use of Ba'athist and other loyalist groups to assist in this process, the widespread arrest, detention and mistreatment of protesters and opposition leaders, the use of the judiciary in

---

[232]  President al-Assad Delivers Speech at People's Assembly, Syrian Arab News Agency (SANA), dated 30 March 2011, at https://web.archive.org/web/20110402044717/http://www.sana.sy/print.html?sid=339278&newlang=ara (Arabic).

prosecuting detainees and the increasing use of the military in security operations.  The Regime adopted more aggressive measures, such as deploying loyalists and larger numbers of security forces to forcibly confront and break up protests, disseminating wanted lists, arresting and detaining large numbers of protesters and, at times, using lethal force on demonstrators.

149.    Although the magnitude of protests and the intensity of popular grievances varied from one governorate to another, the Regime's response across the country had the common theme of using the security apparatus, under the authority of the CCMC, NSB and governorate Security Committees, to aggressively suppress demonstrations and identify, monitor, and arrest protestors and suspected opponents.

150.    It is also of note that the newly established CCMC sat at the centre of the decision-making process in relation to the Regime's security response.  A series of key decisions at the end of April 2011, identified in CIJA-obtained documentation, point towards this period as being of particular significance in the timing of the Regime's initial hardening of its security response and the suppression of demonstrators and opposition activity.  It was also important in regard to the planning for the potential use and deployment of military forces in the governorates.

151.    On 18 April 2011 the minutes of a CCMC meeting (most likely held on the same day or just prior to it) were disseminated by the Regional Command of the Ba'ath Party.  A copy of these minutes was disseminated through the Military Intelligence Department in Damascus down to the Military Intelligence Branches in the governorates.[233]  In reviewing these minutes it is clear that the CCMC closely examined the political and security situation in the country and, critically, concluded that the period of '*tolerance and meeting demands [was] over*' and that a '[*m*]*ulti-faceted*

---

[233]  Ex. C-127, Military Intelligence Branch 294 Circular, dated 20 April 2011, SYR.D0183.003.010-011_ET at 010-011.

confrontation of demonstrators, saboteurs of security and vandals' was to be undertaken.   Instructions

were issued that included the following:

> a - Do not release any detainee, refer detainees to the judiciary.
>
> b - Counter with weapons those who carry weapons against the state, while ensuring that
> civilians are not harmed.
> [. . .]
>
> d - Arrest known offenders, place them in prison and refer them to the judiciary without
> raids.[234]

152.   This important meeting also instructed that certain '[m]echanism[s] for confronting

demonstrations' were to be implemented.   These included:

> - An equipped police force should be prepared to stop demonstrations, with the security
> [agencies] [sic] behind it. Demonstrations should be prepared by the Party and
> organizations to confront them if necessary, according to the situation.
>
> - Armed forces should not be called in unless in cases of extreme need and for specific tasks.
>
> - Tasks, responsibilities and the mechanism for cooperation between the different
> authorities should be precisely defined.[235]

153.   The CCMC instruction also noted that the 'Party apparatus' was to train selected

personnel on 'confronting demonstrators, as well as on the use of weapons', that round-the-clock shifts

were to be established in Party (i.e. Ba'athist) headquarters and that Party reserves were to be made

available as needed in each governorate.

154.   On 20 April, the CCMC again met and again disseminated their decisions.[236]   The

CCMC restated that force would now be used against the opposition, directing that '[a] new phase

should be started to counter conspirators by initiating the use of force against them as of this date'.   It

---

[234] *Ibid.* at 010.

[235] *Ibid.*

[236] Ex. C-128, Report, dated 20 April 2011 from the Regional Command disseminating the
minutes of the CCMC meeting of the same day, SYR.D0183.003.012-013_ET at 012-013.

emphasized that this was needed not only to battle opposition activity but to '*demonstrate the power and capacity of the state*'.

155.    The CCMC instructed that '*detailed plans*' were to be '*developed to counter the possibilities of armed and unarmed demonstrations and sit-ins*', that these plans were to be developed under the supervision of the NSB (i.e. the heads of the various intelligence and security agencies) and that the CCMC should hold daily meetings.   It also proposed the mobilization of some military units and that:

> *The General Command of the Army and Armed Forces will develop overarching plans based on the scenario of a possible spreading of demonstrations and hostile action on a wide scale in all governorates. Measures should be taken and cooperation organised with the implementing authorities, in order to implement a part or all of them as the situation develops.*[237]

Critically the CCMC also instructed:

> *7-Using all detailed means and methods, based on the situation, when surrounding an area, raiding suspects, or countering an anti-government demonstration. (According to the instructions given at the meeting).*
>
> *8-Arresting wanted persons suspected of being involved in sabotage, killing, planning criminal acts and stirring up strife at the instruction of external actors.*[238]

156.    Coming only a matter of weeks after the President's speech in late March, the message of the two CCMC meetings of 18 and 20 April could not have been clearer.   Force was to be used against all demonstrators and those deemed as opposition supporters, wide-ranging groups were to be targeted for arrest, planning was to be undertaken and supervised by the highest levels of the Regime, the military were (where necessary) to be deployed and Ba'athist loyalists were to be mobilised and utilised in support.   This armed response was to forcefully confront and '*battle*' the opposition as well as demonstrate the power and strength of the state (*i.e.*, the ruling regime).

---

[237]  *Ibid.* at 012.
[238]  *Ibid.*

157.     The importance of these late April CCMC decisions cannot be overstated and they had an immediate and deadly effect.  Although there were examples of attacks on demonstrators prior to the late April CCMC instructions, as a result of these particular late April CCMC decisions, violence against protesters significantly increased as demonstrations were confronted in the very manner outlined in these decisions and security operations were widened to include the targeting of organisers and other key opposition figures.

158.     Evidence exists that some authorities were quickly keen to take up the possibility of military support.  On 25 April, for example, the CCMC received a request from the Hama Security Committee for a battalion from the army to be sent to al-Ghab in order '*to preserve security before next Friday after information indicated that vandalism would be carried out during demonstrations.*'[239]

159.     In Homs, the situation deteriorated quickly with the outbreak of anti-Regime demonstrations occurring early in the conflict.  A reference in the minutes of a CCMC meeting on 12 April 2011 noted the Homs Security Committee had confirmed that '*pre-emptive measures*' would be taken in order to prevent a demonstration taking place the following Friday.[240]  It recommended '*to track and arrest rioters in Bab[a] Amr, Joret elarayes, Bab al Sabaa, and Ashirah'.*

160.     Critically, only a day after the 18 April CCMC instructions were issued, a violent (and now infamous) attack on a protest in Homs took place in which a significant number of protesters were shot and killed when security forces cleared a sit-in protest at the clock-tower in the city centre.[241]

---

[239]   Ex. C-153, CCMC Report on the Security Situation in the country as of 25 April 2011, SYR.E0001.006.167-170_ET at 170.
[240]   Ex. C-150, CCMC Report on the security situation as of 12 April 2011, SYR.E0001.006.064-067_ET at 064.
[241]   Ex. C-152, CCMC Report on the Security Situation in the country as of 19 April 2011, SYR.E0001.006.129-133_ET at 131.  Also note BBC News report entitled '*Syria Protests: Homs city*

161.    The CCMC received information that, on 29 April 2011, during protests in the towns of ar-Rastan in Homs Governorate, at least 19 persons were killed and 38 injured.  The Homs Governorate Security Committee, a member of the Regional Command of the Ba'ath party, a senior military figure and the governor met with two delegates from the ar-Rastan residents to discuss the incident of 29 April.[242]  The CCMC recommended the payment of money to the families of those known to have been killed and injured reporting that:

> *This will be given as blood money in order to defuse tension and avoid rendering ar-Rastan a new demonstration hub or another Dar'a, and in order to ensure that the international road will not be cut off.*[243]

162.    A CCMC report on the security situation (dated 12 May 2011) also referenced that the army and security forces had carried out a short operation in Baba Amr – Jouret al-Arayes neighbourhoods in Homs.  The report also noted the death of one member of the military forces, three civilians, a number of injured and the arrest of 65.[244]

163.    Despite the wide range of security measures undertaken by the Regime to suppress mass protests and dissent, the security situation in Syria continued to deteriorate.  The measures implemented by the Regime from April 2011, including the mass arrests and deadly force, did not stop opposition activity but simply continued to fuel it.  This led to a continued growth and increase in demonstrations and opposition activity (including the start of opposition attacks against Regime

---

*sit-in "dispersed by gunfire"*, dated 19 April 2011 at http://www.bbc.co.uk/news/world-middle-east-13130401.
[242]  Ex. C-145, CCMC Report on the Security Situation, dated 01 May 2011, SYR.E0001.006.014-016_ET at 014.
[243]  *Ibid.*
[244]  Ex. C-151, CCMC Report on the Security Situation, dated 12 May 2011, SYR.E0001.006.068-070_ET at 069.  It should be noted that the report does not make it clear whether the casualties referred to were as a direct result of the named operation in Baba Amr—Jouret al-Arayes or in Homs more widely.

security elements), further incidents of violence against protesters, increasing numbers of security operations and sweeps targeting demonstrators, opposition leaders, media activists and opposition supporters resulting in continued widespread arrests and detentions.

164.    As the Regime hardened its security response, opposition activity continued to escalate through the summer months.  The number of demonstrations appeared to grow in size and scale.  In Homs, security operations continued.   On 17 July, the CCMC convened and after '*examining the security situation … and appropriate methods to handle the situations*' directed the Security Committee in Homs to:

> - *Conduct inspection in the city districts …*
>
> -*Start immediately from the eastern city districts and arrest the wanted persons;*
>
> - *Search for the perpetrators of crimes and hand them over to the judiciary[.]*[245]

165.    The Head of the NSB was ordered '*to supervise, monitor and provide necessary assistance*' for the execution of this task and the decision was to be disseminated to all '*competent bodies*' for its execution.

166.    On 20 July propositions from the Homs Security Committee were examined and it was agreed to:

> *Assign[] Comrade Head of the National Security Bureau and Comrade Minister of [the] Interior to meet with the Homs Governorate Security Committee to discuss their propositions submitted on 20/7/2011 on the ground, arrive at and proceed with implementing the best decisions, and identify the actual needs of military units necessary for completing all missions.*[246]

167.    On 23 July, the same two senior officials were tasked:

---

[245]  Ex. C-181, CCMC decision No 3413, dated 18 July 2011, SYR.E0001.017.001_ET at 001.
[246]  Ex. C-171, Minutes of the CCMC meeting of 20 July, dated 21 July 2011, SYR.E0001.015.003-004_ET at 004.

*… to visit the governorate of Homs and discuss the plan of the [S]ecurity [C]ommittee in the governorate to address the security situation on the ground; and to study the possibility of launching dialogue with community figures in the city to achieve security and stability there and finalize the implementation of the balanced inspection plan of its city districts[.]*[247]

168.    At the end of that month the CCMC reported that a large '*inspection and investigation campaign*' was being conducted in Al-Bayyada in the north of Homs with a large number of people being arrested.[248]

169.    As well as opposition demonstrators, those with links to foreign media continued to be a focus of Regime security elements.  In May, the Head of the NSB wrote to the Head of the Political Security Department, and requested that the NSB be supplied with:

*… the information that has been available from your interrogation of detainees who incited demonstrations and those who had contacts with foreign bodies, whether they are media bodies or plotters, or bodies which took part in funding and arming demonstrators, in addition to information on the volume of funding and armament and their sources.*[249]

This instruction was passed down to the Political Security Branches in the governorates for action.

170.    The activity of the Regime and its security elements during this period contributed to a hardening of attitude of the opposition against the government and the growth of armed groups determined to defend local areas and take violent action against security forces they regarded as hostile.  The activity of armed groups included attacks on and killing of security force personnel,[250]

---

[247] Ex. C-172, Minutes of the CCMC meeting held on 23 July, dated 24 July 2011, SYR.E0001.015.005-007_ET at 007.

[248] Ex. C-142, CCMC Report on the security situation, dated 31 July 2011, SYR.E0001.005.008-010_ET at 009.

[249] Ex. C-72, Letter from the Head of the NSB to Comrade Major General Head of the Political Security Department, dated 23 May 2011, SYR.D0077.209.009_ET at 009.

[250] *See, e.g.* Ex. C-132, Report from Military Intelligence Branch 271 to the Military Intelligence Department, dated 13 June 2011, SYR.D0186.096.013-016_ET at 013.  This makes reference to the deaths in Jisr ash-Shughour of military intelligence personnel when the Detachment was overrun.

theft of military equipment,[251] armed clashes with security forces units [252] and attacks on infrastructure.[253]

**B.     SECURITY RESPONSE TO OPPOSITION ACTIVITY (AUGUST – NOVEMBER 2011)**

171.     Despite the increased security measures (continued arrest operations, mobilization and use of Ba'athist and other loyalists and the deployment of the military), the situation throughout the governorates continued to deteriorate through the summer.  In response to this, in August 2011, the Regime began to further review and strengthen their security response.  They did this by attempting to rectify perceived weaknesses, by reorganising the security apparatus and command structures it utilised as well as by formulating, disseminating and implementing clearer national level plans targeting particular groups within the opposition.

172.     The period of late July/early August 2011 is of particular relevance, and was marked by a significant ratcheting up of the Regime's overall security response.  The period witnessed attempts to better co-ordinate all security bodies, a nation-wide approach to the suppression of all opposition, the enhanced deployment of the Syrian Army throughout many areas of the country, and the systematic targeting of opposition groups (demonstrators, supporters, coordinators, funders,

---

[251]  *See, e.g.* Ex. C-26, Circular from the Operations Administration of the General Command of the Army and Armed Forces, dated 19 July 2011, SYR.D0021.001.013-014_ET at 013.

[252]  *See, e.g.* Ex. C-144, CCMC report on the security situation, dated 09 July 2011, SYR.E0001.005.060-061_ET at 060.  This made reference to a number of clashes between armed elements and security forces in Homs.  This included the shooting of police officers on a bus, shooting at a bus belonging to military security, the setting up of checkpoints by armed protesters and firing on cars.  The report noted the reported death of one non-commissioned officer and the injuring of nine members of the security, police and military forces.

[253]  Note, for example, derailment and attack on a train in Homs on 23 July 2011 and attempted attack on a military facility in Homs at http://news.telegraph.co.uk/news/worldnews/middleeast/syria/8657150/Syria-protests-opposition-supporters-launch-attack-on-Homs-army-college.html.  The attack on the train was also discussed in Ex. C-172, Minutes of the CCMC meeting of 23 July 2011, dated 24 July 2011, SYR.E0001.015.005-007_ET at 005.

media activists as well as armed groups) and a greater direct engagement of the CCMC and its members in the security matters in key governorates.

173.    Clear evidence of this was the issuance of an instruction by the Head of the NSB following a CCMC meeting in early August 2011.  On 05 August, the CCMC met and discussed the gravity of the crisis in the country and concluded that '*laxness in handling the crisis*' and '*poor coordination and cooperation among security agencies in sharing information and the results of the ongoing investigations*' was contributing to a prolongation of the conflict.[254]

174.    As a result of this meeting, the following day, the Head of the NSB issued an instruction to the governorate Ba'ath Party Secretaries (i.e. the Heads of the Security Committees) in Hama, Rural Damascus, Deir-ez-Zor, Homs, Idleb and Dar'a governorates to implement a series of tasks.  The tasks given were:

> *1 - Launch daily joint security-military campaigns in key security sectors of your choice as per security priorities. All security branches should participate in the campaigns to raid the locations of persons wanted for crimes of sabotage, killing, assaulting citizens and attacking their properties and government establishments. You are requested to arrest such persons, particularly those who are inciting people to demonstrate, funders of demonstrators, members of coordination committees who organize demonstrations, conspirers who communicate with people abroad to keep demonstrations ongoing and those who tarnish the image of Syria in foreign media and international organizations.*

> *2- Once each sector has been cleansed of wanted persons, you are requested to maintain control of the sector by organizing security and party presence in the sector in cooperation with the city district committee, popular organizations, dignitaries, and influential supporters, so that no wanted person can seek shelter there again.*

> *3- Establish a joint investigation committee at the governorate level that includes representatives from all security branches and the Criminal Security Branch. All persons arrested in security campaigns shall be referred to this committee for interrogation. The results of these interrogations shall be sent to all security branches so that they can be used*

---

[254]  Ex. C-40, Communication from Military Intelligence Branch 294, dated 17 August 2011 attaching Communication from NSB to Secretary of the Ba'ath Party (Heads of Security Committees) in Hama, Damascus Countryside, Deir ez-Zor, Homs, Idleb and Dar'a governorates, dated 06 August 2011, SYR.D0043.004.093-094_ET at 094.

*in identifying and seriously pursuing new targets, with an interest in investigations to find and arrest members of local coordination committees.*

*4- Supply the Head of the National Security Bureau with a daily report on the results of the search, including the names of wanted persons who are arrested, seized weapons, the losses resulting from the security campaign and an overall evaluation of the campaign results.*[255]

175.    In essence, the CCMC discussions at their 05 August meeting and the instructions that fell from it, disseminated *via* the NSB, further stepped up the security response of the Regime. A national level policy was issued that governorates were to follow, which reinforced and specified the key identified groups that were to be targeted in joint military/security operations.  These groups focused on those inciting demonstrations, opposition leaders, co-ordinators, and financiers as well as those involved with communicating with the media and foreign organisations that were, as far as the Regime believed, tarnishing the image of the state.

176.    Decisions on the exact nature and location of where the joint-security operations were to be conducted was delegated down to the governorates and once areas were '*cleansed*' they were to be secured with both security and '*party'* (i.e. loyalist/Ba'athist paramilitary) presence.  The individuals from the identified groups were to be targeted, arrested, and interrogated by members of specialist investigations bodies established in the governorates consisting of elements from all the security/intelligence agencies and the Criminal Security.   Information gained was to be passed between agencies and the Head of the NSB (and by implication the CCMC) was to be kept informed of the results through regular reports.

177.    The work of opposition media activists and the reporting of the conflict in the media continued to be a key issue for the Regime.  The August 05/06 instructions specifically highlighted for arrest those who were contacting the foreign media and those who '*tarnish the image of Syria in*

---

[255]    *Ibid.*

*foreign media and international organizations'.* [256]   In addition, around this time, the CCMC

continued to view the monitoring of the media generally as a significant concern.   On 16 August

2011 it instructed the Minister of Information[257] to establish a '*Media Monitoring Cell*' within his

ministry.   The Minister was tasked with:

> *1.  Creating a Crisis Management Cell and a Media Monitoring Cell at the Ministry of Information assigned the mission of:*
>
> *— Collecting and analyzing information.*
>
> *— Developing appropriate measures and responses.*
>
> *— Supplying the Central Crisis Management Cell with the results of media monitoring, analyses, conclusions and recommendations in a daily report to the Central Cell.*
>
> *2.  Harnessing the activity of members of the press and media and friends, and facilitating their tasks on the ground.*[258]

178.    On 24 August President Bashar al-Assad met with scholars and clerics and gave a

speech during an Iftar feast during Ramadan.   A summary of this speech was disseminated by the

Regional Command of the Ba'ath Party (including a copy being sent down the military chain).   The

speech dealt with the problems facing the country, an external conspiracy designed to divide the

country, in particular through fierce media attacks.   It was reported that:

> *The use by media of voice messages, video clips and hypocritical eyewitnesses is a psychological warfare aimed at creating a state of internal chaos and influencing the spirits of Syrians, and that national unity is the only guarantee for Syria and its people in the face of malicious plots and the only assurance to save Syrian blood, and a guarantee*

---

[256]   *Ibid.*

[257]   Some CIJA provided references indicate that the Minister of Information was a member of the CCMC (or at least was a participant).   *See, e.g.* Ex. C-129, Minutes of Meeting of the CCMC of 23 April, dated 23 April 2011, SYR.D0183.015.018-020_ET at 019.

[258]   Ex. C-187, CCMC Instruction to the Minister of Information, dated 16 August 2011, based on a meeting of the CCMC on 13 August 2011, SYR.E0013.002.025_ET at 025.

*for restoring security and stability. Scholars and clerics have to contribute to achieving that.*[259]

179.     In many governorates, in particular tense areas that had seen significant levels of opposition, new security operations were undertaken after the 05/06 August instructions.   In Homs, on 24 August, the minutes of the CCMC note significant discussion on activity in the governorate. This meeting referenced an initial evaluation by the CCMC of the situation in Homs and the implementation of measures to '*reinforce the perimeter around the city to control entry and exit*'.[260]  At the end of the meeting it was decided, in relation to operations in the governorate, as follows:

> *3.  Pursuing the plan developed to control the situation in the city of Homs and forming a Joint Investigation Committee in the city.  The Committee should deliver the results of its investigations immediately to security agencies for timely utilization.*
>
> *4.  Assigning Comrade Head of the Political Security Department to the governorate of Homs to lead the work of security branches on the ground and to contribute to the successful implementation of the plan developed to control the situation in the governorate of Homs.*[261]

180.     The Joint Investigation Committee was the same body as had been articulated in the earlier instruction of the 05/06 August noted above.  It is also of note that the Head of the Political Security Department had been dispatched not just to supervise the role of the security bodies but to actively '*lead*' them.

181.     The period after the August instructions saw an increase in the number of military/security raids in the governorate.   On 04 September, the CCMC tasked the Head of

---

[259]  Ex. C-67, Report from the Regional Command of the Ba'ath Party, dated 03 September 2011 dispatched on 11 September 2011, SYR.D0069.033.001-002_ET at 001.
[260]  Ex. C-173, Minutes of the CCMC meeting of 24 August, dated 25 August 2011, SYR.E0001.015.015-016_ET at 015.
[261]  *Ibid.* at 016.

Political Security to follow up on the implementation of tasks in Homs.[262]  Open source references identified and reported on incursions in the city by Regime security and military units and significant fighting between armed opposition and Regime elements broke out.  In its first report, the UN Independent International Commission of Inquiry on the Syrian Arab Republic (UN CoI), noted that it made a request to the Syrian authorities for detailed information concerning military operations in Homs in September and an operation in Ar Rastan on 03 October in their investigations concerning '*respect for the right to life*'.[263]

182.    Early in the morning of 29 October, an investigation and search operation was launched in the neighbourhoods of Baba Amr and Joret Elarayes that was reported to the CCMC.[264]  It should be noted that this operation came only days after the appointment of Hassan Turkomani as Head of the CCMC, an appointment that marked a significant militarisation of the conflict.  This operation was clearly of significance and overseen by the CCMC, as on 31 October it was noted in a daily report on the security situation that in relation to Homs:

> *Between 8:00 am and 15:00 pm on 30/10, the Central Crisis Management Cell convened several meetings, attended by the Branch Secretary and the Governor, with the members of the Communication Committee, the neighbourhood committees, the leaders of the party divisions, the leaders of the popular organisations, professional associations and religious leaders.*[265]

---

[262]  Ex. C-174, Minutes of the CCMC meeting of 03 September, dated 04 September 2011, SYR.E0001.015.017-018_ET at 018.

[263]  Report of the UN Independent International Commission of Inquiry on the Syrian Arab Republic (UN CoI) report, dated 23 November 2011, at page 30, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/G11/170/97/PDF/G1117097.pdf?OpenElement ('First UN CoI Report').

[264]  Ex. 158, CCMC Report on the security situation, dated 30 October 2011, SYR.E0001.011.012-015_ET at 013.

[265]  Ex. 159, CCMC Report on the security situation, dated 31 October 2011, SYR.E0001.011.016-019_ET at 017.

183.    The same report noted a number of shootings and other incidents in several neighbourhoods in Homs.  It appears likely that this operation lasted for a number of days (or at least was repeated), as on 03 November the CCMC noted in a security report that:

> *At 6[:]30 of 02/11, a security, police, and army force conducted an investigation and search operation in (Baba Amr neighborhood and affiliated farms). An exchange of fire took place, resulting in (7) army elements falling as martyrs and injuring (13).[266]*

184.    The operation was reported in the media at the time with reference to the bombardment of Homs with tanks.[267]

## C.  SECURITY OPERATIONS IN HOMS (NOVEMBER 2011 – JANUARY 2012)

185.    The period of November 2011 to January 2012 was a significant one in the further escalation of the conflict in key governorates including in Homs.  It was particularly marked, on the one hand, by attempts by the Arab League to defuse the conflict in Syria, while on the other hand, by the increased militarisation of the Regime's response, which included the appointment of the Homs Military and Security Chief, continued arrests and detentions in military/security sweeps and the growth of armed opposition groups and their actions against Regime security elements and infrastructure.  This escalating activity led to the major military attack on Baba Amr in February 2012.

186.    In early November, the Syrian government agreed to an Arab League peace plan to bring an end to the conflict.  This called for a halt to the violence against demonstrators, the release of prisoners, the granting of access for members of the media, human rights groups and Arab League monitors and the withdrawal of the army and tanks from cities (including in Homs).  Dialogue was

---

[266]  Ex. 157, CCMC Report on the security situation, dated 03 November 2011, SYR.E0001.011.009-011_ET at 010.
[267]  *See, e.g.* Report in Al-Jazeera, dated 04 November 2011, entitled '*Syria "violence defies peace deal"*' at http://www.aljazeera.com/news/middleeast/2011/11/201111381935847935.html.

to begin between the Regime and the opposition.[268]   At this very critical time of negotiations with the Arab League, operations in Homs were being discussed in the meetings of the CCMC.   The CCMC put into its agenda for a meeting planned for 02 November a discussion point entitled '*[d]etermination of the work direction in the upcoming phase based on the analysis of the visit to the governorate of Homs.*'[269]

187.    On 06 November 2011, media reporting referenced that Syrian security forces had killed a number of civilians (including in Homs) and this threatened the peace process.[270]   The UN CoI later reported that operations at this time were conducted in the residential areas of Alqaseer, Baba Amr, Bab Al Sibaa, Bab Hood and Karm Al Zaitoon.[271]   According to eyewitnesses, tanks deployed in and around the city frequently fired at residential buildings and the UN CoI wrote that it was estimated that, in a three-week period until 13 November, 260 civilians had been killed.[272] These operations in Homs were reported in some of the CCMC reports.   On 07 November, for example, a CCMC report noted that '*joint forces*' had conducted a '*search and sweep*' in the Baba Amr neighbourhood that had resulted in twelve arrests and the confiscation of some military

---

[268]  *See, e.g.* Report in BBC entitled '*Syria accepts Arab League Peace Plan after Cairo talks*', dated 02 November 2011, at http://www.bbc.co.uk/news/world-middle-east-15560322.  Also note Liz Sly, '*Arab League announces peace plan for Syria*', The Washington Post, dated 02 November 2011, at https://www.washingtonpost.com/world/middle_east/arab-league-announces-peace-plan-for-syria/2011/11/02/gIQAKBm6fM_story.html?utm_term=.6cb38a0e8011.

[269]  Ex. C-169, Agenda for a meeting of the CCMC, dated 02 November 2011, SYR.E0001.014.014_ET at 014.

[270]  *See, e.g.* Julian Borger, '*Syrian crackdown continues prompting urgent Arab League talks*', The Guardian, dated 06 November 2011, at https://www.theguardian.com/world/2011/nov/06/syria-protests-urgent-arab-league-talks; *see also* Adrian Blomfield, '*Arab League warns of "disastrous consequences" for the Middle East after Syria peace plan fails*', Telegraph, dated 06 November 2011, at http://www.telegraph.co.uk/news/worldnews/middleeast/syria/8873162/Arab-League-warns-of-disastrous-consequences-for-the-Middle-East-after-Syria-peace-plan-fails.html.

[271]  First UN CoI report, dated 23 November 2011, at para 39.

[272]  *Ibid.*

equipment.[273]  Protests broke out in ten neighbourhoods during the day.  The report also noted that the military hospital received 5 killed and a number of wounded army personnel with seven wounded civilians reported in the Homs hospital.  Armed men fired rocket-propelled grenades (RPGs) on military and security checkpoints resulting in the death or wounding of three security elements.

188.    On 09 November, the CCMC met and discussed a number of issues including Homs.  They affirmed the withdrawal of tanks from cities (something that had been part of the Arab League peace plan) as well as the strengthening of security and stability in the city of Homs.  The minutes noted that:

> – *Working conditions in hotspots (Homs—Hama—Idleb..) are exceptional conditions and require the spirit of initiative and innovative work methods, such as focusing on sniping, concealing the entry of forces into city districts, using smoke grenades, and concealing the direction of the attack[.]*
>
> – *Armed Forces and security forces have been making appreciated efforts and have achieved great successes, but some small acts, such as theft and bribery, harm these successes and the reputation of the army.*[274]

189.    As a result of the operations undertaken by the Regime, including continued attacks on civilians by the army, the peace deal broke down and on 12 November, the Arab League announced that it was suspending Syria from the organisation.[275]

190.    On 21 November, the CCMC again examined proposals from Homs.[276]  This included a recommendation from the governorate Security Committee on re-establishing a military

---

[273]  Ex. C-161, CCMC report on the security situation of 07/08 November, dated 08 November 2011, SYR.E0001.011.051-054_ET at 052.

[274]  Ex. C-188, Minutes of a CCMC meeting held on and dated 09 November 2011, SYR.E0013.002.046-048_ET at 046.

[275]  *See, e.g.* Yasmine Saleh, Ayman Samir, '*Arab League suspends Syria as global pressure rises*', Reuters, dated 12 November 2011, at https://www.reuters.com/article/us-arabs-syria/arab-league-suspends-syria-as-global-pressure-rises-idUSTRE7AB0CP20111112.

security checkpoint that had been installed earlier and an assessment of whether the governorate was in need of an operations room.  The CCMC agreed at this meeting to approve the request to re-establish the checkpoint and to:

> … us[e] the operations room equipped by the Ministry of Interior in the governorate for commanding governorate operations, and coordinating with the governorate Police Command in this concern[.]

It was also decided, more widely, to:

> Continu[e] the implementation of operations even with the presence of Arab League observers, in order to establish the State's rule over its territories and to secure the country and population.[277]

191.    Following the collapse of the first Arab League peace plan, the Syrian Regime continued to conduct security operations, arrest individuals within targeted groups and conduct security sweeps into opposition areas.  Following the earlier instructions, including those of the CCMC/NSB of 05/06 August 2011,[278] media activists and those who communicated with foreign outlets continued to be targeted and detained.[279]  Furthermore, documentary evidence also notes

---

[276]  Ex. C-180, Minutes of the CCMC meeting of 21 November 2011, dated 22 November 2011, SYR.E0001.015.046-048_ET at 046.

[277]  *Ibid* at 048.

[278]  Ex. C-40, Communication from Military Intelligence Branch 294, dated 17 August 2011 attaching Communication from NSB to Secretary of the Ba'ath Party (Heads of Security Committees) in Hama, Damascus Countryside, Deir ez-Zor, Homs, Idleb and Dar'a governorates, dated 06 August 2011, SYR.D0043.004.093-094_ET at 094.

[279]  *See, e.g.* Ex. C-74, Political Security Department, Special register for names of individuals arrested during the security military campaign in Deir ez-Zur since 7/8/2011, SYR.D0080.048.001_ET and Ex. C-75, Names of Investigation Section detainees for Monday 2/1/2012, dated 02 January 2012, SYR.D0080.048.010-011_ET at 010.  This register includes a series of reports from the Investigations Department of the Deir ez-Zor Political Security to the Head of the Branch listing names of persons arrested in the investigations department.  One report, Ex. C-75, SYR.D0080.048.010-011_ET at 010, lists 30 individuals arrested for a variety of reasons including for being member of a coordination committee, '*[p]articipation in protests*', '*[p]rotesting and filming protests in order to send it to agenda-driven channels*', '*filming protests and public order units*', and participation in armed attacks).

potentially hostile journalists were targeted for arrest.[280]  Concurrently, the Regime also began to look at measures to use the media more effectively for their own purposes.  As noted earlier in this Report, the CCMC instructed the Minister of Information to establish a Media Monitoring Cell within his ministry.[281]  In one of the first meetings of the CCMC after Hassan Turkomani took over as its Head, the importance of the media to the Regime was stressed.[282]  This meeting discussed:

> . . . the important role played by the media and the necessity of having a platform for media influence and of using media information and resources optimally.[283]

192.    The CCMC decided to further strengthen the media strategy of the Regime by sending:

> … a recommendation to the Minister of Information to form a media crisis cell, which [would] include psychology and media experts. It [would] be assisted by political, military, and security experts. Its aim [would] be to deliver a media message of integrity to inside and outside the country.[284]

193.    As part of the 'influence' process, the Regime appeared to begin to consider the controlled visit of some journalists to Syria in order to present their views of the conflict.  For example, on 20 December 2011, the Ministry of Information's Foreign Media Department sent a request to the Governor of Dara'a asking for opinions from senior police and security figures regarding the visit of a group of journalists from Japanese, Italian and Chinese agencies to Dar'a.

---

[280]  *See, e.g.* Ex. C-123, Report from Military Intelligence Branch 235/2 to Branch 271, dated 20 February 2012, SYR.D0179.042.065_ET at 065.  This notes that they had received information on a Lebanese journalist who '*travels constantly to Syria, takes pictures of demonstrations and the Armed Forces, especially burned tanks, in addition to pictures derogating Mr. President Bashar al-Assad'*.  He was to be investigated and, if found, arrested and sent to Military Intelligence 235.
[281]  Ex. C-187, CCMC Instruction to the Minister of Information, dated 16 August 2011 based on a meeting of the CCMC, dated 13 August 2011, SYR.E0013.002.025_ET at 025.
[282]  Ex. C-178, Minutes of Meeting of the CCMC on 24 October 2011, dated 25 October 2011, SYR.E0001.015.024-026_ET at 025.
[283]  *Ibid.*
[284]  *Ibid.*

The journalists were to be accompanied by members of the Ministry of Information and were to tour the governorate in order to witness areas of '*vandalism*'.[285]

194.    In the period of November 2011 to January 2012 the Regime continued to further militarise the conflict by placing the army at the centre of their security efforts.  As noted above in Section III.G, the decisions taken at the end of the month were critical and included the appointment of Military and Security Chiefs in tense governorates where operations were ongoing. As previously highlighted, in the CCMC meeting of 21 November 2011, only weeks after the collapse of the Arab League negotiations, the CCMC discussed:

> … *the positive impact of appointing military commanders with recognized competence and experience to command operations, especially in hot governorates; vesting them with the power to command all superiors and heads of civil, military and security agencies in the district; and the importance of coming up with creative solutions to end the crisis[.]*[286]

195.    At that same meeting, *Imad* Dawoud Rajiha (Minister of Defence/Deputy General Commander of the Army and Armed Forces) was tasked to '*propose the appropriate commanders to take control of operations in the hot governorates (Idleb – Hama – Homs … etc)*' and on 23 November 2011, Rajiha was instructed '*to issue special orders to appoint the commanders with the powers to command the operations in the tense governorates*'.[287]

---

[285]  Ex. C-60, Ministry of Information, Foreign Media Department letter to the Governor of Dar'a, dated 20 December 2011, SYR.D0063.012.127_ET at 127.  Also note Ex. C-61, Minister of Local Administration letter, dated 11 December 2011, SYR.D0063.012.149-150_ET at 149-150.  This letter details the names of '*the media delegation*' that was certified by the Ministry of Information to visit electoral centres for local council elections.  The journalists came from Egyptian, Iranian, Turkish, and Dubai TV networks.  It would seem that the Regime were controlling potentially friendly media outlets in order to disseminate their message, have media influence, maximize the use of their information and portray the Regime in a favourable light.

[286] Ex. C-180, Minutes of the CCMC Meeting on 21 November 2011, dated 22 November 2011, SYR.E0001.015.046-048_ET at 047.

[287]  Ex. C-189, Minutes of the CCMC on 23 November 2011, dated 24 November 2011, SYR.E0013.002.058-059_ET at 059.

196.     As was the case in a number of other governorates, the CCMC decisions resulted in the formal appointment of a Military and Security Chief in Homs.  A senior military officer filled this position with an assistant that came from the Military Intelligence Department.  Although CIJA documentation does not appear to be complete for the entire period of November 2011 to February 2012, references that have been identified appear to indicate that the Homs Military and Security Chief was initially *Imad* Ali Abdullah Ayoub, a Deputy Chief of Staff of the Army and Armed Forces.[288]  As discussed below in Section IV.D,  Ayoub's assistant (a position entitled the '*Security Chief in the Homs Governorate and Assistant to the Military Commander*') was Rafiq Shahadah, a senior officer in the Military Intelligence Department.[289]

197.     After the establishment of the Military and Security Chiefs, the Regime launched further attacks in Homs.  These invariably involved significant shelling of the city.  In December 2011 media reporting was referencing the sniping of civilians and the shelling of urban areas in Homs.[290]

---

[288]  *See* Ex. C-103, Cover letter from Branch 261 attaching a letter from Branch 261 to 'Mr. Imad Ali Abdullah Ayoub, Deputy Chief of Staff, the General Military and Security Chief in the Homs Governorate', dated 10 April 2012, SYR.D0124.020.003-004_ET at 004; Ex. C-57, Appointment order, dated 10 August 2011, SYR.D0063.010.008_ET at 008.

[289]  *See* "Corrigendum to Council Implementing Regulation (EU) No 363/2013 of 22 April 2013 implementing Regulation (EU) No 36/2012 concerning restrictive measures in view of the situation in Syria' in Official Journal of the European Union, dated 09 May 2013 at http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex:32013R0363R(03) (identifying Rafiq Shahadah as '*Head of Syrian Military Intelligence Branch 293 (Internal Affairs)*').

**[290]**  *See, e.g.* Kareem Fahim, '*Syria Observers Urged to Hurry to Homs, Where Death Toll Keeps Rising*', New York Times, dated 26 December 2011 at http://www.nytimes.com/2011/12/27/world/middleast/as-reports-of-deaths-mount-syria-observers-urged-toward-homs.html; Christopher Sultan (trans.), '*Inside Syria's Death Zone: Assad's Regime Hunts People in Homs*', Der Spiegel (Spiegel Online), dated 23 December 2011 at http://www.spiegel.de/international/world/inside-syria-s-death-zone-assad-s-regime-hunts-people-in-homs-a-805519.html.

198.    It should be noted that armed opposition attacks against security force personnel, checkpoints and infrastructure increased significantly by this time and into 2012.   These attacks often resulted in the death and wounding of Regime security personnel.   References in Regime documents make note of the sniping of personnel at checkpoints,[291] RPG attacks, ambushes and abductions.[292]  On 08 December, an oil pipeline was blown up in the governorate causing significant damage to the facility.[293]

199.    A fresh attempt was made by the Arab League to press for peace.   Under significant international pressure, on 19 December, Syria signed another peace plan, agreeing to the deployment of Arab League monitors to observe the planned withdrawal of the Syrian army and armed opposition from cities, and release of detainees.[294]  On 26 December, the first 50 monitors began to deploy.[295]

200.    In the very days before the monitors arrived, however, the Regime launched a significant military operation in Homs.  A CCMC report on the security situation noted that:

> *At 6:00 on 23/12, a search operation was conducted for wanted persons in the city districts of (Baba Amr[] – Jouber – Al-Sultaniyya) as a result of which (42) individuals were arrested. The following were confiscated: /2/ cars, /2/ motorcycles, /2/ field hospitals*

---

[291]  *See, e.g.* Ex. C-163, CCMC report on the security situation, dated 22 November 2011, SYR.E0001.011.148-151_ET at 149; Ex. C-162, CCMC report on the security situation, dated 20 December 2011, SYR.E0001.011.127-131_ET at 128.

[292]  *See, e.g.* Ex. C-182, CCMC report on the security situation, dated 04 February 2012, SYR.E0001.020.015-019_ET at 016.

[293]  Dominic Evans, '*Syria says pipeline blown up by rebel saboteurs*', Reuters, dated 08 December 2011 at https://www.reuters.com/article/us-syria/syria-says-pipeline-blown-up-by-rebel-saboteurs-idUSTRE7B51KB20111208.

[294]  '*Syria signs deal to allow Arab League observers into country*', The Guardian, dated 19 December 2011, at https://www.theguardian.com/world/2011/dec/19/syria-to-admit-arab-league-observers.

[295]  '*Assad crackdown intensifies as Arab League monitors arrive in Syria*', The Guardian, dated 26 December 2011, at https://www.theguardian.com/world/2011/dec/26/syria-crackdown-arab-league-monitors.

*and one field clinic on which was written Free Syrian Army, one Russian rifle, /2/ hunting rifles, /3/ fighting guns, one hand grenade and /4/ explosive devices.*[296]

201.     This report also made note of shooting between armed individuals and military checkpoints, the deaths and wounding (by gunshot) of a number of civilians that had been taken to hospitals (the assailants were '*unidentified*'), the death of one soldier and the wounding of 14 others.

202.     The operation continued the following day with the CCMC reporting that:

> *At 6:00 on 24/12, the search and inspection operation continued in the city districts and villages of (Baba Amr[]—Sultaniyeh—Jober). (Forty-six) people were arrested, /19/ stolen vehicles were seized—along with /4/ Russian rifles—/2/ fighting guns—/8/ (RPGs)— anti-tank missile launcher—/18/ explosive devices—/44/ Israeli-made dynamite sticks— /18/ remote controls—/3/ /RPG/ launchers—/4/ computers—/3/ field hospitals, fake license plates—/100/ kg of chemicals used in making explosive devices—/700/ kg of materials used in making bombs—equipment used in making bombs and a quantity of ammunition—/70/ explosive devices. An explosive device was defused from under the railway in the city district of Baba Amr[].*[297]

203.     This report also noted that an attack was made on a BMP (an armoured infantry fighting vehicle) convoy in Baba Amr and that armed individuals '*took control of the vehicles*' and used them to shoot at checkpoints.  Armed individuals in Baba Amr also allegedly launched an RPG attack on an ambulance, destroying it.[298]  The former Ba'ath Branch Secretary in Homs (in Baba Amr) was killed along with his wife in an RPG attack and five army soldiers were killed and in different city districts, while twenty-eight army and security troops were hospitalised for gunshot injuries.  The operation continued into 26 December.[299]

---

[296]  Ex. C-165, CCMC Report on the Security Situation, dated 24 December 2011, SYR.E0001.011.176-180_ET at 177.
[297]  Ex. C-166, CCMC report on the Security Situation, dated 25 December 2011, SYR.E0001.011.182-186_ET at 183.
[298]  *Ibid* at 184.
[299]  Ex. C-167, CCMC report on the security situation, dated 27 December 2011, SYR.E0001.011.193-199_ET at 195.

204.	In its report of 22 February 2012, the UN CoI referenced the operation in Homs prior to the arrival of the Arab League monitors and noted that:

> *From 24 to 26 December 2011, the army launched a large-scale operation in Bab[a] Amr, Homs, where an FSA group was present. Residential buildings in Bab[a] Amr were shelled by tanks and anti-aircraft guns. League of Arab States observers, who visited on 27 December, confirmed that the area had been shelled. State snipers also shot at and killed unarmed men, women and children.*[300]

205.	The Arab League monitors arrived in Homs on 27 December interrupting the Regime's operations in Baba Amr.[301]  The monitors remained in Syria for a number of weeks.  The report of the Head Observer Mission (written on 18 January 2012) noted that on 27 December 2011, the Head of the Mission and ten observers conducted a preliminary visit to Homs which had seen '*acts of violence and armed confrontation.*'[302]  The report stated that on arriving the Head of the Mission met with the Governor who:

> *… explained that there had ben an escalation in violence perpetrated by armed groups in the city.  There had been instances of kidnapping and sabotage of Government and civilian facilities.  Food was in short supply owing to the blockade imposed by armed groups, which were believed to include some 3000 individuals.  The Governor further stated that all attempts by religious figures and city notables to calm the situation had failed. He made enquiries regarding the possibility of addressing the issue of soldiers and vehicles blocked inside Baba Amr.*[303]

It was further reported that the Mission:

> *… met with a number of opposition citizens who described the state of fear, blockade and acts of violence to which they had been subjected by Government forces.  At a time of*

---

[300]	Report of the UN Independent International Commission of Inquiry on the Syrian Arab Republic, dated 22 February 2012, at para 43, available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/G12/106/13/PDF/G1210613.pdf ('Second UN CoI Report').
[301]	*Ibid.*
[302]	Report of the Head of the League of Arab States Observer Mission to Syria for the period from 24 December 2011 to 18 January 2012 ('Arab League Report'), at para 12, attached as Enclosure 4 to Letter, dated 24 January 2012 from the Secretary-General addressed to the President of the Security Council, S/2012/71, http://repository.un.org/bitstream/handle/11176/16570/S_2012_71-EN.pdf.
[303]	*Ibid.* at para 13.

*intense exchanges of gunfire among the sides, the Mission witnessed the effects of the destruction wrought on outlying districts.  The Mission witnessed an intense exchange of gunfire between the Army and opposition in Baba Amr.*[304]

206.    In summarising their findings in relation to their mandate to monitor and observe the cessation of violence, the Head of the Mission reported that observers witnessed acts of violence perpetrated by Government forces and an exchange of gunfire with armed elements in Homs.  They also observed armed groups committing acts of violence against Government forces, resulting in death and injury among their ranks.  In certain situations, '*Government forces responded to attacks against their personnel with force*'.[305]  It also noted that:

> *In Homs, Idlib and Hama, the Observer Mission witnessed acts of violence being committed against Government forces and civilians that resulted in several deaths and injuries. Examples of those acts include the bombing of a civilian bus, killing eight persons and injuring others, including women and children, and the bombing of a train carrying diesel oil. In another incident in Homs, a police bus was blown up, killing two police officers. A fuel pipeline and some small bridges were also bombed.*[306]

207.    Their mandate expired on 19 January and although they decided to extend it for another month around 23 January, President al-Assad turned down another Arab League peace proposal.  Although the monitors remained in Syria for a short period, the mission effectively collapsed.

208.    As well as shelling in Homs, as reported by the Arab League Monitors, on 11 January, the French journalist Gilles Jacquier was among a number of people killed in central Homs

---

[304] *Ibid.* at para 14.
[305] *Ibid.* at para 26.
[306] *Ibid.* at para 27.

during a government-sponsored visit to the area.[307]   It is of note that the members of the CCMC were aware of this particular incident as it was reported on 12 January.[308]   This report noted:

> At 15:20, an (RPG) was fired at a house on the street of the Sahara tourist resort. Subsequently, a French journalist visited the site where the missile had struck along with a number of civilians and members of the press corps and were targeted by two (RPGs) resulting in the death and martyrdom of /7/ individuals, including the French journalist. /11/ individuals, including a woman, and /3/ members of the press corps were wounded from shrapnel.[309]

### D.   ATTACK ON BABA AMR (FEBRUARY 2012)

#### 1.   Overview

209.   During the month of February 2012, Syrian military and security forces conducted a large-scale operation in Homs, in particular, in the neighbourhoods of Khalidiya and Baba Amr. The operation in Homs during this month was noted by a significant and intensified bombardment in the civilian neighbourhoods followed by intensive ground force operations that eventually succeeded in taking back control of the neighbourhoods lost to the Regime.   The period was marked by the targeting of civilian areas by shelling and tanks fire, significant numbers of civilian casualties and the destruction of buildings and property.   Arrests and killings were reported in the period after the retake of the neighbourhoods.   On the completion of the operation, President al-Assad toured the area in early March blaming terrorists and praising the efforts of the army.

#### 2.   Homs Military and Security Chief

210.   In relation to the command and control of operations in Homs, the role of the Homs Military and Security Chief was significant.   As noted earlier in this Report, in late November

---

[307]   *See, e.g.* Melissa Bell, '*Gilles Jacquier, French journalist, killed in Syria*', The Washington Post, dated 11 January 2012 at https://www.washingtonpost.com/blogs/blogpost/post/gilles-jacquier-french-journalist-killed-in-syria/2012/01/11/gIQADWkuqP_blog.html?utm_term=.d1e61688df0f.
[308]   Ex. C-183, CCMC report on the security situation, dated 12 January 2012, SYR.E0001.022.001-005_ET at 002.
[309]   *Ibid.*

2011, the CCMC discussed the positive effect of appointing competent and experienced military commanders to direct all civilian, military and security bodies in the '*hot*' or tense governorates.[310] As a result, *Imad* Dawoud Rajiha (the Minister of Defence/Chief of Staff of the Army and Armed Forces) was tasked to propose '*the appropriate commanders for operations in hot governorates: Idleb – Hama – Homs . . . etc.*'[311] On 23 November 2011, Rajiha was instructed to '*issue special orders to appoint the commanders with the powers to command the operations in the tense governorates*'.[312]

211.    As noted earlier, national level decisions resulted in the formal appointment of a Military and Security Chief in Homs, a key command position.  A senior military officer filled this position with an assistant that came from the Military Intelligence Department.    CIJA documentation indicates that the Homs Military and Security Chief was (at least initially) *Imad* Ali Abdullah Ayoub, one of the Deputy Chiefs of Staff of the Army.[313]  The fact that such a senior and key figure in the Command of the Army and Armed Forces was appointed to this position in Homs is testimony to the seriousness with which the senior leadership viewed the situation in the governorate.  Furthermore, it indicates a belief that the situation was to be resolved by someone with seniority and experience.

212.    Although Ayoub, as the Military and Security Chief, was the key commander, he did have an Assistant (entitled the '*Security Chief in the Homs Governorate and Assistant to the Military Commander*') who was Rafiq Shahadah, a senior officer in the Military Intelligence Department.  A

---

[310]  Ex. C-180, Minutes of the CCMC on 21 November 2011, dated 22 November 2011, SYR.E0001.015.046-048 at 047_ET at 047.

[311]  *Ibid.* at 048.

[312] Ex. C-189, Minutes of the CCMC meeting on 23 November 2011, dated 24 November 2011, SYR.E0013.002.058-059_ET at 059.

[313]  *See, e.g.* Ex. C-103, Cover letter from Branch 261 attaching a letter from Branch 261 to 'Mr. Imad Ali Abdullah Ayoub, Deputy Chief of Staff, the General Military and Security Chief in the Homs Governorate', dated 10 April 2012, SYR.D0124.020.003-004_ET at 004; Ex. C-57, Appointment order, dated 10 August 2011, SYR.D0063.010.008_ET at 008.

comparison of signatures in CIJA-obtained documents reveals that by early 2012 Shahadah was in this position in Homs. Previously, Rafiq Shahadah had been the head of a Military Intelligence Branch in Damascus (Branch 293). On 23 August 2011, the European Union placed Shahadah on their sanctions list stating that he was:

> *Head of Syrian Military Intelligence (SMI) Branch 293 (Internal Affairs) in Damascus. Directly involved in repression and violence against the civilian population in Damascus. Advisor to President Bashar Al-Assad for strategic questions and military intelligence.*[314]

213.    A small number of documents held by the CIJA allows for a comparison to be made between the signature of the Head of Military Intelligence Branch 293 in 2011/2012 (Shahadah) and the Security Chief in the Homs Governorate and Assistant to the Military Commander in 2012.[315] This comparison appears to demonstrate a match in the distinctive signatures. This would appear to indicate that at some point after *Imad* Ali Abdullah Ayoub was appointed as the Homs Military and Security Chief, Rafiq Shahadah was appointed as his Assistant. It is also of note that one CIJA held document from Branch 293 (signed by Shahadah) is dated 16 February 2012 (i.e. at the height of the Baba Amr attack).[316] This would seem to indicate that Shahadah was potentially doing both jobs concurrently or was able to maintain oversight of some Branch 293 work at the

---

[314] Corrigendum to Council Implementing Regulation (EU) No 363/2013 of 22 April 2013 implementing Regulation (EU) No 36/2012 concerning restrictive measures in view of the situation in Syria in Official Journal of the European Union, dated 09 May 2013 at http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex:32013R0363R(03).

[315] To compare the signatures, note, for example, the signature of the Head of Branch 293 on Ex. C-115, Letter from Branch 293 to Branch 271, dated 28 September 2011, SYR.D0175.004.005_ET at 005 and the signature of '*Major-General Security Commander in the Homs Governorate and Assistant to the Military Commander*' in Ex. C-91, Branch 318 report, dated 20 March 2012, SYR.D0124.006.001-003_ET at 003. The relevant signature appears in the signature block labelled '*Opinion of Mr. Major General Security Chief in the Homs Governorate and Assistant to the Military Commander*'.

[316] Ex. C-135, Communication from Head of Branch 293 to the Head of Branch 222 and the Head of Branch 271, dated 16 February 2012, SYR.D0199.041.009_ET at 009.

same time that he was the Security Chief in the Homs Governorate and Assistant to the Military Commander.

214.    In relation to the function of the Homs Military and Security Chief, it appears from a number of documents provided by the CIJA that this was a critical and significant military position in the governorate.   The initial reason for establishing such a position at all was to place all the security bodies in the governorate under the command of an experienced and senior military figure. In Idleb governorate, the appointment order for the Military and Security Chief came from the President, authorised and signed by the Minister of Defence/Chief of Staff of the Army and Armed Forces.[317]   It charged Major-General Fuad Hammouda with the command of all military units, security forces, police units and government/party authorities and he was to be seen as the head of the Security Committee in the governorate.   All these bodies were requested to fully comply with the order and:

> *Full cooperation and coordination between those concerned is requested for the implementation of organised special operations in order to achieve complete success, ensure the security and stability in the governorate and enhance the confidence of the citizens in their army and security forces.*[318]

215.    It was also referenced that '*a daily report with all activities carried out in the governorate is to be sent to the General Command of the Army and Armed Forces – Operations Commission.*'  If this was the instruction in Idleb (one of the tense or '*hot*' governorates), it would seem very likely that a similar appointment instruction would have been issued for the Military and Security Chief in Homs.

---

[317]  Ex. C-120, Administrative Order from the General Command of the Army and Armed Forces, dated 26 November 2011, SYR.D0178.001.007_ET at 007.

[318]  *Ibid.*

216.     Documentation in the spring and summer of 2012, clearly demonstrates that the Homs Military and Security Chief was the link between the governorate level security/intelligence branches and the military units conducting operations in Homs (including the 11th Division, the 18th Division and the deployed Special Forces units).

217.     *Imad* Ali Abdullah Ayoub's position as the Homs Military and Security Chief fits with the decisions of the CCMC in November 2011 to appoint experienced and seasoned military officers in tense governorates to lead the security apparatus in these areas, as discussed above in Section III.G.  In Idleb, Major-General Fuad Hammouda was a senior Special Forces commander who had been operating in Idleb since the summer of 2011.  Ayoub was also an experienced military officer having commanded the 1st Corps in Dar'a earlier in the conflict.[319]  On his promotion to one of the Deputy Chiefs of Staff of the Army in August 2011, it made Ayoub one of the most senior officers in the General Staff and army.  Homs was a significant military problem for the Regime and it presumably required an officer of the level and calibre of Ayoub, a Deputy Chief of Staff and former commander of the 1st Corps, to deal with its complexities.

218.     A small number of documentary references (predominantly intelligence related documents) provided by the CIJA directly refer to Ayoub in the position of the Homs Military and Security Chief.  The earliest of these is dated 13 March 2012 (less than two weeks after the end of the operations in Baba Amr).[320]  This document was sent from the General Intelligence Branch in Homs (Branch 318) addressed to *'Imad Deputy Chief of Staff of the Army and Armed Forces – The*

---

[319]  Ex. C-64, Letter from the Ministry of Local Administration in Dar'a, dated 14 May 2011, SYR.D0065.002.096_ET at 096.

[320]  Although the CIJA-obtained documentation pertaining to Homs does not provide complete, day-by-day coverage of the period involving the February 2012 attack on Baba Amr, the available documents identify key personnel and structures involved.

*Security and Military Chief in the Homs Government'.*[321]  Although this particular document did not mention Ayoub by name, he was at that time the Deputy Chief of Staff of the Army and Armed Forces.[322]

219.    These documentary references highlight the process of decision-making and the authority of the Homs Military and Security Chief.  It appears evident from these examples that the Homs Military and Security Chief received information from the governorate intelligence branches, who understood his function as a central security figure in the governorate.  The branches could (and did) make recommendations for action, and then prior to any decision by the Military and Security Chief, the information or report was sent to the Assistant who gave his advice and opinion.  It was the Homs Military and Security Chief, however, who gave the final decision on what action was to be taken.  Once this decision was issued it was disseminated back down the chain for action.

220.    Several documents illustrate this process of reporting, recommending, and decision-taking, although their core subject matter is not necessarily always significant.  The 13 March document, noted above, highlights the decision-making processes utilised by the Homs Military and Security Chief and is worth exploring in detail.[323]  The document made reference that an Intelligence Branch patrol in Hama had attempted to defuse an explosive device but it had detonated whilst it was being transported, killing some troops.  The implication was that several timers were being used to mislead those attempting to defuse such devices.  The Homs General Intelligence

---

[321]  Ex. C-112, Branch 261 report to all army units in Homs governorate, dated 31 March 2012, attaching Branch 318 report sent to *'Imad Deputy Chief of Staff of the Army and Armed Forces – the Security and Military Chief in the Homs Government'*, dated 13 March 2012, SYR.D0124.027.004-005_ET at 005.
[322]  Ex. C-57, Appointment order, dated 10 August 2011, SYR.D0063.010.008_ET at 008.
[323]  Ex. C-112, Branch 261 report to all army units in Homs governorate, dated 31 March 2012, attaching Branch 318 report sent to the *'Imad Deputy Chief of Staff, the Security and Military Chief in the Homs Governorate'*, dated 13 March 2012, SYR.D0124.027.004-005_ET at 004.

Branch (Branch 318) had obtained this information and felt it was important enough to pass it on. It did this by submitting the information to the Homs Military and Security Chief, recommending that the information should be circulated to security agencies and the army through Branch 261 (the Homs Military Intelligence Branch) in order to alert those defusing similar devices.

221.    Branch 318 provided the information report to Ayoub with the request '*be informed and advise us of your decision*'.   The document was processed initially by Ayoub's Assistant (Rafiq Shahadah; the '*Major General, the Security Chief in the Homs Governorate and Assistant to the Military Commander*').   Shahadah signed the document and offered his opinion ('*My opinion is to approve the recommendation*').[324]   The Homs Military and Security Chief (Ayoub) then acted on the report and the opinion offered by his Assistant by issuing his '*Decision*' which, in this case, was an approval of the original suggestion made by Branch 318 to circulate the information through Military Intelligence Branch 261.   Once Ayoub issued his decision and signed the document, it was evidently actioned – a second document indicated that Branch 261 did indeed issue a report to all military units attaching a copy of the original letter from Branch 318 referencing '*the decision of Mr. Imad, Deputy Chief of Staff, the Security and Military Chief in the Homs Governorate*' requesting the units to abide by its content.[325]

222.    Other documents also highlight the process of proposal, opinion and decision.   On 24 March, for example, Branch 318 sent a report to '*Mr. Imad, Deputy Chief of Staff for the Army and Armed Forces[–] Security and Military Chief in the Homs Governorate*' passing on information on '*terrorists*' planning to target forces while deployed outside Homs using missiles capable of destroying

---

[324] *Ibid.* at 005.
[325] *Ibid.* at 004.

T 72 tanks.[326]   Branch 318 recommended passing on the information through Military Intelligence

Branch 261.   The Assistant agreed with the recommendation and the Military and Security Chief, in

his decision gave his approval.[327]   In a further documented example, on 10 April, Military

Intelligence Branch 261 (the Homs governorate Military Intelligence Branch) disseminated an

intelligence report to Ali Ayoub by name ('*Mr. Imad Ali Abdullah Ayoub, Deputy Chief of Staff, the*

*General Military and Security Chief in the Homs Governorate*').[328]   The information related to armed

men operating in Homs using machine guns mounted on vehicles and mortars.   It also noted the

location of a restaurant that was being used as a field hospital. Branch 261 recommended that the

information be circulated among the security agencies and the army '*in order to act accordingly*'.

Again the document was signed and stamped with the '*Security Chief in the Governorate and Assistant*

*to the Military Commander*' who requested the approval of Ali Ayoub, who, in turn signed the

document granting his approval.

223.    Although the documents provide by the CIJA relating to the Homs Military and

Security Chief are dated shortly after the attack on Baba Amr, they do identify the apparent link

between the intelligence branches collecting and providing information and the dissemination of this

to military units operating in the Homs area for action.   Again, the Homs Military and Security

Chief and his Assistant appeared to be the centre of this process.

---

[326]  Ex. C-110, Branch 261 report to the 11th and 18th Tank Divisions and the 554th and 41st Special
Forces Regiments, dated 11 April 2011, attaching Branch 318 report, dated 24 March 2012,
SYR.D0124.025.002-003_ET at 003.
[327]  *Ibid.* at 002.
[328]  Ex. C-103, Branch 261 report to the 18th and 11th Tank Divisions and the 554th and 41st Special
Forces Regiments attaching Report from Branch 261 to '*Mr. Imad Ali Abdullah Ayoub, Deputy Chief
of Staff, the General Military and Security Chief in the Homs Governorate*', dated 10 April 2012,
SYR.D0124.020.003-004_ET at 004.

224.     On 14 April, for example, Branch 261 disseminated an instruction to the 11th Tank Division, the 12th Tank Division, the 41st Special Forces Regiment and the 554th Special Forces Regiment enclosing a Branch 261 memo that had clearly been sent earlier to the Homs Military and Security Chief for approval.  The instruction stated that the units were to '[*b*]e *informed and abide by the decision of Imad Deputy Chief of Staff, the General Military and Security Chief in the Homs Governorate*'.[329]  It appears that the task of disseminating instruction to the army units operating in the governorate was given to Military Intelligence Branch 261.[330]

225.     Two identified, CIJA-provided documents (dated June 2012) appear to demonstrate a similar process in the targeting and use of artillery, in which subordinate Branches offered 'proposals', the Assistant offered an 'opinion', and then the Homs Military and Security Chief took a 'decision' on the use of artillery.

226.     The first document is dated 26 June 2012.[331]  On that day, Branch 261 sent information to the Homs Military and Security Chief on a number of houses and locations in ar-Rastan where they indicated armed men were residing and where a suspected explosives manufacturing facility (located at a dispensary) appeared to be located.  Branch 261 proposed that the ar-Rastan sector commander be informed '*through the committee operations office and attack[ ] these locations with artillery*'.[332]  The Assistant (Shahadah) signed and annotated the document with

---

[329]  Ex. C-98, Instruction from Branch 261 to various military units, dated 14 April 2012, SYR.D0124.013.003_ET at 003.

[330]  *See, e.g. ibid.*; Ex. C-105, Instruction from Branch 261 to various military units, dated 24 April 2012, SYR.D0124.023.001_ET at 001.

[331]  Ex. C-93, Report from Branch 261 to the 11th Tank Division, dated 06 July 2012, attaching a report from Branch 261 to the Homs Military and Security Chief, dated 26 June 2012, SYR.D0124.008.003-004_ET at 004.

[332]  *Ibid.*  It is unclear from this document what '*committee operations office*' refers to, whether this was the Governorate Security Committee or another committee that had been established in the command of the Homs Military and Security Chief.

the comment '*My opinion is to approve*'.  The Homs Military and Security Chief gave his decision agreeing with the proposals and instructions to task the commander of ar-Rastan sector to '*verify the location of targets and shell them with the artillery*'.[333]  As a result of these recommendations and decisions, on 06 July, Branch 261 sent a cover letter to the 11th Tank Division enclosing the decision of the Homs Military and Security Chief instructing '*be informed, abide by the content and inform the Talbiseh Sector Commander*'.[334]

227.    In a similar manner, on 27 June, Branch 261 sent another report to the Homs Military and Security Chief with information about a number of defected officers living in a multi-story house in ar-Rastan.[335]  According to this report, the second floor was being used as a field hospital.  To the north of the building, it was reported that there was a kindergarten and a vegetable market.  A further reference noted that a house was being used as a weapons store and a defected officer was allegedly staying at another location.  Branch 261 recommended that forces in the area '*use the information*'.  The '*opinion*' made by the Assistant was to '*accurately locate the location and bombard it immediately*'.  The '*decision*' of the Homs Military and Security Chief appeared to be to agree with the suggestion of his Assistant and he instructed that:

> *The commander of the ar-Rastan sector, determine the location of the place and strike with artillery immediately.*[336]

228.    It should be noted that by this time (June 2012), *Imad* Ali Ayoub had been replaced as the Homs Military and Security Chief by Major General Naim Jassem Suleiman (who had been the Chief of Staff of the 3rd Corps).[337]

---

[333] *Ibid.*
[334] *Ibid.* at 003.
[335] Ex. C-97, Branch 261 report sent to the Homs Military and Security Chief, dated 27 June 2012, SYR.D0124.013.002_ET at 002.
[336] *Ibid.*

229.     Although the process of 'proposal', 'opinion' and 'decision' clearly placed the Homs Military and Security Chief as the senior security and military commander in the governorate,[338] some documentary evidence exists indicating that the Assistant did appear to have some authority to issue instructions himself to the intelligence branches, in some cases without a noted signature from the Homs Military and Security Chief.

230.     As an example, on 18 April, Branch 318 sent a report addressed specifically to Rafiq Shahadah ('*Major General Security Chief in the Homs Governorate and Assistant to the Military Commander*').[339]   It noted that in following up communications of suspected individuals in Homs they had monitored a phone call between two individuals.   One was named ▮▮▮▮▮▮ and the other was an unidentified individual that worked as an anchor for al-Jazeera.   The report noted that:

> ▮▮▮▮▮ *was informing the latter that the city was subject to heavy bombardment, on an average of one shell every five minutes and around 20 missiles. He said that the attacks targeted al-Khalidiya neighbourhood and Jawrat al-Shiyah and that the missiles were either Iranian or Russian Raad because the trajectory of the missile could be heard. He also informed him that 18/04/2012 coincides with the anniversary of Homs Square massacre, the first massacre of the events. It was also said that around 150 bodies were rotting in the national hospital due to electricity cut-off, and around 1000 bodies were in the neighbourhoods of Jawrat al-Shiyah, al-Qarabis, al-Qusur, and old Homs. They are going to be taken away before the arrival of the monitors and attention should be drawn to this issue.*[340]

---

[337]  *See, e.g.* Ex. C-104, Branch 261 report sent to '*Major-General Naim Jassem Suleiman, Homs Military and Security Chief*', dated 22 May 2012, SYR.D0124.021.002_ET at 002.  This also identifies the process of 'proposal' by the Branch, 'opinion' of the Assistant and the 'decision' of the Homs Military and Security Chief.

[338]  *See, e.g.* Ex. C-96, Branch 261 letter to the 11th and 18th Tank Divisions and 41st and 554th Special Forces Regiments, dated 02 May 2012 attaching a report from Branch 318 to the Homs Military and Security Chief, dated 12 April 2012, SYR.D0124.012.006-007_ET at 006-007.

[339]  Ex. C-102, Branch 261 instruction to various military units, dated 02 May 2012 attaching a Branch 318 report to the Security Chief in the Homs Governorate and Assistant to the Military Commander, dated 18 April 2012, SYR.D0124.020.001-002_ET at 002.

[340]  *Ibid.*

231.    The Head of Branch 318 proposed to circulate the information to '*the security agencies and army units through Branch 261*' and to '*take the necessary measures*'.  This proposal was agreed to by Shahadah.  A number of days later Branch 261 passed the information down to the military units in the area (the 11th Tanks Division, 18th Tanks Division, 41st Special Forces Regiment, and 554th Special Forces Regiment) with the instruction to '*be informed*.[341]

232.    It is not clear from these two documents if Shahadah had been authorised to take this decision as a result of his position: he was by title the '*Security Chief*' in the governorate and the information was intelligence related rather than information which would potentially necessitate complex military action that may have required Ayoub's authorisation.  It is possible that there had been some prior agreements made with the Homs Military and Security Chief about what instructions Shahadah could take without the annotation or signature of the Homs Military and Security Chief.  It is also conceivable that there had been some communication or discussion between the Homs Military and Security Chief and Shahadah prior to the 18 April instruction itself that did not necessitate the signature of the Military and Security Chief.  It is also conceivable that Shahadah was fulfilling an 'Assistant' role when the Homs Military and Security Chief was physically away from Homs.

233.    Irrespective of how Shahadah came to issue the instruction without the normal 'decision' of the Homs Military and Security Chief, he evidently was able to authorise the proposal made by Branch 318.[342]  A small number of other references also note a similar process.  Two reports

---

[341]  *Ibid.* at 001.
[342]  Another identified reference noting a similar decision by the Security Chief and Assistant to the Military Commander is Ex. C-106, a Branch 261 report to various military units, dated 24 April 2012, attaching a report from the Air-Force Intelligence Branch in the Central Region report, dated 13 April 2012, SYR.D0124.023.003-004_ET and at 003-004.

from Air-Force Intelligence (one dated 20 March[343] and a second dated 13 April 2011[344]) provided information in the Khalidiyeh area of Homs to the Homs Security Chief.  Both proposed that the information should be circulated through Branch 261 to all security agencies and army units operating in the area.  Another reference dated 05 April was a report from General Intelligence Branch 318 sent to Shahadah.  It stated as follows:

> *We were told by a source that on 3/4/2012 three houses located at the end of the city district of Karm al-Zeitoun, behind the phosphate corporation, were burned down after their owners abandoned them as a result of the poor security situation in the said district. The same has happened in more than one district where unidentified individuals, late at night, have burned down houses in several city districts in order to fuel conflict, strike fear and panic among civilians, and accuse the security and army of perpetrating these acts.*[345]

234.    The Head of Branch 318 recommended that the information be circulated through Branch 261 to '*act accordingly and arrest the perpetrators of such acts*'.  Shahadah's decision was to approve this recommendation.

### 3.    Syrian Army Forces

235.    The key military units involved in Homs governorate in 2011 and 2012 principally involved elements of the 3rd Corps, in particular the 11th[346] and 18th Tank Divisions.[347]  Additional

---

[343] Ex. C-92, Branch 261 instruction to all army units in the Central Region, dated 21 February 2012 attaching a report from the Air-Force Intelligence Branch in the Central Region to the Homs Security Chief, dated 20 March 2012, SYR.D0124.008.001-002_ET at 002.

[344] Ex. C-106, Branch 261 report to various military units, dated 24 April 2012, attaching an Air-Force Intelligence Branch in the Central Region report, dated 13 April 2012, SYR.D0124.023.003-004_ET at 003-004.

[345] Ex. C-95, Instruction from Military Intelligence Branch 261, dated 21 April 2012, attaching General Intelligence Branch 318 report sent to '*Mr. Major General Security Chief in Homs Governorate, Assistant to the Military Commander*', dated 05 April 2012, SYR.D0124.011.005-006_ET at 006.

[346] *See, e.g.* Ex. C-108, Branch 261 letter, dated 03 April 2012, SYR.D0124.024.003_ET at 003; Ex. C-103, Cover letter from Branch 261, dated 24 April 2012 attaching a letter from Branch 261 to '*Mr. Imad Ali Abdullah Ayoub, Deputy Chief of Staff, the General Military and Security Chief in the Homs Governorate*', dated 10 April 2012, SYR.D0124.020.003-004_ET at 003.  These documents both note the 11th Tank Division on the distribution list.

elements from the Special Forces[348] and 4th Division also appeared to have played a role in the Baba Amr attack in February 2012.

236.     The Commander of the 3rd Corps in 2011 was Major-General Talal Tlas although it is believed that Major-General Wajih Yahya Mahmoud replaced him as Corps Commander sometime at the end of 2011 or early 2012.   Mahmoud had been the Commander of the 18th Tank Division.[349]   Documents provided by the CIJA do not make clear the exact role of the 3rd Corps Commander in Homs during the attack on Baba Amr, especially after the establishment of the Homs Military and Security Chief.

237.     The 18th Tank Division was one of the key units of the 3rd Corps and appears to have been based and utilised in the city of Homs itself.   The 18th Tank Division comprised a series of

---

[347]  *See, e.g.* Ex. C-84, Report from Police Command in Homs on the abduction of a Lieutenant Colonel from the 120th Brigade of the 18th Division, dated 31 October 2011, SYR.D0088.010.005_ET at 005; Ex. C-160, CCMC Report on the Security Situation, dated 03 December 2011, SYR.E0001.011.030-037_ET at 032.  This notes the defection of an officer and troops from the 18th Division in Homs; Ex. C-108, Branch 261 letter, dated 03 April 2012, SYR.D0124.024.003_ET at 003.

[348]  Ex. C-91, Branch 261 cover letter, dated 08 April 2012, attaching a cover letter from Branch 318 sent to '*Homs Military Intelligence Branch, Air-Force Intelligence Branch in the Central Region and Political Security*', dated 24 March 2012 and Branch 318 report to the '*Deputy Chief of Staff of the Army and Armed Forces, Homs Military and Security Chief*', dated 20 March 2012, SYR.D0124.006.001-003_ET at 001.  The Branch 261 cover letter is distributed to the 11th and 18th Tank Divisions as well as the 554th and 41st Special Forces Regiments.

[349]  *See, e.g.* Ex. C-13, Letter from the Commander of the 18th Tank Division, dated 09 October 2011, SYR.D0017.089.069_ET at 069.

subordinate Brigades including the 120th Mechanised Brigade,[350] the 131st Tank Brigade,[351] the 134th Tank Brigade[352] and the 167th Tank Brigade.[353]

238. A limited number of documents provided by the CIJA indicate that the 18th Tank Division manned and operated checkpoints in Homs city. On 03 December 2011, a CCMC report on the security situation noted that a Captain defected '*from Division /18/ with (16) elements who were deployed to a checkpoint in Baba Amr*' taking weapons and military equipment with them.[354] On 02 February 2012, a Minister of Interior report to the CCMC referenced that two conscripts from the 18th Division had defected from a security checkpoint in Bayada city district.[355]

239. Other units identified in CIJA identified documents included the engagement of the 41st and 554th Special Forces Regiments. These two regiments appeared to have been placed under the command of the Homs Military and Security Chief.[356]

240. The 4th Tank Division has historically been seen as an elite unit of the Syrian army. Based in Damascus this unit has gained something of a notorious reputation in the Syrian conflict. CIJA provided documentation appears to indicate that, until the end of 2011, the commander of the

---

[350] Ex. C-84, Report from Police Command in Homs on the abduction of a Lieutenant Colonel from the 120th Brigade of the 18th Division, dated 31 October 2011, SYR.D0088.010.005_ET at 005.

[351] Ex. C-85, Administration Annex for Training and Evaluation, undated, SYR.D0090.001.025-029_ET at 029.

[352] Ex. C-14, Letter to the 18th Tank Division from the 134th Tank Brigade, dated 08 October 2011, SYR.D0017.089.070_ET at 070.

[353] *See* Ex. C-137, Undated annex, SYR.D0220.004.009-012_ET at 011.

[354] Ex. C-160, CCMC report on the security situation, dated 03 December 2011, SYR.E0001.011.030-037_ET at 032.

[355] Ex. C-191, Report from the Minister of Interior, dated 02 February 2012, SYR.E0013.007.145-154_ET at 147.

[356] *See, e.g.* Ex. C-98, Branch 261 report, dated 14 April 2012, SYR.D0124.013.003_ET at 003; Ex. C-107, Branch 261 report, dated 24 April 2012, SYR.D0124.023.005_ET at 005; Ex. C-106, Branch 261 report to various military units, dated 24 April 2012, attaching an Air-Force Intelligence Branch in the Central Region report, dated 13 April 2012, SYR.D0124.023.003-004_ET at 003; Ex. C-105, Branch 261 report, dated 21 April 2012, SYR.D0124.023.001_ET at 001.

4th Division was Major-General Ali Muhammad Dergham.[357]  It is believed that Dergham was eventually replaced.  Significant open source reporting indicates that although Major-General Ali Dergham (and any replacement) was the *de jure* Division commander; the *de facto* commander was the President's brother Maher al-Assad.[358]

### 4.    Homs Governorate Intelligence/Security Branches

241.    As is the case in all of Syria, Homs had a series of intelligence and security branches that operated within the governorate.  These were Military Intelligence Branch 261, the Air-Force Intelligence Branch in the Central Region, General Intelligence Branch 318 and the Homs Political Security Branch.

242.    In 2011/2012, Military Intelligence Branch 261 was commanded by Brigadier-General Muhammad bin Abdul Hadi al-Zamrini.  On 09 September 2010, Zamrini had been appointed as the Assistant Head of Branch.[359]  On 23 August 2011, the European Union placed Zamrini on their restrictive measures list indicating that he was the '*Branch Chief for Syrian Military Intelligence (SMI) in Homs*' and had been '[*d*]*irectly involved in repression and violence against the civilian population in Homs.*'[360]

243.    As noted earlier in this report, the intelligence and security branches were involved in an array of tasks and Branch 261 was no different in this regard.  It was involved in the arrest of

---

[357]  Ex. C-16, Letter from the 4th Tank Division to the Infantry Training School, dated 20 October 2011, SYR.D0018.014.026_ET at 026; Ex. C-15, List of officers from the 4th Tank Division selected to attend a platoon commander's course, dated 12 November 2011, SYR.D0018.013.005_ET at 005.
[358]  *See, e.g.* European Union Council decision 2012/739/CFSP, dated 29 November 2012 concerning restrictive measures against Syria at http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32012D0739.
[359]  Ex. C-133, Transfer order No 68, dated 09 September 2010, SYR.D0197.053.014_ET at 014.
[360]  European Union Council decision 2012/739/CFSP, dated 29 November 2012 concerning restrictive measures against Syria at http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32012D0739.

individuals,[361] the collection and passage of information and intelligence,[362] security studies on identified individuals[363] and the receipt of wanted lists.[364]

244.    In terms of their own information gathering, Branch 261 utilised a number of methods of collection including the acquisition of intercepted communications and the use of informants.  In relation to the interception of communications, Branch 261 clearly had the ability to monitor phone calls from individuals of interest, and to collect this information, analyse it and disseminate it to others for action.  On 26 September 2011, for example, one CIJA provided document notes information gathered by Branch 261 that it had gained from monitoring the phone calls of four individuals (one of whom was a self-styled '*Emir*' in Idleb).[365]  Two of the individuals discussed a request for the provision of a unit of blood.  The details of the individuals and the conversation they had were passed in a report from Branch 261 to Branch 271, the Military Intelligence branch in Idleb.

245.    In another reference, on 28 September 2011, Branch 261 sent a cover letter and the transcript of a conversation between two individuals (one in Hama and one in al-Rastan in Homs)

---

[361]  *See, e.g.* Ex. C-119, Report from Homs Military Police to the Head of Branch 261, dated 11 September 2011, SYR.D0175.011.042-043_ET at 042.  This document details the activities of an individual who had been held by Branch 261 but was being transferred to Branch 293 by the Military Police.

[362]  Ex. C-31, Circular, dated 11 May 2011 from Branch 294 to all branches referencing a Branch 261 report on the details of a leaflet issued by Syrian opposition in Lebanon, SYR.D0043.001.181_ET at 181.

[363]  Ex. C-134, Military Intelligence Branch 271 request to Branch 261 for the security study on an individual, dated 04 November 2011, SYR.D0197.071.007_ET at 007.

[364]  *See, e.g.* Ex. C-5, Communication from Military Intelligence Branch 294, dated 14 December 2011 listing 21 individuals to be searched for and when arrested brought to Branch 227 (Damascus), SYR.D0006.008.006_ET at 006.

[365]  Ex. C-118, Report from Branch 261 to Branch 271, dated 26 September 2011, SYR.D0175.011.039_ET at 039.

discussing the situation in ar-Rastan and that it was surrounded by the army.[366]   The details on the transcript indicate that Branch 261 had the capacity to identify individuals by name, the telephone numbers they were using, the time of calls and the details of conversations.

246.     Branch 261 also utilised sources or informers for the collection of information.[367]   In a later-dated document (26 June 2012), for example, Branch 261 sent a report to the Homs Military and Security Chief indicating that they had received information from '*trusted sources*'.[368]   It indicated that there were two chicken farms to the east of a cement factory in ar-Rastan where around 150-200 militants were living.   It also stated that '*injured terrorist elements*' were receiving treatment '*at al-Berr hospital in ar-Rastan, located off the agricultural bank from the western side*'.  Branch 261 proposed to the Homs Military and Security Chief to '*influence them with artillery or aircraft*'.   The Homs Military and Security Chief agreed with the proposal, instructing to '*act accordingly*'.

247.     Branch 261 (Military Intelligence) was potentially the most important of the intelligence and security branches in Homs as it appeared to act as something of a conduit between the Homs Military and Security Chief and the military units in the governorate.   As noted earlier in this Report, a process of 'proposal' (by intelligence branches), 'opinion' (by the Homs Security Chief and Assistant to the Military Commander) followed by a 'decision' (by the Homs Military and Security Chief) was utilised with the intelligence branches and those in command in the governorate.  When a decision was taken by the Homs Military and Security Chief that required the further

---

[366]  Ex. C-114, Cover letter and transcript sent from Branch 261 to Branch 271, dated 28 September 2011, SYR.D0175.004.001-002_ET at 001-002.
[367]  *See, e.g.* Ex. C-109, Branch 261 report to the General Military and Security Chief in Homs, dated 28 March 2012, SYR.D0124.024.004_ET at 004.
[368]  Ex. C-100, Branch 261 report to the General Military and Security Chief in the Homs Governorate, dated 26 June 2012, SYR.D0124.017.002_ET at 002.

dissemination of information to or the action by military units, this was facilitated through Branch 261. This could be for information provided both by Branch 261 itself or information provided by the other security/intelligence branches.

248.     As an example, on 10 April, Branch 261 disseminated an intelligence report to Ali Ayoub (by name).[369] This related to armed men operating in Homs using machine guns mounted on vehicles and mortars and referenced the location of a restaurant that was being used as a field hospital.  Branch 261 recommended that the information be circulated among the security agencies and the army.  Ayoub granted his approval.  A little later, Branch 261 drafted a cover letter enclosing the same report and Ayoub's signature and determination and sent this to the 11th Tank Division, the 18th Tank Division, the 554th and 41st Special Forces Regiments drawing specific attention to Ayoub's decision.[370]

249.     Demonstrating the same dissemination process but utilising information from another intelligence/security branch, on 20 March, Branch 318 (General Intelligence) sent a report to the Homs Military and Security Chief providing information from '*a source*' about armed opposition activity in various locations.[371]  It noted that the source had indicated that '*around /600/ gunmen fled Baba Amr to the Lebanese town of Arsal*'.  Branch 318 proposed that the information be circulated to '*all security agencies and army units through Branch 261 to take the necessary security measures*'.  On 08 April, Branch 261 disseminated the information to the military units in the

---

[369]  Ex. C-103, Cover letter from Branch 261 attaching a letter from Branch 261 to '*Mr. Imad Ali Abdullah Ayoub, Deputy Chief of Staff, the General Military and Security Chief in the Homs Governorate*', dated 10 April 2012, SYR.D0124.020.003-004_ET at 004.

[370]  *Ibid.* at 003.

[371]  Ex. C-91, Branch 261 cover letter, dated 08 April 2012, attaching a cover letter from Branch 318 sent to '*Homs Military Intelligence Branch, Air-Force Intelligence Branch in the Central Region and Political Security*', dated 24 March 2012 and Branch 318 report to the '*Deputy Chief of Staff of the Army and Armed Forces, Homs Military and Security Chief*', dated 20 March 2012, SYR.D0124.006.001-003_ET at 002.

governorate including the 11th Tank Division, the 18th Tank Division, and the 554th and 41st Special Forces Regiments.[372]

250.    In a similar manner to Branch 261, General Intelligence Branch 318 also appeared to have the capability to intercept communications.   On 03 April 2012, for example, Branch 318 dispatched a report to *Imad* Ali Ayoub that referenced the monitoring of a phone call between two individuals discussing the situation in Deir Baalba district in Homs city and the opposition defences in the area and their lack of ammunition.[373]   The Head of Branch 318 proposed that the information be circulated to all security agencies and army units through Branch 261 '*to take the necessary security and military measures*'.   The Homs Military and Security Chief approved the proposal and later the report was disseminated by Branch 261 to the military units in the area.[374]   It should be noted that around this time, open source reporting made reference of a significant massacre that occurred in Deir Baalba.[375]

251.    In terms of the other two intelligence/security branches in Homs, in early 2012, the Air-Force Intelligence Branch in the Central Regions was commanded by Staff Brigadier-General

---

[372]  *Ibid.* at 001.

[373]  Ex. C-94, Branch 261 report to various military units, dated 26 April 2012 attaching Branch 318 report to the '*Deputy Chief of Staff of the Army and Armed Forces[,] Homs Military and Security Chief*', dated 03 April 2012, SYR.D0124.008.005-006_ET at 006.

[374]  *Ibid.* at 005.

[375]  *See, e.g.* Erika Solomon, '*Syrians find "massacre" on Homs city street*', Reuters, dated 07 April 2012, at https://www.reuters.com/article/us-syria-bodies/syrians-find-massacre-on-homs-city-street-idUSBRE83606V20120407.

Sayel Asa'ad Dawoud[376] and the Political Security Branch in Homs was commanded by Brigadier-General Hussam Luqa.[377]

### 5.    Armed Opposition Activity (October 2011 – February 2012)

252.    By the autumn of 2011 an organised armed opposition had been firmly established in Homs that was controlling sections of the city and undertaking operations against Regime security forces. Prior to this, some documentary references had already noted the presence of armed elements during some of the earlier demonstrations in Homs governorate, especially after the deaths of protesters at the hands of security elements.[378]   Some references also noted that armed elements had caused casualties to Regime security forces in this period[379] and that weapons smuggling into Homs was being reported.[380]

253.    In the summer months, after the establishment of the Free Syrian Army (FSA) in July 2011, armed opposition groups began to further organise and coalesce in Homs.   By the autumn, defected officers and soldiers that had fled to Homs and volunteers from the city had formed an opposition that gradually began to take control of some city areas initially as defensive groups.[381]   They developed further and began to conduct their own active operations against Regime

---

[376]   Ex. C-92, Branch 261 instruction to all army units in the Central Region, dated 21 February 2012 attaching a Communication from the Air-Force Intelligence Branch in the Central Region to the Homs Security Chief, dated 20 March 2012, SYR.D0124.008.001-002_ET at 002.

[377]   Ex. C-69, Political Security Branch in Homs report to the Head of the Political Security Branch in Ar-Raqqa, dated 26 June 2012, SYR.D0077.017.008_ET at 008.

[378]   *See, e.g.* Ex. C-147, CCMC report on the security situation, dated 04 May 2011, SYR.E0001.006.024-027_ET at 025.

[379]   *See, e.g.* Ex. C-148, CCMC report on the security situation, dated 06 May 2011, SYR.E0001.006.032-037_ET at 034.

[380]   Ex. C-131, Bulletin from the Communications Administration, dated 22 June 2011, SYR.D0183.016.123-124_ET at 123.

[381]   *See, e.g.* Dispatch from BBC reporter Paul Wood in Homs, dated 26 November 2011, entitled '*Syria slowly inches towards civil war*' at http://www.bbc.co.uk/news/world-middle-east-15905970. Also referenced in Telegraph article by Paul Wood, dated 26 November 2011, entitled '*Syria*

forces. As joint military/security operations began to increase in Homs, the activity of armed

opposition groups also began to increase.[382]   Incidents reported to the CCMC included shooting at

Regime checkpoints and armed clashes,[383] the killing of security force personnel,[384] and attacks on

infrastructure.[385]

254.    By November, Regime forces lost control of Baba Amr and their presence was

limited to holding a number of checkpoints in the district and their own military forces surrounding

the city.[386]   Armed clashes between the Regime and the opposition became even more frequent.

Some of the reports to the CCMC note this activity, including RPG attacks by '*gunmen*' and

continued assaults on Regime checkpoints.[387]   Other reports note the death and wounding of

---

*Despatch: inside the battle for Homs, centre of resistance to Bashar al-Assad*' at
http://www.telegraph.co.uk/news/worldnews/middleeast/syria/8917973/Syria-despatch-inside-the-
battle-for-Homs-centre-of-resistance-to-Bashar-al-Assad.html.

[382] *See* Report of the UN Independent International Commission of Inquiry on the Syrian Arab
Republic (UN CoI) report, dated 16 August 2012, at paras 26-29, 58, available at
http://www.ohchr.org/Documents/HRBodies/HRCouncil/RegularSession/Session21/A-HRC-21-
50_en.pdf ('Third UN CoI Report').

[383] *See, e.g.* Ex. C-155, CCMC report on the security situation, dated 09 June 2011,
SYR.E0001.008.029-031_ET at 029; Ex. C-156, CCMC report on the security situation, dated 26
June 2011, SYR.E0001.008.073-074_ET at 073.

[384]   *See, e.g.* Ex. C-141, CCMC report on the security situation, dated 01 August 2011,
SYR.E0001.001.003-005_ET at 003.

[385] *See, e.g.* Ex. C-164, CCMC report on the security situation, dated 23 December 2011,
SYR.E0001.011.165-169_ET at 166.

[386] *See, e.g.* Ex. C-190, Report from the Minister of Interior, Political Security Division, dated 02
February 2012, noting checkpoints in the Baba Amr area of Homs, SYR.E0013.004.017-031_ET at
019-020.

[387]   *See, e.g.* Ex. C-168, CCMC report on the security situation, dated 01 February 2012,
SYR.E0001.012.001-006_ET at 003.  This noted RPG attacks and an attack by unknown gunmen
who '*opened fire against an army checkpoint on Baba Amr neighbourhood.  As a result, 3 elements from
the army suffered wounds*'.  Also note Ex. C-192, Report from the Minister of Interior to the CCMC,
dated 03 February 2012, SYR.E0013.007.155-168_ET at 158-159.  This notes in Homs examples
of demonstrations in which some members were armed, attacks on Regime checkpoints, the killing
of security force personnel, attacks on infrastructure and abductions.

Regime security force personnel.[388]  In one reference on 05 February, for example, a report noted the wounding of seventy-seven military and security personnel in various locations in Homs.[389]  Attacks on infrastructure by '*unknown gunmen*' were also referenced, including damage to the oil pipeline that ran through Homs governorate.[390]

255.    When the Arab League observers arrived in Homs they attempted to negotiate a cease-fire in Homs but were unsuccessful.  The report of the mission details several incidents of armed violence between Regime forces and armed opposition groups in Homs and Baba Amr.  It also reports that members of the Mission were in contact with both opposition groups and Regime officials, and sought to mediate between the parties.[391]  After their withdrawal, the Regime launched the shelling of and attack on Baba Amr.

**6.    Baba Amr Offensive (4 – 28 February 2012)**

256.    On the eve of the attack on Baba Amr, the NSB issued a circular disseminating the measures that the CCMC had directed from a meeting they had held on 01 February 2012.[392] According to the NSB circular, the CCMC had '*discussed the outcomes of security and military actions*' at the national level and took a number of decisions '*pertaining to guiding military and security commanders*'.  Taking into consideration that the Deputy General Commander of the Army and Armed Forces/Minister of Defence was a member of the CCMC and that the instructions discussed specifically related to both military commanders as well as security ones, it would seem likely that the

---

[388]  *See, e.g.* Ex. C-164, CCMC report on the security situation, dated 23 December 2011, SYR.E0001.011.165-169_ET at 166.

[389]  Ex. C-193, Report from the Minister of Interior to the CCMC, dated 05 February 2012, SYR.E0013.007.181-192_ET at 184.

[390]  *See, e.g.* Ex. C-168, CCMC report on the security situation, dated 02 January 2012, SYR.E0001.012.001-006_ET at 003.

[391]  Arab League Report at paras. 13, 15, 16.

[392]  Ex. C-70, Circular from the NSB, dated 03 February 2012, SYR.D0077.030.007-008_ET at 007-008.

CCMC instructions would have also been disseminated through the military chain as well as the NSB (intelligence/security) chain, as noted in this circular.

257.    The NSB circular passed on a series of measures that the CCMC had decided upon at their 01 February meeting.   It instructed that checkpoints were to be activated and mutually supportive, that the armed opposition were to be stopped from establishing checkpoints, measures were to be undertaken to block the flow of funds and weapons into opposition areas, meetings were to be held '*in order to evaluate, on a daily basis, all the carried out operations, analyse the situation from all angles and carefully examine the next day's tasks*', there was to be constant communication between '*leaders and subordinates*' and obstacles were to be overcome.[393]   In relation to targeting, the CCMC instructed that military and security commanders were to:

> *<u>Carefully examine and constantly follow-up on information about targets</u>, in addition to carrying out successful surprise actions, always taking the initiative, <u>resorting to deception and camouflage</u> and <u>appropriate means of psychological war, wearing down and draining the enemy</u>, achieving the optimal exploitation of the abilities of the special tasks groups that are under the command of the commanders, and beginning the implementation of actions that guarantee success and constantly striving to adopt new working methods and methodologies.*[394]

On the retaking of territory, the CCMC instructed:

> *Take measures to reinforce the presence of military, security and police units in recovered regions and close down all roads that facilitate the infiltration of armed men and terrorists, as well as all points leading to the border with Lebanon.*[395]

258.    The NSB were to be supplied with the names of '*killed armed men and terrorists after each and every clash with them.*'   The names were to be disseminated through all media outlets to assure the '*credibility of military and security activities carried out against them in order to boost the morale of the public.*'

---

[393]   *Ibid.* at 007.
[394]   *Ibid.* (underlining in original).
[395]   *Ibid.*

259.    The CCMC meeting and the decisions emanating from it clearly indicated a tightening of command and control of impending military/security operations, a blocking of supply routes into opposition controlled areas, an emphasis on targeting and the improvement of command and control measures in order to ensure the success of military operations.  It appears significant that the major military operation in Homs and Baba Amr began only a matter of days after this CCMC meeting with a bombardment of residential areas, initially in Khalidya, on the night of 03/04 February.[396]  This was followed a few days later with the shelling on Baba Amr, something that continued for much of February 2012.[397]

260.    Although CIJA provided documentation is limited in relation to the shelling itself, it is clear from open source reporting (much of it referenced contemporaneously), and from subsequent reports from bodies such as the UN, that the shelling was on a significant and constant scale and targeted to the civilian areas of the city.  It should also be noted that the area around Homs had seen the establishment of a number of Regime checkpoints including in Baba Amr[398] and these checkpoints tightened the control of access into and out of the city.

---

[396]  Report by Damien Pearse in the Guardian, dated 04 February 2012 entitled '*Fury over Homs massacre as UN Security Council gathers for Syria vote*' at https://www.theguardian.com/world/2012/feb/04/homs-massacre-un-vote-syria; Telegraph report, dated 04 February 2012, entitled '*Homs 'massacre' leaves 260 dead*' at http://www.telegraph.co.uk/news/worldnews/middleast/syria/9061181/Homs-massacre-leaves-260-dead.html.
[397]  BBC report, dated 08 February 2012 entitled '*Syria: Homs under heaviest shelling yet*' at http://www.bbc.co.uk/news/world-middle-east-16941399, New York Times report by Neil MacFarquhar, dated 14 February 2012 entitled '*Syria Resumes Heavy Shelling of Homs*' at http://www.nytimes.com/2012/02/15/world/middleeast/syrian-tanks-resume-shelling-despite-un-rebuke.html and CBS News report, dated 21 February 2012, entitled '*Syrian forces shell Homs as troops mass*' at https://www.cbsnews.com/news/syrian-forces-shell-homs-as-troops-mass/
[398]  Ex. C-168, CCMC report on the security situation, dated 01 February 2012, SYR.E0001.012.001-006_ET at 003.

261.    The UN CoI, which had been collecting information since late 2011 on the situation throughout the country (including from Homs).   In relation to the period prior to the attack on Homs, the UN CoI assessed that the army had conducted a number of large-scale operations that had included the shelling of residential areas and in its report of 22 February referenced that:

> On 3 February 2012, in an escalation of violence, State forces in Homs began shelling densely populated areas in Khaldieh with heavy weapons. The presence of snipers prevented civilians from fleeing. On 6 February, the same type of operation was extended to Bab[a] Amr, which the Government shelled and attacked with rockets.[399]

262.    It further reported that starting in November 2011 the levels of violence between the Regime and opposition groups, including in Homs had increased.   Army snipers in cities and 'shabiha' gunmen had been terrorizing the population 'targeting and killing small children, women and other unarmed civilians.[400]   It also reported that mortar bombs were also being fired into densely populated areas and that after the withdrawal of Arab League monitors:

> …the army intensified its bombardment with heavy weapons. It gave no warning to the population and unarmed civilians were given no chance to evacuate. As a result, large numbers of people, including many children, were killed. Several areas were bombarded and then stormed by State forces, which arrested, tortured and summarily executed suspected defectors and opposition activists.
>
> According to the Violations Documenting Centre, at least 787 civilians, including 53 adult women, 26 girls and 49 boys, were killed in the first two weeks of February 2012 alone. The largest number of victims died in Homs.[401]

263.    After a prolonged period of intense and constant shelling throughout much of February, the Syrian Regime ground forces attacked Baba Amr around 29 February and on 01

---

[399]  Second UN CoI report, dated 22 February 2012, at para 46.
[400]  Ibid. at para 39.
[401]  Ibid. at paras 40-41.

March any remaining opposition forces withdrew.  The Syrian security forces retook Baba Amr on that day.[402]

264.     On 07 March 2012, the UN Humanitarian Chief, Baroness Amos visited Baba Amr and reported that parts of Baba Amr had been '*pretty devastated*'.[403]

265.     On 27 March, President Bashar Al-Assad visited Baba Amr.  Syrian TV reported the event stating that the destruction and bombardment had been the result of '*armed terrorists*'.  The report on the visit stated that the President had '*… toured the streets of the neighbourhood and surveyed the state of civilian residences, infrastructure, and service institutions after the systematic devastation of Baba Amr by armed terrorist groups.*'[404]  He met with and praised the work of the army and armed forces and stated:

> *Good riddance to the terrorists.  The state will help you all, and helps those who help the state.  Of course, the state was thinking, and we were trying to find solutions with rational people.  But when the terrorists are in control, there is no solution except the solution that occurred.*

266.     In August 2012, five months after Baba Amr was retaken by Regime forces and with additional investigation, the UN CoI summarised the activities that had occurred there in February

---

[402] *See, e.g.* Report by Paul Burge in the Telegraph, dated 01 March 2012 entitled '*Syria: Security forces take total control of Baba Amr district of Homs*' at http://www.telegraph.co.uk/news/worldnews/middleeast/syria/9116629/Syria-Security-forces-take-total-control-of-Baba-Amr-district-of-Homs.html and report by Peter Beaumont in the Guardian entitled '*Syrian rebels retreat from Baba Amr district of Homs*', dated 02 March 2012 at https://www.theguardian.com/world/2012/mar/01/syrian-rebels-retreat-baba-amr-homs

[403] *See, e.g.* Reuters report, dated 07 March 2012 entitled '*Syrian District Baba Amr "pretty devastated": U.N. aid chief*' at https://www.reuters.com/article/us-syria-un/syrian-district-baba-amr-pretty-devastated-u-n-aid-chief-idUSTRE8261ZO20120307

[404] *See, e.g.* Ex. C-1, Translation of Addounia TV News Report on the Visit of Bashar al-Assad to Homs, SYR.A0472.092, at https://www.youtube.com/watch?v=ICDskVOJp9Q.  Also note report by Adrian Blomfield in Daily Telegraph entitled '*Syria: Bashar al-Assad tours Homs as he accepts UN peace plan*', dated 27 March 2012, at http://www.telegraph.co.uk/news/worldnews/middleeast/syria/9170129/Syria-Bashar-al-Assad-tours-Homs-as-he-accepts-UN-peace-plan.html.

and March 2012.  They concluded that a large-scale military attack had been launched '*using mortar shells, missiles and tank shells.  Although Bab[a] Amr had been targeted on previous occasions, the sustained intensity of this attack was unprecedented.*'[405]  Despite the active presence of armed groups and their military opposition, the Regime severely restricted access to the area and took control.  The UN CoI reported that many civilians fled the area after the attack and that civilians continued to be killed by snipers after the attack itself.  The UN CoI also reported that:

> *The commission recorded a high incidence of extra-judicial executions of civilians in various neighborhoods of the city of Homs since March 2012.  Multiple accounts were received of the killing of the entire Sabbouh family in Bab Amr on 5 March.  On 11 and 12 March 2012, the neighbourhood of Karm al-Zeytoun reportedly came under an attack by what was described as Shabbiha protected by the army.  Multiple families were killed in their homes, apparently by knives or other sharp instruments.  Estimates of casualties, unverified by the commission, ranged from 35 to 80 in that attack.*

> *The commission found that hors de combat fighters were similarly killed.  One man interviewed by the commission stated that he assisted in the burial of 15 bodies of fighting aged men that appeared to have been executed.  Syrian security forces and Shabbiha reportedly removed adult men from houses in the neighbourhood of Sultaniya, before lining them up and shooting them.*[406]

267.    Documents from August and December 2012 give some indication on how artillery had been utilised by the Regime in the preceding months.  On 28 August 2012, *Imad* Ali Ayoub (who had only recently been promoted to the Chief of Staff of the Army and Armed Forces) disseminated a Circular (through the Commander of the Artillery and Rocket Forces) to '*commanders of formations and units*' of the Army.[407]   This Circular noted that '*pursuant to the assigned missions being implemented on the ground*' some shortcomings had been observed in relation to the use of artillery.  These included:

---

[405]  Third UN CoI Report, dated 16 August 2012, at para 30.
[406]  *Ibid.* at paras 33-34.
[407]  Ex. C-140, Circular from the General Command of the Army and Armed Forces, Artillery and Rocket Forces sent to the commanders of formations and units, dated 22 August 2012, SYR.D0234.021.014_ET at 014.

> *[A] large consumption of artillery shells of all types, as a result of incorrect use of artillery in terms of:*
>
> > *a. Firing at targets without observation does not produce the desired outcome.*
> >
> > *b.   Using resources having lower effectiveness and overlooking more effective resources, e.g. using BM-21 vehicles which have lower effectiveness in cities and forests.*
> >
> > *c. Failing to capitalize on artillery fire to ensure the advance of infantry and tanks and the occupation of the firing target, and firing merely in retaliation or to silence specific firing.*[408]

268.     The Circular instructed that '*it was prohibited to use artillery without observation because this does not produce the desired outcome and is a useless waste of resources*'[409] and that artillery consumption was to be rationed.   Formation commanders were to '*assume full responsibility for compliance with the instructions*'.   The Circular is of some note as it appeared to indicate a knowledge on the part of the General Command of the Army and Armed Forces that had been a large consumption of artillery rounds fired during previous combat missions, that some targets were being fired on without the proper observation procedures and that artillery ammunition was not being used effectively (including using rocket (BM-21) ammunition in cities).[410]

269.     A number of months later, similar instructions were again issued by the General Command.   On 09 December 2012, the Head of the Artillery and Rocket Forces issued a Circular (again authorised by *Imad* Ali Ayoub) to the Heads of Artillery in the '*Corps, Divisions and Independent Regiments*'.[411]   The report directed that, in order to give support to units of the Army

---

[408]   *Ibid.*

[409]   *Ibid.*

[410]   The Circular noted above makes reference to BM-21 vehicles.   This is a truck mounted 122mm multi-barreled rocket launcher used by the Syrian Army.

[411]   Ex. C-139, Circular from the Head of the Artillery and Rocket Forces to the Heads of Artillery of Corps, Divisions and Independent Regiments, dated 09 December 2012, SYR.D0234.021.005-006_ET at 005.

who were being attacked and to '*closely observe artillery fire*,' formations were to abide by a series of

instructions.[412]  These included:

> *1.  It is prohibited to use artillery without observation because doing so will not achieve the desired result and is a useless waste of resources.*

> *2.  Ration the consumption of artillery as required by the situation only.*

> *3. Artillery observers (artillery officers) should be sent with these formations, units and services within your allocated sector of responsibility to extract and verify target coordinates, with due consideration of safe distances from friendly forces, observing artillery firing and deducing the appropriate corrections to range and direction.*

> *4.  Artillery fire should be capitalized on correctly, i.e. to ensure the advance of infantry and tank units and the occupation of the site that was targeted.*

> *5.  The validity of coordinates should be verified for the locations of terrorist groups and armed gangs, by using computers and by triangulation using the regular methods (use of compass – rangefinder).*

> *6.  Analyse meteorological conditions, carry out firing using members in proportion with targets, and undertake propulsion, aerial and technical preparations before firing.*

> *7.  Accurately check the topographic connection of the fire position and observation sites using the full topographic database and GPS systems according to resources.*

> *8.  Ensure that the artillery ammunition is ready before firing. Save ammunition as much as possible, according to the situation. Use the right charges for the distances when firing, to ensure the safety of the equipment.*

> *9.  Use computers when target training firing crewmembers and compare to the training of crewmembers in terms of range and direction using recognized methods (Russian board – maps).*

> *10.   Commanders should directly supervise the registration of instructions prior to firing.*[413]

270.    This document is of note in highlighting identified problems in the use of artillery

and giving an indicating how artillery had been previously used.   Furthermore it demonstrates

procedures that were available to the Syrian Army for the accurate targeting of artillery (the use of

---

[412]  *Ibid.*

[413]  *Ibid.*

artillery observers, rangefinders, GPS, computers etc) again seemingly implying that these were not being routinely used by some units.  The document also demonstrates the chain of command in relation to artillery matters (from the General Command of the Army and Armed Forces, the Artillery and Rocket Forces, the Corps and subordinate units of the Army).[414]

271.    In analysing the document more closely, it appeared that significant quantities of artillery ammunition had previously been expended resulting in a need for rationing.[415]  There had also clearly been problems in relation to the use of artillery observers that necessitated the specific instruction that artillery fire was to be prohibited without '*observation*'.[416]  This clearly inferred that some artillery fire had previously been initiated without the use of artillery observers.  The Circular specifically instructed that artillery observers were to be sent to units to obtain accurate targeting information (co-ordinates, distances, corrections etc.) again implying that such procedures had not always previously been followed.  The importance of the issue is demonstrated by the fact that the General Command of the Army and Armed Forces were issuing such an instruction (with the authority of the Chief of Staff of the Army and Armed Forces), and that they were specifically instructing all artillery officers to abide by its content and were disseminating it to subordinate levels.[417]

## V.    CONCLUDING REMARKS

272.    In reviewing the documentary references provided by the CIJA and other related materials, it is evident that from February/March 2011 the Syrian Regime, under the authority of its national leadership, utilised its security forces (political, military, police, and intelligence/security

---

[414]  *Ibid.* 005-006.
[415]  *Ibid.* 005.
[416]  *Ibid.*
[417]  *Ibid.* 005-006.

agencies) to confront and repress opposition groups and individuals in order to prevent the spread of anti-Regime activity and maintain its exclusive control of the State.  The Regime specifically targeted certain groups: those inciting demonstrations, opposition leaders, co-ordinators, and financiers as well as those involved with communicating with the media and foreign organisations that were, as far as the Regime believed, tarnishing the image of the state.  The Regime utilised existing and newly established security bodies with which to direct, command, control and monitor their security response.

273.    The Regime developed a comprehensive military/security strategy with which to confront protesters and opposition activity in the governorates (including in Homs).  This strategy initially relied heavily on the intelligence/security, police and Ba'athist and other loyalists to confront and suppress demonstrations, protesters and opposition supporters leading to their mass arrest, abuses and killings.  These security measures, in turn, led to the eventual emergence of an armed opposition that became active in taking control of opposition areas, attacking security force personnel and infrastructure.

274.    As the security situation deteriorated, the Regime further militarised its response by relying significantly on the use of the army (particularly from the autumn of 2011) and saw the establishment in key governorates of Military and Security Chiefs who commanded the security elements and the security operations in these areas.  In Homs, this militarisation resulted in military operations culminating in February 2012 with the launch of a large-scale military operation against the district of Baba Amr in Homs, an area held by opposition forces.  This operation involved the prolonged shelling of civilian areas in Baba Amr through much of that month leading to significant

numbers of civilian deaths and destruction of property.   The area of Baba Amr was retaken by elements of the Syrian Army and other security forces at the end of February 2012.

*       *       *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is a true and correct statement of my independent professional opinion.

Executed on 02 03 2018

Ewan Brown