# Annex 29

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHLEEN COLVIN *et al.*,<br><br>          *Plaintiffs*,<br><br>     v.<br><br>SYRIAN ARAB REPUBLIC,<br><br>          *Defendant*. | Civil No. 1:16-cv-01423 (ABJ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... iii

LIST OF DECLARANTS AND EXPERTS ................................................................ vi

I.     INTRODUCTION ............................................................................................1

     A.     Statement of the Case.............................................................................1

     B.     Marie Colvin .........................................................................................1

     C.     The Parties ............................................................................................2

          i.     Plaintiffs...................................................................................2

          ii.     Defendant .................................................................................3

II.     STATEMENT OF FACTS ...............................................................................3

     A.     Background ............................................................................................3

          i.     The Assad Regime's Response to the Arab Spring and Syria's Descent into Civil War....................................................4

          ii.     The Regime's Media Crackdown ..............................................5

          iii.     The Battle of Homs and Siege of Baba Amr ..............................8

     B.     The Extrajudicial Killing of Marie Colvin.........................................10

          i.     The Regime's Targeting of the Baba Amr Media Center..........10

          ii.     Marie Colvin's Arrival in Baba Amr ......................................12

          iii.     The Eve of the Attack: February 21, 2012...............................14

          iv.     The Attack: February 22, 2012 ...............................................16

          v.     The Regime's Celebration of Marie's Death ............................18

     C.     Procedural History ..............................................................................19

III.     ARGUMENT .................................................................................................20

     A.     Jurisdiction and Standing Exist in This Matter...................................21

i.      Federal Subject Matter Jurisdiction Exists, Since Syria Is Not Entitled to Immunity for Its Extrajudicial Killing of Marie Colvin ........................21

ii.     Syria Is Subject to the Personal Jurisdiction of this Court Since Subject Matter Jurisdiction Exists and Syria Has Been Properly Served ...................................................................................................22

iii.    Plaintiffs Have Standing to Bring Their Section 1605A(c) Claims Against Syria.......................................................................................22

B.      Syria Is Liable for the Extrajudicial Killing of Marie Colvin Under FSIA Section 1605A(c) ...............................................................................22

i.      The Syrian Regime Was Responsible for Shelling the Baba Amr Media Center and Killing Marie Colvin ....................................................23

ii.     The Regime's Murder of Marie Colvin Was an "Extrajudicial Killing" Actionable Under FSIA Section 1605A(c) ................................24

C.      The Regime's Extrajudicial Killing of Marie Colvin Entitles Plaintiffs to Economic Damages, Solatium, and Punitive Damages .........................................32

i.      Plaintiffs Are Entitled to Damages Reflecting the Economic Value of Life Lost in the Baba Amr Media Center Attack.......................................32

ii.     Plaintiff Cathleen Colvin Is Further Entitled to an Award of Solatium Given the Anguish Caused by the Death of Her Sister.............................34

iii.    The Court Should Also Award Punitive Damages Given the Outrageous Nature of the Assad Regime's Deadly Attack, the Depravity of Its Motives, and the Importance of Punishing and Deterring Such Conduct..........................................................................37

IV.    CONCLUSION.............................................................................................41

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**U.S. Cases**

*Anderson v. Islamic Republic of Iran,*
  90 F. Supp. 2d 107 (D.D.C. 2000) ........................................................................41

*Bakhtiar v. Islamic Republic of Iran,*
  571 F. Supp. 2d 27 (D.D.C. 2008), *aff'd*, 668 F.3d 773 (D.C. Cir. 2012) ............................29

*\*Belkin v. Islamic Republic of Iran,*
  667 F. Supp. 2d 8 (D.D.C. 2009) ..............................................................33, 34, 35

*Bluth v. Islamic Republic of Iran,*
  203 F. Supp. 3d 1 (D.D.C. 2016) ........................................................................34

*Bodoff v. Islamic Republic of Iran,*
  907 F. Supp. 2d 93 (D.D.C. 2012) ......................................................................37

*Braun v. Islamic Republic of Iran,*
  228 F. Supp. 3d 64 (D.D.C. 2017) ......................................................................38

*Cohen v. Islamic Republic of Iran,*
  238 F. Supp. 3d 71 (D.D.C. 2017) ......................................................................22

*Cohen v. Islamic Republic of Iran,*
  268 F. Supp. 3d 19 (D.D.C. 2017) ......................................................................40

*Dacer v. Estrada,*
  No. C 10-04165 WHA, 2014 WL 229801 (N.D. Cal. Jan. 21, 2014)....................................39

*Doe v. Saravia,*
  348 F. Supp. 2d 1112 (E.D. Cal. 2004)..................................................................39

*\*Elahi v. Islamic Republic of Iran,*
  124 F. Supp. 2d 97 (D.D.C. 2000) .............................................................. *passim*

*Flanagan v. Islamic Republic of Iran,*
  190 F. Supp. 3d 138 (D.D.C. 2016) ....................................................................25

*Gates v. Syrian Arab Republic,*
  580 F. Supp. 2d 53 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011)..................................41

*Goldberg-Botvin v. Islamic Republic of Iran,*
  938 F. Supp. 2d 1 (D.D.C. 2013) ......................................................................32

*Estate of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006) .................................................................35

*Kaplan v. Cent. Bank of the Islamic Republic of Iran*,
  55 F. Supp. 3d 189 (D.D.C. 2014) ...................................................................25

*\*Kim v. Democratic People's Republic of Korea*,
  774 F.3d 1044 (D.C. Cir. 2014) .......................................................20, 24, 27

*\*Kim v. Democratic People's Republic of Korea*,
  87 F. Supp. 3d 286 (D.D.C. 2015) ..............................................................39, 40

*Letelier v. Republic of Chile*,
  488 F. Supp. 665 (D.D.C. 1980) .....................................................................29

*Mohammadi v. Islamic Republic of Iran*,
  782 F.3d 9 (D.C. Cir. 2015) ............................................................................21

*Oveissi v. Islamic Republic of Iran*,
  879 F. Supp. 2d 44 (D.D.C. 2012) ..................................................................38

*Owens v. Republic of Sudan*,
  71 F. Supp. 3d 252 (D.D.C. 2014) ..................................................................33

*\*Owens v. Republic of Sudan*,
  864 F.3d 751 (D.C. Cir. 2017) .............................................................. *passim*

*Roeder v. Islamic Republic of Iran*,
  333 F.3d 228 (D.C. Cir. 2003) ........................................................................20

*Saludes v. Republica de Cuba*,
  577 F. Supp. 2d 1243 (S.D. Fla. 2008) ...........................................................24

*Shoham v. Islamic Republic of Iran*,
  No. 12-CV-508 (RCL), 2017 WL 2399454 (D.D.C. June 1, 2017) ........................23

*Simpson v. Socialist People's Libyan Arab Jamahiriya*,
  326 F.3d 230 (D.C. Cir. 2003) ........................................................................21

*Surette v. Islamic Republic of Iran*,
  231 F. Supp. 2d 260 (D.D.C. 2002) .................................................................34

*\*Thuneibat v. Syrian Arab Republic*,
  167 F. Supp. 3d 22 (D.D.C. 2016) ...............................................20, 32, 35, 38

*United States v. Long*,
  328 F.3d 655 (D.C. Cir. 2003) ........................................................................28

iv

*Valencia v. Islamic Republic of Iran*,
   774 F. Supp. 2d 1 (D.D.C. 2010) ...........................................................................29

*Valore v. Islamic Republic of Iran*,
   700 F. Supp. 2d 52 (D.D.C. 2010) .........................................................................22

*Weinstein v. Islamic Republic of Iran*,
   184 F. Supp. 2d 13 (D.D.C. 2002) .........................................................................38

*Worley v. Islamic Republic of Iran*,
   75 F. Supp. 3d 311 (D.D.C. 2014) .....................................................................25, 27

**Statutes**

18 U.S.C. § 2441(d) ...................................................................................................31

28 U.S.C. § 1330 ...................................................................................................21, 22

*28 U.S.C. § 1350 ......................................................................................................29

28 U.S.C. § 1605(b) ...................................................................................................21

*28 U.S.C. § 1605A ............................................................................................ *passim*

28 U.S.C. § 1608 ...................................................................................................19, 20

**Other Authorities**

International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S.
   171 ........................................................................................................................30

Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J.
   Reports 1996 (July 8) ............................................................................................30

*Prosecutor v. Milošević*,
   Case No. IT-98-29/1-T, Trial Chamber Judgment (Int'l Crim. Trib. for the
   Former Yugoslavia Dec. 12, 2007) ........................................................................31

Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the
   People's Democratic Republic of Yemen, 45 Fed. Reg. 33956 (May 21, 1980) ......................3

S. Res. 404, 112th Cong. (2012) ................................................................................33

## LIST OF DECLARANTS AND EXPERTS

| DECLARANT | CITATION |
|---|---|
| **Cathleen Colvin**: Plaintiff and youngest sister of Marie Colvin; parent of Justine and Christopher Araya-Colvin, as well as minor L.A.C., niece and nephews of Marie Colvin and beneficiaries of Marie Colvin's estate | **C. Colvin Decl.** |
| **Justine Araya-Colvin**: Plaintiff and niece of Marie Colvin; beneficiary of Marie Colvin's estate | **J. Araya-Colvin Decl.** |
| **Christopher Araya-Colvin**: Plaintiff[1] and nephew of Marie Colvin; beneficiary of Marie Colvin's estate | **C. Araya-Colvin Decl.** |
| "**Ulysses**": former Syrian intelligence officer<br><br>        *Partial redaction and use of pseudonym requested* | **Ulysses Decl.** |
| **Paul Conroy**: freelance photojournalist and filmmaker; colleague of Marie Colvin who traveled with her to Syria | **Conroy Decl.** |
| **Wael al-Omar**: Syrian interpreter and guide for Marie Colvin and Paul Conroy | **al-Omar Decl.** |
| **Abdelmalek Nouar a.k.a. Anwar Malek**: journalist and reporter for *Dar Al-Emane*; former observer with the Arab League of States Observer Mission to Syria | **Nouar Decl.** |
| **Abdel Majid Mohammed Abdel Majid Barakat**: former employee of the Syrian Central Crisis Management Cell | **Barakat Decl.** |
| "**John Doe**": Syrian journalist and media activist at the Baba Amr Media Center<br><br>        *Partial redaction and use of pseudonym requested* | **Doe Decl.** |
| **Adnan Al-Hamid a.k.a. Khaled Abu Salah**: Syrian media activist and co-founder of the Baba Amr Media Center | **al-Hamid Decl.** |

---

[1] The interests of Christopher Araya-Colvin (a.k.a. "C.A.C.") have been represented before this Court by his mother, Cathleen Colvin.  *See* Pls.' Compl., ECF No. 1.  Plaintiffs have moved for the Court to substitute Christopher Araya-Colvin as Plaintiff in his own right, as he reached the age of majority subsequent to Plaintiffs' submission of their Complaint.  *See* Pls.' Mot. for Substitution of Real Party in Interest, ECF No. 40.

| | |
|---|---|
| **John Witherow**: Editor of *The Sunday Times* for most of Marie Colvin's career with the paper; current Editor of *The Times* | **Witherow Decl.** |
| **Javier Espinosa**: Bureau Chief of *El Mundo*, who reported from Homs, Syria at the same time as Marie Colvin | **Espinosa Decl.** |

| EXPERT | CITATION |
|---|---|
| **Dr. Maria Tsennykh**: Director in the Forensic and Litigation Practice of FTI Consulting, Inc.; expert in valuation, economics, and accounting | **Tsennykh Rep.** |
| **U.N. Special Rapporteur David Kaye**: U. N. Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression | **Kaye Rep.** |
| **Ambassador Robert S. Ford**: Ambassador of the United States to the Syrian Arab Republic from 2011 until 2014 | **Ford Rep.** |
| **Ewan Brown**: Consulting Analyst and Investigator working with the Commission for International Justice and Accountability<br><br>        *Partial redaction requested* | **Brown Rep.** |

## I.    INTRODUCTION

### A.    STATEMENT OF THE CASE

On February 22, 2012, Marie Colvin, an American reporter hailed by many of her peers as the greatest war correspondent of her generation, was assassinated by government forces of the Syrian Arab Republic ("Syria") as she reported on the suffering of civilians in Baba Amr, a besieged neighborhood in the Syrian city of Homs.  Marie was killed in a targeted rocket attack on the Baba Amr Media Center ("Media Center"), a makeshift broadcast studio run by local media activists in a secret residential location.  The rocket attack also killed acclaimed French photographer Rémi Ochlik and injured British photographer Paul Conroy, Syrian translator Wael al-Omar, and French journalist Edith Bouvier.

The evidence presented by Plaintiffs establishes that Marie was tracked down and targeted by agents of the regime of Syrian President Bashar al-Assad ("Assad Regime" or "Regime") as part of a strategy to surveil, capture, and even kill journalists to prevent reporting on the Regime's crackdown on political opposition after the "Arab Spring" protests in 2011.

This deliberate, malicious conduct by the Regime was undertaken in blatant violation of established rules of international law, and constitutes an extrajudicial killing.  Under section 1605A of the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs are entitled to an award of compensatory and punitive damages.  *See* 28 U.S.C. § 1605A ("Section 1605A").  While an award of damages will never fully redress the harm caused by the Regime's outrageous conduct, it is Congress' clear intent that an award be issued to punish and deter state sponsors of terrorism in cases such as this.

### B.    MARIE COLVIN

Marie Colvin was a legend among war reporters.  Born in New York on January 12, 1956, she became renowned for her victim-centered dispatches from the war zones of the world.

*See* Declaration of Cathleen Colvin ("C. Colvin Decl.") ¶¶ 5, 18.   Marie spent over 25 years writing for the British newspaper *The Sunday Times*.   Declaration of John Witherow ("Witherow Decl.") ¶ 8.   Throughout her career, Marie was dedicated to telling the stories of war's victims. *See* C. Colvin Decl. ¶ 26.   She believed that reporting could curtail the excesses of brutal regimes and make the international community take notice of atrocities.   *See id.*

Marie's career as a war correspondent brought her in its early years to the 1987 siege of Basra in Iraq and ended with the February 2012 siege of Baba Amr in Syria.   *See* Witherow Decl. ¶ 22; C. Colvin Decl. ¶¶ 16-25.   Those sieges bookended a career that brought her to East Timor, where her reporting is credited with having secured the evacuation of over 1,000 refugees abandoned at a besieged United Nations ("U.N.") compound.   C. Colvin Decl. ¶ 19.   Her work later took her to Sri Lanka, where she was ambushed by military forces after interviewing Tamil Tiger leaders.   Witherow Decl. ¶ 24; C. Colvin Decl. ¶ 21.   A grenade blinded her in one eye, leaving Marie with her signature eye-patch.   C. Colvin Decl. ¶¶ 21–22.   But she refused to "hang up her flak jacket."   Witherow Decl. ¶ 24.   She wrote after the incident: "I did not set out to be a war correspondent.   It has always seemed to me that what I write about is humanity in extremis, pushed to the unendurable, and that it is important to tell people what really happens in wars . . . ."   *Id.*

## C. THE PARTIES

### i. Plaintiffs

Plaintiff Cathleen Colvin is the youngest sister of Marie Colvin and a U.S. citizen.   C. Colvin Decl. ¶ 2.[2]   She brings this action on her own behalf and on behalf of her minor child L.A.C.,[3] who is a beneficiary of the estate of Marie Colvin under Marie's will.   *Id.* ¶ 3.

---

[2] Marie Colvin was a U.S. citizen at the time of her death as well.   C. Colvin Decl. ¶ 5.

Plaintiffs Justine and Christopher Araya-Colvin are the niece and nephew of Marie Colvin; both are U.S. citizens.  Declaration of Justine Araya-Colvin ("J. Araya-Colvin Decl.") ¶¶ 1-2; Declaration of Christopher Araya-Colvin ("C. Araya-Colvin Decl.") ¶ 1.  Each brings this action as a beneficiary of the estate of Marie Colvin under Marie's will.

### ii.  Defendant

Defendant Syria is a dictatorship under the control of President Bashar al-Assad, Regional Secretary of the Socialist Arab Ba'ath Party ("Ba'ath Party") and General Commander of the Army and Armed Forces.  Expert Report of Ewan Brown ("Brown Rep.") ¶¶ 39–40.  The United States has designated Syria a state sponsor of terrorism since December 29, 1979.  *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33956 (May 21, 1980); Expert Report of Robert S. Ford, Former U.S. Ambassador to Syria ("Ford Rep.") ¶ 15.

## II.   STATEMENT OF FACTS

### A.  BACKGROUND

Syria has been ruled by the Assad Regime since 1970, when a military coup brought Hafez al-Assad to power.  Ford Rep. ¶¶ 11–12.  Hafez was succeeded by his son and current President, Bashar al-Assad.  *Id.* ¶ 16.  The Assad Regime dominates Syria through its control of the security agencies (the '*mukhabarat*'), the military, and paramilitary forces ('*shabiha*').  *See* Ford Rep. ¶¶ 17–26; Brown Rep. ¶¶ 37–137.  These institutions have allowed the Regime to quash opposition and instrumentalize state terror through torture, assassinations, and sponsorship of terrorism – a record of violence stretching back decades.  *See* Ford Rep. ¶¶ 14–18.

---

[3] As noted above, Plaintiffs have moved that the Court substitute Christopher as a party of interest in this matter, in lieu of his interests being represented by Cathleen Colvin as parent and next friend while he was still a minor.  *See supra* note 1.

### i. The Assad Regime's Response to the Arab Spring and Syria's Descent into Civil War

In 2011, a wave of protests known as the "Arab Spring" swept the Middle East and North Africa, toppling in their wake dictators in Tunisia and Egypt. *See* Ford Rep. ¶¶ 28–29. When the Arab Spring reached Syria, it spurred the rise of a largely non-violent political opposition movement and, later, an armed insurrection. *Id.* ¶ 28.

The Syrian uprising began in the southern city of Dera'a on March 18, 2011, when thousands marched against the arrest and alleged torture of 15 young boys who had painted anti-Assad graffiti. *Id.* ¶ 30. Demonstrations calling for reform, an end to corruption, and the release of political prisoners soon spread across Syria. *Id.* ¶ 31; Brown Rep. ¶ 26.

Rather than accept reform, the Assad Regime mobilized its entire security, military, and political apparatus to neutralize the opposition, media, and independent civil society through force. *See* Declaration of Abdel Majid Mohammed Abel Majid Barakat ("Barakat Decl.") ¶¶ 10, 32, 40; Ford Rep. ¶¶ 37–38. To coordinate this effort, the Regime set up the Central Crisis Management Cell ("CCMC") in the spring of 2011. Brown Rep. ¶ 45. The CCMC was a national security body composed of the most senior political, military, and intelligence officials in the country. Barakat Decl. ¶¶ 10–11; Brown Rep. ¶ 46. As explained by former CCMC employee Abdelmajid Barakat and confirmed by military analyst Ewan Brown, the CCMC received intelligence reports from across Syria and coordinated the Regime's armed crackdown on the uprising. Barakat Decl. ¶ 11; Brown Rep. ¶¶ 44, 48–52. Permanent members of the CCMC included senior-level members of the Syrian government: the Minister and Deputy Minister of Defense, the Minister of Interior, the Head of the National Security Bureau (the central office coordinating all intelligence agencies), and the heads of Syria's four intelligence agencies. Brown Rep. ¶¶ 46, 53. Other senior officials of the Syrian government attended

4

CCMC meetings, including President Assad's brother, Maher al-Assad, and representatives from President Assad's office. *See* Barakat Decl. ¶¶ 12–13. CCMC decisions were personally reviewed and approved by President Assad. *Id.* ¶ 21.

Through the CCMC, the Assad Regime engaged in the widespread and systematic suppression of dissent. *See* Ford Rep. ¶¶ 37–38; Brown Rep. ¶¶ 8–9. Government forces opened fire on demonstrations and detained thousands. Ford Rep. ¶ 39; Brown Rep. ¶ 9. Robert Ford, former U.S. Ambassador to Syria, who was posted in Damascus at the time, notes that U.N. and American efforts to estimate casualties yielded "horrific statistics": an estimated 5,000 civilians were killed in 2011, while some 20,000 people were arbitrarily detained, with many of them subjected to torture. Ford Rep. ¶ 39. In 2012 alone, the U.S. Department of State estimated that the Regime kidnapped 6,000 women, raped or mutilated at least 4,000 women and girls, and selected children for targeting or torture because their relatives were suspected activists or rebels. *Id.* ¶ 40.

The Regime's crackdown ultimately prompted the formation of an armed opposition. Members of the Syrian Army began to defect and, in the summer of 2011, formed rebel groups that eventually coalesced into the Free Syrian Army ("FSA"). *Id.* ¶ 36. As the violence escalated, the CCMC militarized the Regime's strategy, sending Syria toward a full-scale armed conflict by the end of 2011. *See* Brown Rep. ¶¶ 181–85; Expert Report of David Kaye, U.N. Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression ("Kaye Rep.") ¶ 32 n.83.

### ii.   The Regime's Media Crackdown

Independent media became a priority target as the Regime escalated its crackdown and sought to impose a media blackout. The initial suppression of traditional forms of journalism spurred Syrian activists to develop novel ways of resisting censorship. As a result, the months

following the Arab Spring saw a rise in the number of so-called "citizen journalists" disseminating news through online blogs and social media networks. *See* Kaye Rep. ¶ 12; Declaration of Adnan al-Hamid a.k.a. Khaled Abu Salah ("al-Hamid Decl.") ¶¶ 17-19.[4]

Baba Amr was at the heart of that independent media movement. In the summer of 2011, a local activist known as Khaled Abu Salah and a group of citizen journalists formed the Baba Amr Media Center. Al-Hamid Decl. ¶ 18. They used the internet, mobile phones, and satellite devices to document protests, circulate footage of government abuses, and communicate with foreign journalists. *Id.* ¶¶ 17–20; Declaration of John Doe ("Doe Decl.") ¶¶ 7–10.[5] Converting a residential apartment in Baba Amr into a makeshift broadcast studio, they used a clandestine satellite dish, anonymizing software, and proxy internet servers to mask their location from the Regime. Al-Hamid Decl. ¶¶ 19–20; Doe Decl. ¶ 8; Declaration of Wael Fayez al-Omar ("al-Omar Decl.") Exs. A1–A3 (marking the Media Center's location on satellite images). The Media Center activists also began giving interviews to foreign news agencies, including *The Washington Post*, *The New York Times*, BBC, CNN, and Al-Jazeera. Doe Decl. ¶ 9. Those reporting from the Media Center were non-combatant civilians who operated independently from the armed rebels. Al-Hamid Decl. ¶ 23; Doe Decl. ¶ 13–14. While rebels were occasionally sources of information for the Media Center, the activists themselves were not part of the armed opposition and did not participate in the hostilities in Baba Amr. Al-Hamid Decl. ¶ 23; Doe Decl. ¶ 13–14.

Nevertheless, President Assad's inner-circle "considered media activists one of the greatest threats to the [R]egime." Barakat Decl. ¶ 30; *see also* Declaration of Abdelmalek Nouar

---

[4] "Khaled Abu Salah" is the popular pseudonym of Adnan al-Hamid. *See* al-Hamid Decl. ¶ 2.

[5] Examples of video footage shot in Baba Amr and published online by the Media Center are available as Doe Exs. A–C and al-Hamid Exs. B, C.

("Nouar Decl.") ¶¶ 28, 31-32.  The Regime subjected independent sources of news to a range of repressive measures, from formal censorship to arrest – and even armed attack.  Ford Rep. ¶ 44; Barakat Decl. ¶¶ 29–36.

The Regime's anti-media vitriol was promoted by President Assad himself.  In a speech in August 2011, President Assad accused the media of engaging in "psychological warfare aimed at creating a state of internal chaos and influencing the spirits of Syrians."  Brown Ex. C-67 at 002.  Regime officials echoed this rhetoric in state-owned media.  Syria, they claimed, was the target of a "media-led conspiracy" and an "unprecedented media war . . . using all technologies of communications, virtual world and satellites."  Kaye Rep. ¶ 18; Kaye Exs. 1, 2.

These were not mere words.  The Regime enforced draconian anti-free-speech laws, which resulted in the arrests of numerous dissidents and media activists.  Kaye Rep. ¶¶ 20–22; Ford Rep. ¶¶ 63–65.  It limited foreign correspondents' access to the country, denying most visas and curtailing physical entry to areas of interest.  Kaye Rep. ¶¶ 20–22; Ford Rep. ¶¶ 63–65.  And these restrictions were further backed by a policy of censorship through terror formulated at the highest levels of the Regime.  *See* Kaye Rep. ¶¶ 25–29; Ford Rep. ¶¶ 63–65.

On August 5, 2011, the CCMC issued orders to Regime forces throughout the country to launch "joint security-military campaigns" against "those who tarnish the image of Syria in foreign media and international organizations," and other wanted persons.  Brown Rep. ¶¶ 173–177; Brown Ex. C-40 at 094.  These instructions were disseminated – with deadly effect – through the military and security chains of command.  *See* Brown Ex. C-40 at 093.  As the U.N. Special Rapporteur on Freedom of Expression David Kaye concludes: "the Syrian government instituted a campaign to intimidate, arbitrarily detain, torture, forcibly disappear, and kill

journalists and any other persons working to document the Regime's atrocities."  Kaye Rep. ¶ 25.[6]

For example, on August 25, 2011, Syrian security forces tortured Ali Ferzat, a renowned political cartoonist, in apparent retaliation for satirizing President Assad.  Kaye Rep. ¶ 26.  On November 20, 2011, the mutilated body of cameraman Ferzat Jarban was found one day after his arrest for filming protests.  *Id.*  On February 16, 2012, security forces raided the Syrian Center for Media and Freedom of Expression, subjecting human rights lawyer Mazen Darwish, journalist Mansour al-Omari, and other staff members to torture and detention.  *Id.*

This escalating campaign of violence against the media ultimately led to the killing of Marie Colvin during the siege of Baba Amr in February 2012.

### iii.  The Battle of Homs and Siege of Baba Amr

By the end of 2011, Homs, Syria's third-largest city, had become the center of the Regime's crackdown on the opposition.  Ford Rep. ¶ 41.  One neighborhood was a particular flash point: Baba Amr, a working-class residential district in southwestern Homs.  Declaration of "Ulysses" ("Ulysses Decl.") ¶ 25.  In the fall of 2011, a small group of FSA-aligned rebels, carrying only small arms, established a defensive perimeter around the neighborhood in order to protect civilians from the Regime's attacks.  Ulysses Decl. ¶ 26–28; al-Hamid Decl. ¶ 24; Doe Decl. ¶ 12.  From December 2011 until the end of February 2012, Syrian military and security forces and *shabiha* encircled Baba Amr with checkpoints, tanks, and artillery, laying siege to the

---

[6] The Special Rapporteur's observation is borne out by internal Regime documents from 2011 and 2012, which confirm that Syrian security forces arrested those "filming protests in order to send it to agenda-driven [television] channels," Brown Exs. C-74, C-75 at 010, interrogated detainees on their "contacts with foreign . . . media bodies," Brown Ex. C-72 at 009, and wiretapped calls between activists and foreign reporters, forwarding intercepts to army units for them to "take the necessary measures."  Brown Ex. C-102 at 002.

neighborhood.  Ulysses Decl. ¶ 27.  Power, water, telecommunications, and access to food were regularly cut.  *Id.*

Two Regime officials oversaw the siege of Baba Amr: (i) *Imad*[7] Ali Ayoub, often called the "Homs Military and Security Chief" (who was also Deputy Chief of Staff of the Syrian Army); and (ii) Ayoub's deputy, Major General Rafiq Shahadah, often called the "Security Chief in the Homs Governorate and Assistant to the Military Commander" (a senior Military Intelligence officer).  Brown Rep. ¶¶ 81, 210–212.[8]  These were *ad hoc* positions created by the CCMC in the fall of 2011 for the purpose of coordinating joint military,[9] intelligence,[10] and *shabiha* operations against the opposition.  Ulysses Decl. ¶¶ 9 n.3, 18 n.5; Brown Rep. ¶¶ 210–11, 219.  These officials led military and security operations in Homs, *see, e.g.*, Brown Rep. ¶¶ 219–21; Brown Ex. C-112 at 004, and appear to have done so through what was informally called the "Homs Military-Security Committee."  *See* Ulysses Decl. ¶ 18.[11]  They formed the

---

[7] The term "*Imad*" is a senior military rank in the Syrian Army, superior to a Major General. Brown Rep. ¶ 46 n.25.

[8] Evidence suggests that Homs Military and Security Chief, Ali Ayoub, exercised formal command over joint operations in Homs, giving final written approval of orders (possibly from an office in Damascus), while his assistant, Security Chief Rafiq Shahadah, played a more operational role on the ground in Homs.  *Compare* Ulysses Decl. ¶ 18 (noting that Ayoub had returned to Damascus when Shahadah started) *with* Brown Rep. ¶¶ 229–34 (discussing Security Chief Shahadah's apparent authority to issue instructions to military and security forces, and noting possibility that "Shahadah was fulfilling an 'Assistant' role when the Homs Military and Security Chief was physically away from Homs").

[9] The military units under their command included elements of the 11th and 18th Tank Divisions, the 41st and 554th Special Forces Regiments, Brown Rep. ¶¶ 93, 216, and the Republican Guard, Ulysses Ex. D.

[10] The intelligence forces under their command included Military Intelligence Branch 261 and General Intelligence Branch 318.  *See* Ulysses Decl. ¶ 28; Ulysses Ex. C; Brown Rep. ¶ 241.

[11] Although Regime documents uncovered to date do not explicitly reference a "Homs Military-Security Committee," there are clear indications that this nomenclature was used.  For example, Security Chief Shahadah used a "committee operations office" to inform and instruct artillery units.  *See* Brown Ex. C-93 at 004.  And in the Idleb governorate, the position equivalent to

central hub linking intelligence and military operations in Homs, under a chain of command that ran to the CCMC and ultimately to President Bashar al-Assad. *See* Brown Rep. ¶¶ 116–119, 216, 219; Ulysses Exs. C, D.

From February 4 to 28, 2012, the Syrian army subjected Baba Amr to sniper fire and saturated the area with shells from multiple rocket launcher systems, tanks, and mortars. *See* Ulysses Decl. ¶ 29; al-Hamid Decl. ¶¶ 30–31; Doe Decl. ¶ 16; Brown Rep. ¶¶ 261–66. Rather than concentrate fire at the front lines surrounding the neighborhood, the artillery blanketed the soft, civilian core. Doe Decl. ¶ 16. Local activists compared it to "raking a comb across the neighborhood." Al-Hamid Decl. ¶ 30. The Regime flew aerial surveillance drones over Baba Amr, acquiring targets and monitoring the destruction of the neighborhood. *See* Ulysses Decl. ¶ 29.

The battle for Baba Amr drew the attention of journalists from around the world, who sought to report from inside the siege lines. Ulysses Decl. ¶ 25; al-Hamid Decl. ¶ 25. But in addition to the usual dangers that attend war reporting, these journalists – and the Syrians who helped them – faced a new distinct threat: deliberate targeting by the Assad Regime.

**B.   THE EXTRAJUDICIAL KILLING OF MARIE COLVIN**

**i.   The Regime's Targeting of the Baba Amr Media Center**

In late 2011 and early 2012, the Assad Regime received tips from intelligence sources that foreign journalists were traveling to Syria through Lebanon and reporting from the Baba Amr Media Center. Ulysses Decl. ¶¶ 35–37. Acting on this intelligence, senior officials of the Assad Regime formed a plan to intercept the journalists' communications, track their movement

---

Ayoub's was called the "Head of the Security and Military Committee." Brown Ex. C-126 at 025. Ulysses confirms that officers in Homs referred to this *ad hoc* body as a "Committee." Ulysses Decl. ¶ 18.

to locate the Media Center, and capture or kill the journalists.  *Id.* ¶¶ 35-40, 50.  This plan culminated in the killing of Marie Colvin and Rémi Ochlik on February 22, 2012.

The Regime's operations against the Media Center began in or around late December 2011, when Major General Ali Mamluk, Head of the General Intelligence Directorate and CCMC Member, received intelligence reports from sources in Lebanon that foreign journalists were arriving at the Beirut international airport and being smuggled across the border into Syria. Ulysses Decl. ¶ 35.  Mamluk circulated a memorandum with instructions that all intelligence branches in Homs were to confirm the intelligence reports, capture the journalists, and "take all necessary measures."  *Id.*; *see also* Nouar Decl. ¶ 31.

Under the direction of the Homs Security Chief Major General Rafiq Shahadah, the intelligence branches in Homs launched a joint effort to surveil the journalists and prevent their reporting.  *See* Ulysses Decl. ¶ 38.  Over the following weeks, Mamluk continued to receive reports that foreign journalists were entering Homs, including teams from CNN and the BBC. *Id.* ¶ 37.  Regime officials were regularly monitoring news broadcasts coming out of Homs, and were fully aware that reporters were succeeding in getting in and out of Baba Amr.  *Id.*  In fact, the CCMC had established a "Media Monitoring Cell" for the purpose of monitoring the media and "[d]eveloping appropriate measures and responses."  Brown Rep. ¶ 177; Brown Ex. C-187, at 025.

Throughout January and February 2012, the Regime used two streams of intelligence to hunt for the Media Center and the visiting foreign journalists.  The first were intercepts: security forces regularly operated a mobile satellite interception device, which circled around Baba Amr attempting to wiretap broadcast signals and geo-locate their origins.  Ulysses Decl. ¶ 39.  On multiple occasions, Homs Security Chief Shahadah relayed the coordinates of intercepts to

artillery units so that they could shell the identified locations.  *Id.* ¶ 50.  The intelligence, however, proved too imprecise and the attacks repeatedly failed.  *Id.*

Shahadah also developed a second stream of intelligence: informants.  *Id.* ¶ 40.  For this task, Shahadah relied on Khaled al-Fares, a local narco-trafficker who worked as an agent of the Regime to finance the local *shabiha* paramilitaries and recruit informants.  *Id.* ¶¶ 20–22, 40.  Al-Fares had a direct connection to Maher al-Assad, the President's brother and *de facto* commander of the elite Fourth Division of the Syrian Army, ██████████ called the "boss." *Id.* ¶¶ 12 n.4, ███████████████████████ about the location of the Media Center and the presence of foreign journalists.  *Id*. ¶ 40.

In addition, in January 2012, senior Regime officials – including CCMC members – tried to extract the location of the Baba Amr Media Center from Arab League observers.  Abdelmalek Nouar, a former Arab League observer, recalls a discussion on or around January 5, 2012 in which Syria's Deputy Minister of Defense Assef Shawkat asked Nouar to reveal the location of the Media Center, which Nouar had previously visited.  Nouar Decl. ¶ 27.

During this discussion, Shawkat characterized *The New York Times* and *The Washington Post* as "terrorist newspapers" and alleged that foreign media, such as CNN and Al-Jazeera, were collaborating with terrorists.  *Id.* ¶ 28.  Shawkat asked if Nouar had seen foreign journalists present in Baba Amr, telling him: "In reality, they are not journalists.  They are agents of the Israeli and American intelligence services who are trying to infiltrate Syria."  *Id.* ¶ 30.  Shawkat told Nouar: "Each journalist who enters into Baba Amr without state authorization—for us these are terrorists.  They are targets for our military services and our security forces."  *Id.* ¶ 31.

### ii.  Marie Colvin's Arrival in Baba Amr

Marie Colvin and British photographer Paul Conroy traveled to Syria on assignment for *The Sunday Times* around February 13, 2012.  Declaration of Paul Conroy ("Conroy Decl.")

¶¶ 5–6.  They set out on a smuggler's route across the Lebanese-Syrian border and entered the Homs countryside.  *Id.* ¶ 9.  On or around February 15, they snuck into Homs through an underground water tunnel, accompanied by a Syrian activist named Wael al-Omar, who worked as their interpreter.  *Id.* ¶ 11; al-Omar Decl. ¶ 15.

They eventually arrived under cover of night at the Media Center, which was located on the ground floor of a three-story apartment-building tucked away on a small street in southern Baba Amr.  Conroy Decl. ¶ 13; al-Omar Decl. ¶ 16–17.  The Media Center hosted foreign journalists, offering sleeping quarters and a satellite internet connection.  *See* Conroy Decl. ¶ 13; Doe Decl. ¶ 19.  When Marie, Paul, and Wael arrived, a team from CNN was already there.  Doe Decl. ¶ 20.

Marie's team spent the night at the Media Center and was woken early the next morning by the sound of shelling.  Conroy Decl. ¶ 14.  Throughout the day, missiles and mortar fire swept through the neighborhood, landing indiscriminately on residential streets.  *Id.*  Wael recognized the pattern of fire from his prior, mandatory, military service as a forward artillery observer in Syria's 14th Special Forces Division.  Al-Omar Decl. ¶¶ 5, 7, 17.  His trainers called it "Russian style": the gunners would scorch an entire area with artillery, moving in waves without directing fire at any particular target.  *Id.* ¶ 7.[12]

Despite the shelling, Marie managed to interview locals, touring an improvised field hospital and a cellar called the "widow's basement" where residents, mainly women and children, sought shelter from the Regime's bombardment.  Conroy Decl. ¶¶ 15–17; Conroy Exs. A-1, A-2, B, C-1, C-2.

---

[12]  Syrian government documents confirm that artillery units in 2012 had engaged in indiscriminate fire "without observation" to such an extent that they were depleting ammunition reserves.  Brown Rep. ¶¶ 269–271; Brown Ex. C-139 at 005.

Later that evening, Marie heard rumors that a Regime ground invasion was imminent, so she and the other journalists fled Baba Amr through the same water tunnel in which they had arrived.  Conroy Decl. ¶ 18.  From the outskirts of Homs, Marie was able to dictate her story to *The Sunday Times* via satellite phone.  *Id.* ¶ 19.  On February 19, 2012, *The Sunday Times* published Marie's account of the siege: "Crammed amid makeshift beds and scattered belongings are frightened women and children trapped in the horror of Homs, the Syrian city shaken by two weeks of relentless bombardment."  Witherow Ex. A-2.  But Marie wanted to return to Baba Amr.  Conroy Decl. ¶ 19.  "This was today's Sarajevo," she told Paul.  She refused to "cover Sarajevo from the suburbs."  *Id.*  When Wael warned Marie that the Regime was certain to retake the neighborhood, she responded, "I am not worth more than the children dying there."  Al-Omar Decl. ¶ 19.

On the night of February 20, Marie, Paul, and Wael made their way back to the Media Center.  Conroy Decl. ¶ 19.  The next morning, they realized that the shelling had reached a new level of intensity.  Paul, a former gunner and observer in the British Royal Artillery, recognized the sound of rockets, mortars, and howitzer cannon.  *Id.* ¶ 20.  He heard the buzzing of drones circling overhead.  *Id.*  They determined that conditions were too dire for them to leave the Media Center and tour the neighborhood.  *Id.* ¶ 21.  Instead, they stayed at the Media Center, gathering accounts, photos, and video footage.  *Id.*

### iii.  The Eve of the Attack: February 21, 2012

Marie decided that news of what they were seeing could not wait three days until Friday – filing day at *The Sunday Times*.  Conroy Decl. ¶ 21.  On the evening of February 21 (Tuesday night), Marie gave live interviews via the Media Center's satellite link to the BBC, Channel 4 (U.K.), and CNN.  *Id.*  In Marie's last broadcasts, she told the BBC that Regime forces were "shelling with impunity and a merciless disregard for the civilians who simply cannot escape."

Pls.' Mot. for Default J. Ex. A, *Journalist Marie Colvin in Homs: 'I saw a baby die today'* (BBC television broadcast Feb. 21, 2012) (start at 02:53).   To CNN's Anderson Cooper, Marie reported: "It's a complete and utter lie that they're only going after terrorists. . . .  The Syrian Army is simply shelling a city of cold, starving civilians."   Pls.' Mot. for Default J. Ex. B, *Anderson Cooper 360: Interview with Marie Colvin* (CNN television broadcast Feb. 21, 2012) (start at 06:05); *see also* Pls.' Mot. for Default J. Ex. C, *Interview with Marie Colvin* (Channel 4 News television broadcast Feb. 21, 2012).   Later that night, Javier Espinosa from the Spanish newspaper *El Mundo*, arrived at the Media Center with French reporter Edith Bouvier and French freelance photographers Rémi Ochlik and William Daniels.   *See* Declaration of Javier Antonio Espinosa Robles ("Espinosa Decl.") ¶¶ 9, 10, 14.

Meanwhile, Syrian intelligence forces were closing in.   Around 10:00 pm on February 21, 2012, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ Ulysses Decl. ¶ 51. ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ she has information about the Media Center and the foreign journalists.  She knows their location and where they are spending the night ██ *Id.* ████████████████████████████████ the informant ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████ the boss," referring to Maher al-Assad.  *Id.* ██████ ████████████████████████████████████████████████████████ Al-

Fares brought her to a special conference room at the Military Technical Affairs Faculty that was used to plan military operations.  *Id.* ¶¶ 23, 56.[13]

There, during the early morning hours of February 22, 2012, Homs Security Chief Rafiq Shahadah convened a meeting to debrief the informant.  *Id.* ¶ 56.  A number of Syrian military officials were present, including Brigadier General Issam Zahreddine from the Republican Guard and ███████████████████ from the Special Forces.  *Id.* ¶ 57.  The informant was shown an aerial photo of Baba Amr that was projected onto a screen.  *Id.*  After the meeting, a hard-copy report was ████████████████████████████████████████ conveyed to its Computer and Signals Section, to be cross-checked against wiretapped information.  *Id.* ¶ 58.

Later, ████████████████████████, the Deputy Head of the Computer and Signals Section of Military Intelligence Branch 261██████ ████████ Major General Shahadah that a broadcast had been intercepted that night from the very same location. *Id.* ¶ 60.  He briefed Shahadah █████████████████████████████ the Deputy Head██ ████: "The boss is very happy."  *Id.*

### iv.  The Attack: February 22, 2012

At around 9:30 a.m. on the morning of February 22, the "long, wailing sound of a rocket cut through the air."  Conroy Decl. ¶ 23; *see also* Doe Decl. ¶ 25.  An explosion shook the room as a shell landed in front of the Media Center.  Conroy Decl. ¶ 23.  Within seconds of the first blast, a second shell fell, this time to the rear of the building.  *Id.*

---

[13] Syrian government documents confirm that a "committee operations office" was used by Ayoub and Shahadah on other occasions to channel intelligence to army units for the targeting of artillery strikes.  *See* Brown Rep. ¶ 226; Brown Ex. C-93 at 004.

Wael al-Omar, woken by the first blast, scrambled to gather his belongings.  Al-Omar Decl. ¶ 22.  Artillery units were unleashing a battery of rockets: Wael counted five more salvos of rockets, drawing closer and closer to the Media Center.  *Id.* ¶ 23.  The shrill whistle of exhaust-propelled rockets was unmistakable: from his prior service with the Special Forces, Wael recognized the sound as belonging to the Syrian Army's multiple rocket launcher systems.[14]  *Id.* ¶ 24.  The pattern of fire was recognizable, too.  Both Paul and Wael realized from their artillery training that the Media Center was being "bracketed": an artillery technique for targeting a specific location whereby a forward observer relays course corrections to the gunners between salvos until a target is struck.  Al-Omar Decl. ¶ 23; Conroy Decl. ¶ 24.[15]

In the chaos of the incoming fire, the journalists and activists at the Media Center ran to evacuate through the front hall of the ground-floor apartment to the entrance.  *See* al-Omar Decl. ¶ 25; al-Omar Ex. B (hand-drawn layout of the Media Center).  One activist tried to organize the evacuation, telling the others to run in pairs across the street towards a building with an underground shelter.  Al-Omar Decl. ¶ 26.  Marie and Wael held hands and waited for the first pair to run out.  *Id.*  Then suddenly, Wael was pulled back by a Syrian activist.  In Wael's place, the French photographer Rémi Ochlik ran alongside Marie, holding her hand.  *Id.*

Just as Marie and Rémi entered the front vestibule of the building, the shriek of a rocket pierced the air.  *Id.* ¶ 28.  An explosion engulfed the Media Center.  Conroy Decl. ¶ 26.  The blast killed Marie and Rémi and sent a shock wave into the main room of the Media Center,

---

[14]  Syrian government documents confirm the Army's use of BM-21 multi-barreled rocket launchers in urban areas during 2012.  *See* Brown Rep. ¶¶ 267–68; Brown Ex. C-140 at 014.

[15]  Syrian government documents confirm this artillery targeting technique, noting the use of GPS, computers, and rangefinders to acquire target information and the use of observers to "deduc[e] the appropriate corrections to range and direction."  *See* Brown Rep. ¶¶ 269–70; Brown Ex. C-139 at 005.

wounding Paul Conroy, Wael al-Omar, and Edith Bouvier.  Conroy Decl. ¶ 29; al-Omar Decl. ¶ 28.

The incoming artillery fire continued, a sustained attack that lasted more than 17 minutes. *See* Doe Decl. ¶¶ 25–27; Doe Exs. D, E.  The sound of the chaos was captured in real-time in a Skype audio recording, in which the explosions at the Media Center and the cries of Paul Conroy and other victims can be heard.  *Id.*

The survivors of the attack eventually fled from the building.  Conroy Decl. ¶¶ 27–29. Paul Conroy, gravely wounded, tried to scramble through the rubble of the entryway.  *Id.* ¶ 27. He collapsed next to Marie's body.  *Id.*  She was torn up, her body motionless.  *Id.*  Paul knew she was dead.  *Id.*

Javier Espinosa, who was uninjured, ran across the street to take shelter.  Espinosa Decl. ¶ 19.  The shells had been redirected and were now falling onto the street, where the survivors were trying to escape.  *Id.*; Conroy Decl. ¶ 28.  In the lull between shells, Javier and Paul could hear the buzzing of a drone overhead.  Espinosa Decl. ¶ 20; Conroy Decl. ¶ 28.  The shelling eventually ceased.  From the other side of the street, Javier took a photo of the damaged facade of the Media Center.  Espinosa Decl. ¶ 19; Espinosa Ex. A.

Khaled Abu Salah, one of the founding members of the Media Center, who had been in a nearby building during the attack, arrived on the scene shortly afterwards to assess the damage. Al-Hamid Decl. ¶ 38.  In shock, he narrated what he observed while a cameraman filmed the bodies of Marie Colvin and Rémi Ochlik lying in rubble.  *Id.* ¶¶ 38–39, al-Hamid Exs. D, E.

### v.  The Regime's Celebration of Marie's Death

After confirming the success of the attack on the Media Center, Homs Security Chief Major General Shahadah convened a group of Syrian military and intelligence officers to celebrate ██████████████████████████████  Ulysses Decl. ¶ 62.  Shahadah

thanked and congratulated them, including two officers who had debriefed the informant the night before: Brigadier General Issam Zahreddine and Colonel Ali Salim from the Republican Guard.  *Id.*  The heads of the Homs branches of the intelligence agencies also attended the party, including Brigadier General Muhammad Zemrini, head of Military Intelligence Branch 261, and Colonel Firas al-Hamed, head of General Intelligence Branch 318.  *Id.*  ████████ ███████████████ of the Special Forces eventually arrived at the celebration as well; Khaled al-Fares identified him as the officer who had launched the attack, congratulated him, and told him he would soon be getting a promotion.  *Id.* ¶ 63.

It was announced that an intelligence office had intercepted communications from inside Baba Amr confirming the deaths of Marie Colvin and Rémi Ochlik.  *Id.* ¶ 64.  The officers drank and celebrated the success of the attack.  *Id.* ¶ 65.  "That blind bitch was Israeli," ████████ ███████████████ shouted.  *Id.*  Shahadah replied: "Marie Colvin was a dog and now she's dead.  Let the Americans help her now."  *Id.*

A few days later, on or around February 25, 2012, al-Fares received a new car: a black Hyundai Genesis.  *Id.* ¶ 66.  ██████████ the car was a gift from Maher al-Assad, a reward for the successful operation.  *Id.*

## C. PROCEDURAL HISTORY

On July 9, 2016, Plaintiffs commenced this action seeking damages and other relief for the extrajudicial killing of Marie Colvin under the FSIA, 28 U.S.C. § 1605A(c).  Pls.' Compl., ECF No. 1.  Service of process was effected on Syria by diplomatic channels on February 6, 2017 in accordance with 28 U.S.C. § 1608(a)(4).  Aff. of Jerry N. Hess, ECF No. 28.  Pursuant to Section 1608(c)(1) and 1608(d), Defendant's answer or other responsive pleading was due no

later than April 7, 2017.  None was filed.[16]  On July 11, 2017, the Clerk of the Court entered

default against Defendant for failure to plead or otherwise defend this action.  Clerk's Entry of

Default, ECF No. 31.

## III.   ARGUMENT

Under the FSIA, this Court may enter default judgment against Syria if it deems that

Plaintiffs have established their claim "by evidence satisfactory to the court."  *See* 28 U.S.C.

§ 1608(e).  While the Court "has an obligation to satisfy itself that plaintiffs have established a

right to relief," *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003), "the

FSIA leaves it to the court to determine precisely how much and what kinds of evidence the

plaintiff must provide."  *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047

(D.C. Cir. 2014).   In reaching its determinations, the Court may take "[u]ncontroverted factual

allegations that are supported by admissible evidence . . . as true."  *Thuneibat v. Syrian Arab

Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016); *see also Owens v. Republic of Sudan,* 864 F.3d

751, 785 (D.C. Cir. 2017) ("lenient standard is particularly appropriate for a FSIA terrorism case,

for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from

an absent and likely hostile sovereign").

---

[16] In addition to receiving formal service through diplomatic channels, Syria has evidently been aware of Plaintiffs' claims since early on in the proceedings.  Aff. for Default, ECF No. 29.  *See also President al-Assad's Interview with NBC News – Video*, SYRIAN ARAB NEWS AGENCY (July 14, 2016), http://sana.sy/en/?p=82569 (for video of the interview, see Bill Neely, *Bashar Al-Assad Says U.S. Is "Not Serious" About Defeating ISIS*, NBC NEWS (July 14, 2016, 04:09 AM), http://www.nbcnews.com/storyline/aleppos-children/bashar-al-assad-says-u-s-notserious-about-defeating-n609036, at Part 6).  President Assad stated that Marie Colvin "came illegally to Syria, she worked with the terrorists" and was "responsible of [*sic*] everything that befall on [*sic*] her."  *Id.*

**A.  JURISDICTION AND STANDING EXIST IN THIS MATTER**

> **i.  Federal Subject Matter Jurisdiction Exists, Since Syria Is Not Entitled to Immunity for Its Extrajudicial Killing of Marie Colvin**

Although foreign states are generally immune from lawsuits, the FSIA recognizes a "terrorism exception" that strips sovereign immunity for those cases "in which money damages are sought against a foreign state for personal injury or death that was caused by" certain actions contrary to international law, including an "extrajudicial killing."  28 U.S.C. § 1605A(a)(1). This exception applies here for the reasons set forth in Section III.B. below, and may be invoked because the additional pre-requisites for a case to be heard under § 1605A(a)(2) are met: (i) Syria was designated a state sponsor of terrorism at the time of Marie's killing, *see supra,* Section I.C.ii; (ii) Plaintiffs and Marie Colvin were nationals of the United States at the time Marie was killed, *see supra*, Sections I.B, I.C.i; and (iii) Plaintiffs afforded Syria a reasonable opportunity to arbitrate, *see* Pls.' Offer to Arbitrate, ECF No. 2; *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233–34 (D.C. Cir. 2003) (holding FSIA "does not require any particular form of offer" and that offer made after service of complaint afforded a reasonable opportunity to arbitrate).  28 U.S.C. § 1605A(a)(2).  *See generally Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (discussing §1605A(a)(2) pre-requisites). Finally, Plaintiffs have brought this action within 10 years of Marie's killing.  28 U.S.C. § 1605(b).

Accordingly, since Syria is not entitled to immunity under the FSIA, this Court has "original jurisdiction" over this matter.  28 U.S.C. § 1330(a).

### ii.   Syria Is Subject to the Personal Jurisdiction of this Court Since Subject Matter Jurisdiction Exists and Syria Has Been Properly Served

This Court has personal jurisdiction over Syria because, as set forth in Plaintiffs' Affidavit for Default, ECF No. 29; *see also* Aff. of Jared N. Hess, ECF No. 28, service was effected in accordance with the FSIA's requirements. *See* 28 U.S.C. § 1330(b); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) ("[p]ersonal jurisdiction over foreign states exists as long as the Court can exercise original jurisdiction under 28 U.S.C. § 1330(a) and service of process meets the standards set forth by 28 U.S.C. § 1608").

### iii.   Plaintiffs Have Standing to Bring Their Section 1605A(c) Claims Against Syria

Under the FSIA terrorism exception, nationals of the United States may seek an award of economic damages, solatium, and punitive damages against non-immune foreign states. 28 U.S.C. § 1605A(c). Plaintiffs are U.S. nationals. *See supra* Section I.C.i. Plaintiffs may therefore recover the economic damages arising from Marie's death as beneficiaries of her estate.[17] Additionally, Plaintiff Cathleen Colvin has standing to seek solatium for the emotional pain she has suffered from being deprived of the society and comfort of her sister. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010). Finally, all Plaintiffs have standing to sue for punitive damages. *Id.* at 83.

### B.   SYRIA IS LIABLE FOR THE EXTRAJUDICIAL KILLING OF MARIE COLVIN UNDER FSIA SECTION 1605A(c)

Under Section 1605A, a designated state sponsor of terrorism is liable to a national of the United States for death caused by an act of "extrajudicial killing" of that "state, or of an official,

---

[17] Plaintiff Cathleen Colvin is not a residuary beneficiary in Marie's estate, but asserts claims on behalf of her minor child, L.A.C., who is. *See* C. Colvin Decl. ¶ 3.

employee, or agent of that foreign state."[18]  28 U.S.C. § 1605A(c).  The record presented by

Plaintiffs overwhelmingly proves Syria's liability for Marie Colvin's death.

### i.  The Syrian Regime Was Responsible for Shelling the Baba Amr Media Center and Killing Marie Colvin

Marie was killed by an act of a "foreign state, or of an official, employee, or agent of that

foreign state."  *See* 28 U.S.C. § 1605A(c) ("a foreign state shall be vicariously liable for the acts

of its officials, employees, or agents").  As shown above in Section II.B (documenting high-level

government planning and supervision of Marie's assassination), Marie's death, and that of Rémi

Ochlik, was caused by the Baba Amr Media Center attack orchestrated by the Syrian state

through its officials, employees, and agents.  The planners and perpetrators of the attack included

Syrian military and security officials from the highest ranks of the Assad Regime.  *See* Ulysses

Decl. ¶¶ 24, 56–57 (describing role of Homs Security Chief Rafiq Shahadah in overseeing the

attack); Brown Rep. ¶¶ 210–34 (analyzing the command responsibility of Homs Military-

Security Chief Ali Ayoub and his deputy, Homs Security Chief Shahadah).  These officers were

executing an official policy of targeting journalists, through a security apparatus under the top-

down control of the Assad Regime.  *See* Barakat Decl. ¶ 11 (describing CCMC's oversight of

military-security operations); Brown Rep. ¶¶ 179–208 (detailing the command structure linking

---

[18] Because Plaintiffs are bringing their claims under the federal cause of action authorized by 28 U.S.C. § 1605A(c), they are not required to rely on state tort law to establish liability.  *Owens*, 864 F.3d at 808–09 (detailing history of the terrorism exception to the FSIA and the significance of the 2008 enactment of a federal cause of action under § 1605A(c)).  An extrajudicial killing under Section 1605A is a wrongful death for which Plaintiffs may recover without bringing a wrongful death claim under state law.  *See Shoham v. Islamic Republic of Iran*, No. 12-CV-508 (RCL), 2017 WL 2399454, at *18 (D.D.C. June 1, 2017) ("It is axiomatic that acts of terrorism under section 1605A—including extrajudicial killing or material support thereof—are, by definition, wrongful.  Any deaths resulting from an act of terrorism under section 1605A are properly considered wrongful deaths, and a plaintiff's recovery under a wrongful death theory of liability is appropriate.  Thus, where a foreign state or an agency/instrumentality thereof is liable for an extrajudicial killing . . . it may be liable for the economic damages experienced by the decedent's heirs under the . . . the FSIA.").

the military and intelligence forces in Homs to the CCMC and President Assad and analyzing CCMC communications concerning Homs).

Marie's killing is thus directly attributable to the Syrian state.  *See, e.g.*, *Kim*, 774 F.3d at 1051 (directing entry of default judgment against North Korea for torture and extrajudicial killing carried out by state operatives); *Saludes v. Republica de Cuba*, 577 F. Supp. 2d 1243, 1251 (S.D. Fla. 2008) (state liable for torture by state police directed against a journalist for his journalistic activities).[19]

### ii.  The Regime's Murder of Marie Colvin Was an "Extrajudicial Killing" Actionable Under FSIA Section 1605A(c)

Marie Colvin's death – methodically planned and executed by the Assad Regime – constitutes an "extrajudicial killing."   The FSIA defines "extrajudicial killing" as (1) a "deliberated killing" that (2) was "not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people," and which (3) was not "lawfully carried out under the authority of a foreign nation" "under international law."   28 U.S.C. §§ 1605A(a)(1), (h)(7) (incorporating the definition of the term under the Torture Victim Protection Act, 28 U.S.C. § 1350, note § 3(a)).   As the D.C. Circuit emphasized, an extrajudicial-killing claimant "need demonstrate only that the [defendant] killed the [victim] without due process." *Kim*, 774 F.3d at 1050.  The record presented by Plaintiffs more than demonstrates this here.

---

[19] There is no question that Syria's attack on the Media Center was the direct cause of Marie's death and Plaintiffs therefore do not separately discuss causation.

### 1.   The Regime's Rocket Attack on the Baba Amr Media Center Was a "Deliberated Killing" Intended to Kill Marie Colvin and Other Civilians

Plaintiffs present overwhelming evidence that Marie was killed by the Assad Regime through precisely the sort of purposeful, considered conduct regularly held to be a "deliberated killing" by this Court. *See, e.g., Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 163 (D.D.C. 2016) (defining "deliberated killing" as one that is "arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action" by reference to pattern jury instructions).   For example, in *Kaplan v. Central Bank of the Islamic Republic of Iran*, this Court found that deadly rocket attacks launched against civilian targets by Hezbollah – a non-state terrorist ally of the Assad Regime – were extrajudicial killings under Section 1605A.   55 F. Supp. 3d 189, 200 (D.D.C. 2014).   The hallmark of attacks held to be extrajudicial killings has been their "careful planning" and "meticulous" preparation.   *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 325 (D.D.C. 2014) (ruling that bombing of a U.S. Marines unit was a deliberated killing for purposes of Section 1605A where the "meticulous[ly]" prepared attack "was carried out after careful planning and caused the deaths of 241 servicemen").   As shown below, Marie's killing bears all the indicia of a meticulously planned attack designed to take civilian life and instill terror.

The declaration of "Ulysses," a defector from the Syrian intelligence services, reconstructs the Regime's planning and preparation of the rocket attack on the Media Center. Ulysses Decl. ¶¶ 50–62.   ███████████████████████████████████████████ Ulysses directly observed how events unfolded during the evening of February 21 and morning of February 22.   *Id.* ¶ 51.   ██████████ the informant's tip as to the location of the Media Center.   *Id.*   ███████████████████████████ between Regime officials in which an operational plan was approved, ████████ went all the way up to the office of Maher al-Assad, the

President's brother and *de facto* commander of the Syrian Army's elite Fourth Division.  *Id.*
¶¶ 51, 53–54; *see also id.* ¶ 12 n.4.  ███████  the Signals Section's confirmation that a
broadcast had been made that night from the same location (when Marie gave interviews to
multiple news stations).  *Id.* ¶ 60.  He observed first-hand as a sophisticated military-security
apparatus sprang into action to plan and then execute an artillery strike on that location.  *See Id.*
¶¶ 50–62.  And in the morning, there was confirmation that Marie had been killed, followed by
celebration, and, ultimately, rewards for those involved – acts clearly showing the intent to kill
Marie.  *Id.* ¶¶ 62–67.[20]

The Regime's motive for killing Marie was clear – and indeed openly admitted by
Regime officials.  Beginning in August 2011, the CCMC authorized joint military-security
campaigns against those who "tarnish[ed] the image of Syria in the foreign media. . . ."  Brown
Ex. C-40 at 094; *see also supra* Section II.A.ii.  And in January 2012, senior Regime officials,
including the Deputy Defense Minister, openly announced in diplomatic discussions that they
intended to target the Media Center, specifically because it hosted foreign journalists.  Nouar
Decl. ¶¶ 28–32; *see also supra* Section II.B.i.  They acted on that intent on February 22.

The Regime's *modus operandi* in shelling the Baba Amr Media Center further reflects
the deliberate and calculated nature of the attack.[21]  *First*, the heavy caliber rockets used in the

---

[20] Ulysses' account of the actors involved that night, including the top-level officials who
authorized the strike, is corroborated by the Expert Report of Ewan Brown and the Syrian
government documents on which he relies.  Brown's reconstruction of the Syrian military-
security apparatus confirms Ulysses' knowledge of the secretive Regime's structure, personnel,
and policies – details only available to an insider.  *See, e.g.*, Brown Rep. ¶¶ 212–213 (confirming
Rafiq Shahadah's role as Security Chief in Homs); *id.* ¶¶ 244–246 (confirming Military
Intelligence Branch 261's use of signals interception and informants to monitor opposition in
Homs).

[21] The D.C. Circuit has held that expert testimony and circumstantial inference can suffice,
without more, to establish liability under the terrorism exception.  *See Owens*, 864 F.3d at 787–

shelling were identical to those used by the Syrian Army, and only the Regime possessed such weaponry at the time. *See* al-Omar Decl. ¶ 24 (recognizing the sound of rocket launcher systems used by the Syrian army); Brown Rep. ¶ 267 (analyzing Syrian Army documents revealing the use of such rocket launcher systems in urban areas); Doe Decl. ¶ 11 (noting that FSA rebels in Baba Amr lacked heavy artillery). *Second*, the pattern of fire indicated the attack's targeted nature. As former soldiers trained in artillery and reconnaissance, Paul Conroy and Wael al-Omar recognized that the incoming rockets were being launched using a "bracketing" technique commonly employed "to ensure that shells hit their intended target." Conroy Decl. ¶ 24; al-Omar Decl. ¶ 23. Conroy describes bracketing as "walk[ing] rounds onto a target" via careful observations and adjustments, until the intended target is hit. Conroy Decl. ¶ 24. The Regime's targeting method clearly reflects that Marie's killing was deliberate and "carried out after careful planning." *Worley*, 75 F. Supp. 3d at 321, 325 (considering, among other factors, the method of attack as proof of its deliberateness).

The timing of the attack likewise leaves no doubt it was deliberate. The Regime struck after it intercepted Marie's broadcasts on the night of February 21, which corroborated the informant's tip. Ulysses Decl. ¶¶ 58, 60; *see also* Conroy Decl. ¶¶ 21–22.[22]

The level of coordination required in the attack is further proof of its deliberate nature. The attack was planned, prepared, and executed by a joint enterprise that included the Homs

---

89 (finding state liable over objection that plaintiffs presented only circumstantial evidence); *accord Kim*, 774 F.3d at 1049. Plaintiffs present far more.

[22] The Regime was also put on notice of Marie's presence by her live broadcasts on major news networks from inside Baba Amr, which the Regime, with its dedicated Media Monitoring Cell and interception capabilities, could not have avoided. *See* Brown Rep. ¶¶ 177, 244–45, 250. Marie's then-editor describes how on the ground, Paul sensed that "Marie's high profile due to th[e] week's material in paper and TV interviews also compromise[d their] safety." Witherow Decl. ¶ 15.

Military-Security Committee, Military Intelligence Branch 261, General Intelligence Branch 318, and Syrian Army units, including Special Forces and the Republican Guard. *See* Ulysses Exs. C, D. These very same actors were responsible for other operations against media targets, including after Marie's killing. *See* Brown Rep. ¶¶ 230–31. For example, internal Regime documents show that on April 18, 2012, Shahadah received a report from General Intelligence Branch 318 summarizing intercepted phone calls between an activist and an Al-Jazeera news anchor in Homs; he forwarded the information via Military Intelligence Branch 261 to Army units, including the 41st Special Forces Regiment, with orders to "take the necessary measures." Brown Ex. C-102 at 001–02. That operation bears a striking resemblance to the Media Center attack. Put simply, the military-security apparatus responsible for killing Marie coordinated similar operations, using equivalent means and methods.[23]

Moreover, the attack on the Media Center was part of the Regime's long-standing and escalating campaign to violently silence media workers, including foreign journalists, as enemies of the state. *See* Kaye Rep. ¶¶ 25–30; Ford Rep. ¶¶ 58–68; Brown Rep. ¶¶ 66, 169–78. Indeed, in the same week as its attack on the Baba Amr Media Center, the Regime liquidated another preeminent press-freedom organization in Syria: the Syrian Centre for Media and Freedom of Expression. *See* Kaye Rep. ¶ 26. The Regime's attack on the Media Center was thus neither accidental nor indiscriminate, but rather an operation undertaken after meticulous planning and in furtherance of its explicit goal of curtailing free media.

---

[23] *Modus operandi* evidence is highly probative in identifying the existence of a conspiracy or joint criminal enterprise, as it exposes motives for conduct that might otherwise be innocently explained. *See United States v. Long*, 328 F.3d 655, 666 (D.C. Cir. 2003) (affirming admissibility of expert testimony "regarding the *modus operandi* of a certain category of criminals where those criminals' behavior is not ordinarily familiar to the average layperson"). Here, it shows that Marie's killing was part of the Regime's coordinated campaign to attack journalists.

In short, both direct testimony and evidence of the Regime's means, motive, and opportunity show that Marie's killing was a deliberate, politically motivated assassination. *See Bakhtiar v. Islamic Republic of Iran*, 571 F. Supp. 2d 27, 30, 33–34 (D.D.C. 2008), *aff'd*, 668 F.3d 773 (D.C. Cir. 2012) (finding regime rule was marked by "a policy of assassinating dissidents at home and abroad" and holding that killing was "deliberate and meticulously planned").

### 2. The Regime's Deadly Attack on a Civilian Was Not Authorized by Any Court

The Regime never charged Marie with any crime, nor afforded her a trial. Its deliberate killing of Marie was not "authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people," 28 U.S.C. § 1350, note § 3(a); and the Regime has never claimed otherwise. *See, e.g., Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 11 (D.D.C. 2010) (refusing to view killing as authorized where "there [is no] evidence that these acts were judicially sanctioned by *any* judicial body – much less a court that respects guarantees of life and liberty").

### 3. The Regime's Deadly Attack on a Civilian Was Not Authorized Under International Law

The Regime's deliberate killing of Marie was not, as a matter of "international law," "lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1350, note § 3(a). Instead, it violated clear precepts of international law, long recognized by U.S. courts in holding that assassinations, summary executions, and deadly bombing attacks constitute extrajudicial killings. *See, e.g., Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) ("Whatever policy options may exist for a foreign country, it has no 'discretion' to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international

law."); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 107 (D.D.C. 2000) (same).  Indeed, Marie's killing was a dual violation of both international human rights law and international humanitarian law governing armed conflict, binding on Syria through its own treaty obligations or through the operation of customary international law.  Kaye Rep. ¶¶ 31–33, 40–42.

For example, as a party to the International Covenant on Civil and Political Rights, a key human rights instrument, Syria is bound by Article 6(1), which protects the inherent right to life, of which no one may be "arbitrarily deprived."  International Covenant on Civil and Political Rights (the "ICCPR") art. 6(1), Dec. 16, 1966, 999 U.N.T.S. 171; *see also* Kaye Rep. ¶¶ 40–41.  The ICCPR prohibits any derogations from the right to life, including during a "time of public emergency which threatens the life of the nation."  ICCPR arts. 4, 6; *see also* Kaye Rep. ¶ 41 n.108.  The ICCPR also continues to apply during times of armed conflict,[24] *see* Kaye Rep. ¶¶ 39–41, when the "test of what is an arbitrary deprivation of life" is further informed by international humanitarian law.  Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996 (July 8), ¶ 25, http://www.icj-cij.org/files/case-related/95/095-19960708-ADV-01-00-EN.pdf.  As discussed below, international humanitarian law clearly prohibits the deliberate targeting of civilian journalists, making Marie's unjustifiable killing an arbitrary deprivation of life.

The targeted killing of Marie Colvin – a civilian journalist not involved in hostilities – cannot be justified by any purported military necessity under international humanitarian law.  In

---

[24] The application of international humanitarian law is triggered when fighting reaches a sufficient degree of intensity and the belligerents have a sufficient degree of organization so as to constitute an "armed conflict"; this is a fact-specific inquiry.  *See* Kaye Rep. ¶ 32 n.83.  Here, the U.N. Independent International Commission of Inquiry on the Syrian Arab Republic has determined that the hostilities in Homs in February 2012 had developed into an armed conflict of a non-international character sufficient to trigger the application of international humanitarian law.  *Id.*  The facts in the record are consistent with that finding.

this regard, "Common" Article 3, included in all four Geneva Conventions, prohibits Syria from targeting civilians for attack unless and for such time as they take direct part in hostilities. *See, e.g.,* Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War art. 3(1)(a), Aug. 12, 1949, 75 U.N.T.S. 287 ("[V]iolence to life and person, in particular murder of all kinds" are prohibited "at any time and in any place whatsoever" against "[p]ersons taking no active part in the hostilities"). Indeed, the deliberate targeting of civilians – such as journalists – is a war crime under U.S. and international criminal law. *See* 18 U.S.C. § 2441(d)(1)(D) (imposing penalties on "a person who intentionally kills, or conspires or attempts to kill, . . . one or more persons taking no active part in the hostilities"); Kaye Rep. ¶¶ 36–37.[25]

Marie Colvin and the other media workers at the Media Center on the morning of February 22, 2012 were civilians trying to expose to the world the brutal siege of Baba Amr; they were not actively engaged in hostilities and therefore could not have been a legitimate target of attack. As Special Rapporteur Kaye explains:

> [J]ournalists who cover the conflict in Syria and report on related events do not constitute direct participants in hostilities and cannot be deemed legitimate targets under international humanitarian law. Nor can the Syrian government's rhetoric of engaging in a "media war" make them such. The camera, the pen, and even Facebook are not weapons of war, no matter how damaging war reporting might be to a belligerent power and no matter how forcefully that power condemns wartime journalism as propaganda.

Kaye Rep. ¶ 38 (internal citations omitted); *cf.* Nouar Decl. ¶ 29 ("cameras, not Kalashnikovs").

*See also, e.g., Elahi,* 124 F. Supp. 2d at 114 (noting that assassination of a vocal dissident as part

---

[25] For example, in 2007, the International Criminal Tribunal for the Former Yugoslavia convicted a former Bosnian-Serb army commander of war crimes, based in part on his ordering of the shelling of a television studio. *Prosecutor v. Milošević,* Case No. IT-98-29/1-T, Trial Chamber Judgment, ¶¶ 580, 964 (Int'l Crim. Trib. for the Former Yugoslavia Dec. 12, 2007), available at http://www.icty.org/x/cases/dragomir_milosevic/tjug/en/071212.pdf.

of a strategy "to decapitate the opposition" "violate[d] fundamental precepts of international law" and was contrary to "society's interest in the free expression of political ideas").

In sum, the Regime's killing of Marie Colvin was both extrajudicial, in its deliberate nature and total lack of due process, and unlawful, in its dual violation of international human rights and humanitarian law.

### C. THE REGIME'S EXTRAJUDICIAL KILLING OF MARIE COLVIN ENTITLES PLAINTIFFS TO ECONOMIC DAMAGES, SOLATIUM, AND PUNITIVE DAMAGES

There is a gross unreality to placing a numeric value on a human life lost to a targeted killing intended to silence dissent and hide government abuses. Nevertheless, the FSIA utilizes damages as an effort to redress some of the harm done to plaintiffs and to deter perpetrators from future acts of brutality. Such damages "may include economic damages, solatium . . . and punitive damages." 28 U.S.C. § 1605A(c). This Court has awarded such damages where, as here, plaintiffs (i) demonstrate that the defendant's "commission of [an] act[ ] of extrajudicial killing . . . w[as] reasonably certain to, and indeed intended to, cause injury" and (ii) "prove the amount of damages by a reasonable estimate consistent with this Circuit's application of the American rule on damages." *Goldberg-Botvin v. Islamic Republic of Iran*, 938 F. Supp. 2d 1, 11 (D.D.C. 2013) (internal citations omitted). As demonstrated above, the Syrian Regime perpetrated an act of extrajudicial killing that was reasonably certain – and, indeed, intended – to kill Marie Colvin and other civilians.

#### i. Plaintiffs Are Entitled to Damages Reflecting the Economic Value of Life Lost in the Baba Amr Media Center Attack

Courts quantify and award compensatory damages reflecting (i) income the decedent was expected to have earned but for her death that is "reasonabl[y] estimate[d]" by an expert and based on well-founded assumptions, *see, e.g. Thuneibat*, 167 F. Supp. 3d at 48–50; and (ii) "reasonable" funeral expenses like the cost of any family travel, *see, e.g. Elahi*, 124 F. Supp.

2d at 109; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009).  Recoverable economic damages may include "lost wages, benefits and retirement pay, and other out-of-pocket expenses," *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 258 (D.D.C. 2014), *aff'd in part*, question certified, 864 F.3d 751 (D.C. Cir. 2017), and can be based on past activities and forward-looking projections that take into account personal planning, prior professional success, industry standards, and other similar factors.  *See, e.g., Belkin* 667 F. Supp. 2d at 24.

At the time of her death, Marie was already widely regarded as a legend in her field. C. Colvin Decl. ¶ 26; Witherow Decl. ¶ 25.  Her dedication to and skill at reporting on conflicts and disasters around the globe earned her numerous awards, including the prestigious British Press Awards' Foreign Reporter of the Year.  *See* C. Colvin Decl. ¶ 26 n.18 (listing awards); *see also* Witherow Decl. ¶¶ 25–26 (describing Marie's "legion of accolades" and "glittering prizes," and pronouncing her to be "the leading war correspondent of her generation").  A posthumous U.S. Senate Resolution described Marie as "one of the foremost war correspondents of her generation" who "exemplified American values of humanity, accountability, decency, transparency, and courage," "worked with relentless bravery to report on the recent uprising in Syria and to expose crimes against humanity, human-rights violations, and the ravages of war in conflict zones throughout the world, including the Balkans, the Chechen Republic, Libya, and Sri Lanka," and "serv[ed] as the conscience of the world."  *See* S. Res. 404, 112th Cong. (2012); *see also* C. Colvin Decl. ¶ 44.  Marie's career was "extraordinary," and promised "remarkable" future accomplishments, including books and films based on her extraordinary experiences, as well as speaking engagements and more of the kind of writing that earned her accolades like "queen of war correspondents."  *See* Witherow Decl. ¶¶ 22, 33; C. Colvin Decl. ¶ 16 (quoting

articles).   "[S]he would have done it all and more if she had not been murdered."   C. Colvin Decl. ¶ 29; *see also* Witherow Decl. ¶¶ 33–38.

Plaintiffs' expert, Dr. Maria Tsennykh, provides a conservative estimate for economic damages as of the date of this filing of $2,382,476.   Expert Report of Dr. Maria Tsennykh ¶ 46. This estimate was derived from a gross earnings model that incorporated information about Marie's past earnings with *The Sunday Times* and projected future earnings based on documents provided by *The Sunday Times* and Marie's estate, as well as witness declarations, regarding Marie's expected retirement plans, health, the risk factors involved in her job, and adjustments for the time value of money and other economic factors.   *See id.* ¶¶ 16–17.   This methodology has previously been accepted by this Court as providing a reasonable estimate of damages.   *See, e.g.*, *Belkin*, 667 F. Supp. 2d at 24 (accepting expert's gross earnings analysis based on "reasonable and well-founded assumptions about the likely earnings of [decedent] had she survived," including pension, and applying interest and discount rates for the time value of money); *see also Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 268 (D.D.C. 2002) (accepting expert's estimate for timing of retirement based on assumption that decedent would have worked for a government salary until the age of 65 and would have subsequently worked "in the private sector at a salary commensurate with that of others in similar positions from a similar background" for another five years).

### ii.   Plaintiff Cathleen Colvin Is Further Entitled to an Award of Solatium Given the Anguish Caused by the Death of Her Sister

Section 1605A specifically provides for solatium recovery,[26] 28 U.S.C. § 1605A(c)(4), and courts in this Circuit routinely grant such awards to plaintiffs who experience "mental

---

[26] Plaintiffs do not separately analyze their harm under the framework of intentional infliction of emotional distress, as this Court has held them to be "indistinguishable" and "functionally

anguish, bereavement, and grief" of a sibling with whom they had a "close personal relationship." *Belkin,* 667 F. Supp. 2d at 22; *see also Elahi*, 124 F. Supp. 2d at 110-11 ("Solatium may include a claim for loss of a sibling where the claimant proves a close emotional relationship with the decedent . . . .   Testimony about the mental anguish and grief experienced as a result of the death of a loved one is sufficient to sustain a claim for solatium.").

FSIA extrajudicial killing claims generally merit an award of solatium for siblings based on, *inter alia*, (i) "a close emotional relationship" or "special bond" between the siblings as compared to the norm; (ii) the surviving sibling's sense of "profound emotional loss" and its likelihood of persisting; and (iii) any "horrific surrounding circumstances." *Elahi*, 124 F. Supp. 2d at 110–12.  Courts in this Circuit generally begin with "a baseline award of $2.5 million to siblings," from which the Court can then "deviate in order to compensate for specific circumstances." *Thuneibat*, 167 F. Supp. 3d at 51; *see also Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *Elahi*, 124 F. Supp. 2d at 109–12 (granting an upward departure and awarding a total of $5 million for each sibling based on "special bond" with the decedent, extreme sorrow at his death, and noting the "attendant horrific surrounding circumstances" of death by violent attack).[27]

The circumstances surrounding Marie's death merit an elevated solatium award. Cathleen's relationship with Marie was extraordinary.  As Cathleen attests, Marie was her "principal support system"; a "sister, friend, [and] second mother" to whom Cathleen "turned to in [her] hardest moments."  C. Colvin Decl. ¶¶ 31, 45; *see also* J. Araya-Colvin Decl. ¶ 12; C.

---

identical to" claims for solatium under FSIA § 1605A.  *See, e.g., Surette*, 231 F. Supp. 2d at 267 n.5; *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 21 (D.D.C. 2016).

[27] "In determining the appropriate award of damages for solatium, the Court may look to prior decisions awarding damages for intentional infliction of emotional distress as well as to decisions regarding solatium."  *Belkin,* 667 F. Supp. 2d at 23.

Araya-Colvin Decl. ¶ 4.[28]   The two sisters kept in close contact, sometimes through the exceptional means of satellite phones, despite Marie's far-flung deployments and Cathleen's own challenging work.   *See id.* ¶ 36.   They showed up in each other's darkest moments, traveled together regularly, planned for joint film projects and a vacation home.   *See id.* ¶ 28.   Marie also played an important role for Cathleen's children, and their loss of this relationship has weighed on Cathleen alongside her own.   *See id.* ¶¶ 32, 47–49; *see also* J. Araya-Colvin Decl. ¶¶ 10, 12; C. Araya-Colvin Decl. ¶¶ 6, 8.   The nature of Marie's death has also deprived Cathleen's children of a significant relationship in a way that haunts their adolescence.   *See, e.g.,* J. Araya-Colvin Decl. ¶¶ 6, 10–11, 13 (describing, *inter alia*, the absurdity of having to Google her "dead aunt" in lieu of getting to speak with her); C. Araya-Colvin Decl. ¶¶ 7–8 ("I still carry Aunt Marie's death with me like a scar.").

The grief and loss Cathleen has experienced have been profound and abiding.   She writes:

> Losing Marie gutted me.  She had been so many things to me – sister, friend, a second mother.  Marie was the person I turned to in my hardest moments.  It seemed impossible to get through this unbearable loss without having her to talk to.  I still struggle to cope with that hollow, bereft feeling; I still have the impulse to call her.  I still cry at night when it is quiet, and every time I talk about her murder. . . .  Sometimes losing her feels like it is still happening to me, with new aching spaces in my life revealed every time I think that she should be there to watch my kids discover themselves and the world, or that she should give them some inappropriate gift or take them on a trip with her.  Mostly I just want to hear her laugh.  Marie was everything to me and my life is completely different without her.  She should still be here.

C. Colvin Decl. ¶¶ 45, 53.

---

[28] Marie's role in Cathleen's life was particularly significant in light of their father's early death when Cathleen was only eleven, *see* C. Colvin Decl. ¶¶ 9–12.  *See, e.g. Elahi*, 124 F. Supp. 2d at 111–12 (awarding upward adjustment to $5 million in solatium to each brother of deceased because the evidence showed that, despite the distance, the victim "not only was a dearly beloved brother to his two younger brothers, but he also fulfilled the role of the head of the family and his loss may be said to be that of a brother and a father").

Cathleen's suffering was made more acute by the horrific circumstances of Marie's death: knowledge of violent rocket fire and crushing stone; a frantic, nightmarish effort to repatriate Marie's body; the guilt of knowing how many endangered themselves to help; and the irreparable damage to her family from experiencing the loss.  C. Colvin Decl. ¶¶ 38–39; *see also* C. Araya-Colvin Decl. ¶ 6.

###### iii.  The Court Should Also Award Punitive Damages Given the Outrageous Nature of the Assad Regime's Deadly Attack, the Depravity of Its Motives, and the Importance of Punishing and Deterring Such Conduct

The FSIA terrorism exception authorizes punitive damages to deter and penalize attacks on civilians.  *See Owens*, 864 F.3d at 816.  Such damages are clearly warranted here.  Marie's killing – in itself a cold-blooded and calculated act – was part of a larger pattern and practice of censorship through violence that left numerous media workers in Syria dead, disappeared, or broken through torture.  The harm inflicted through these acts extends far beyond the pain inflicted upon Marie and other victims, and even beyond the suffering of their bereaved family members.  The deliberate targeting of journalists inflicts broad societal harms, as it isolates the besieged Syrian civilian population from the international community and cuts off citizens and policymakers around the world from the front-line conflict reporting that is essential to deliberation on matters of war.  Harms of this magnitude can only be deterred through commensurate punitive damages.

Punitive damages are "meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future."  *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012) (internal quotations omitted).  In considering whether to award punitive damages, courts evaluate "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or

intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* (internal quotations omitted).[29]  The Assad Regime's extrajudicial killing of Marie Colvin is precisely the type of "outrageous" conduct that this Court has previously held merits punitive damages under this framework.[30]

*First*, the character of Defendant's acts could not have been more depraved.  The record proves that the Regime targeted Marie because she was a journalist intent on publicizing its abuses.  Such targeting is not only a war crime and human rights violation, *see supra*, Section III.B.ii.3, but also reflects a cynical strategy of silencing dissent no matter the cost.  It is thus precisely the type of politically motivated killing that this Court has previously condemned through punitive damages.  *See, e.g., Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56–57 (D.D.C. 2012) (finding that a street assassination of a high-ranking official was an act of "extreme depravity" and "among the most heinous the Court can fathom," and awarding $300 million in punitive damages); *Elahi*, 124 F. Supp. 2d at 102, 114 (awarding $300 million in

---

[29] Although this Court has sometimes used other methods for calculating punitive damages, those approaches do not appear to apply to situations where (i) the state itself ordered the attack; and (ii) the state's conduct had not been adjudicated previously.  *Cf. Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 87 (D.D.C. 2017) (holding that alternative approach multiplying state's expenditure on terrorism by accepted factor was appropriate for "exceptionally deadly attacks" with hundreds of victims); *Thuneibat*, 167 F. Supp. 3d at 53–54 (punitive damages award based on ratio of punitive to compensatory damages appropriate only where same conduct had already been litigated).

[30] This Court has already established that Syria has substantial wealth at its disposal.  *See, e.g.*, *Thuneibat*, 167 F. Supp. 3d at 54.  The Court previously looked to Syria's expenditures on terrorism, which were estimated to amount to between $500 and $700 million annually, to conclude that Syria's wealth favored high punitive awards.  In 2011, the last year for which data is available, Syria is also reported to have spent almost $2.5 billion on its military, which was directly responsible for Marie's extrajudicial killing.  *Syrian Military Budget*, MILITARYBUDGET.ORG (last visited Mar. 18, 2018), http://militarybudget.org/syria/.  *Cf. Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 25 (D.D.C. 2002) (concluding that the Iranian Ministry of Information and Security had "substantial amounts of funds at its disposal," given that it had approximately 30,000 employees and an annual budget of between USD $100 and $400 million).

punitive damages based on finding that assassination of a dissident "for his outspoken criticism of the Iranian regime" was part of "intentional, premeditated, malicious, and cruel" strategy "to decapitate the opposition" and thus warranted the "substantial punitive damages awarded" because it "violate[d] fundamental precepts of international law" and because of a need to "recognize society's interest in the free expression of political ideas"); *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 291 (D.D.C. 2015) (awarding $300 million in punitive damages upon finding that the State's torture and killing of a missionary for his humanitarian efforts towards defectors and refugees was "awful and worthy of the greatest condemnation" warranting "significant deterrence").

In comparable cases of political assassinations, other courts have recognized the need for significant punitive damages.  In *Doe v. Saravia*, for example, the Eastern District of California found that the killing of El Salvador's Archbishop Romero, who used his position to denounce human rights abuses, warranted substantial punitive damages to account for the "international stature of the victim" and his importance to seeking peace in El Salvador and bridging communities.  348 F. Supp. 2d 1112, 1121, 1159 (E.D. Cal. 2004); *see also Dacer v. Estrada*, No. C 10-04165 WHA, 2014 WL 229801, at *5 (N.D. Cal. Jan. 21, 2014) (noting importance of deterring extrajudicial killings of publicists engaged in political activity through punitive damages awards).  Similarly, the Regime's deliberate killing of Marie justifies the imposition of significant punitive damages, as it took the life of a journalist of global stature whose work contributed to the world's understanding of armed conflict and even saved lives.  *See, e.g.*, Witherow Decl. ¶¶ 22–26, 33.

*Second*, the Regime's direct responsibility for Marie's death also supports a significant punitive damages award.  Unlike the defendants in most Section 1605A cases, the Syrian Regime

was not merely a financial accomplice; it was the direct perpetrator of the crime.  *Compare Kim*, 87 F. Supp. 3d at 291 (awarding $300 million in punitive damages for North Korea's abduction, torture and killing of a missionary for his humanitarian efforts towards North Korean refugees and defectors), *with Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 28 (D.D.C. 2017) (considering that "outsized punitive damages award is also less justified when the perpetrator funded the terrorist activities rather than carried them out himself").

*Third*, the harm inflicted was devastating.  The Regime's killing of Marie ended an extraordinary life and devastated Marie's family in countless cruel ways.  It was an outrageous act "worthy of the greatest condemnation," which "caused irreparable emotional and psychological harm to the [plaintiffs]."  *Kim*, 87 F. Supp. 3d at 291.  And that harm is not limited to Marie's family.  The brutal, public, and highly symbolic killing of Marie was designed to instill fear in the Syrian civilian population and to have a chilling effect on newsrooms and their coverage of the Syrian conflict.  *See* Kaye Rep. ¶ 30 (noting chilling effect on coverage of Syria as a distinct societal harm); Witherow Decl. ¶ 30 ("A death deters future assignments by less well-resourced [news] organizations.").  The Regime specifically targeted "those who tarnish the image of Syria in foreign media and international organizations," Brown Ex. C-40 at 094, whether they are foreign journalists or Syrians sharing information with foreign journalists or human rights organizations.  By targeting the lines of communication that linked Syria to the outside world, the Regime evidently aimed to isolate Syria's civilian population from the aid and solidarity of the international community.  *See* Kaye Rep. ¶ 30; Brown Rep. ¶¶ 146, 177–78 (noting Regime rhetoric of defending Syria against international conspiracy); *see also* Nouar Decl. ¶ 28 (describing Syrian Deputy Defense Minister Shawkat's statement that "he would have been able to destroy Baba Amr in 10 minutes if there were not any video cameras").

While Syrians themselves suffered the most from this policy, the Regime's media blackout had rippling effects around the world.   The international system depends on news reporting to make democratically informed decisions on how to respond to humanitarian disasters.  *See* Kaye Rep. ¶ 43.  As this Court observed in *Anderson v. Islamic Republic of Iran*, targeted attacks on journalists "inhibit the gathering and reporting of news" in warzones and warrant punitive damages in order "to vindicate the interest of society at-large in the collection and dissemination of complete and accurate information about world conflicts."  90 F. Supp. 2d 107, 114 (D.D.C. 2000).  That such social harms were not only the effect, but the intended consequence of Marie's killing, justifies a punitive damages award of the highest degree.

*Finally*, the need for deterrence is clear.  The Regime continues to engage in attacks on civilians in general, and journalists in particular.  *See* Kaye Rep. ¶¶ 27–28; *see also* Witherow Decl. ¶¶ 20, 31.

Courts in this Circuit have long imposed punitive damages to punish and deter politically motivated assassinations.  An elevated punitive damages award here would not only punish the Assad Regime's outrageous actions in murdering Marie Colvin, but also condemn its practice of "achieving political victory through heinous acts of barbarism."  *See Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (finding Syria liable for an extrajudicial killing under the FSIA and awarding $300 million in punitive damages in the hope that "substantial awards will deter" similar conduct), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011).

## IV.    CONCLUSION

Marie Colvin said that a war correspondent's role was to go where "injustices [are] happening," even if it means "going to a place where people are being shot and they are shooting at you."  Witherow Decl. ¶ 35; Witherow Ex. A-10.  Marie believed that telling the story of war through its victims' eyes was the only way she could make the world "stand up, take notice, and

do something to protect them."  C. Colvin Decl. ¶ 33.  The trick, Marie said, "is having enough faith in humanity to believe that someone will care."  Witherow Decl. ¶ 35; Witherow Ex. A-10. The Assad Regime's attack of February 22, 2012 cut short Marie's lifelong work of "opening the world's eyes to hidden atrocities."  Witherow Decl. ¶ 36.  This atrocity should not stay hidden.

For all the reasons stated above, Plaintiffs ask the Court to find Defendant liable under Section 1605A and award them damages and any other relief the Court deems proper.  Should the Court deem further proceedings necessary or appropriate, Plaintiffs stand ready to present additional evidence or address any questions the Court may have through further submissions, live testimony, or conference.

Dated: March 22, 2018

Respectfully submitted,

/s/ Scott A. Gilmore

Scott A. Gilmore (D.C. Bar 1002910)
sgilmore@cja.org
Inyoung (Sarah) Hwang (admitted *pro hac vice*)
shwang@cja.org
Carmen K. Cheung (admitted *pro hac vice*)
ccheung@cja.org
L. Kathleen Roberts (admitted *pro hac vice*)
kroberts@cja.org
CENTER FOR JUSTICE & ACCOUNTABILITY
One Hallidie Plaza, Suite 406
San Francisco, CA 94102
(415) 544-0444 (telephone)

Henry Weisburg (admitted *pro hac vice*)
hweisburg@shearman.com
Daniel Lewis (D.C. Bar 489636) (admitted *pro hac vice*)
daniel.lewis@shearman.com
Daniel Purisch (admitted *pro hac vice*)
daniel.purisch@shearman.com
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4000 (telephone)

Mark Lanpher (D.C. Bar 1014490)
mark.lanpher@shearman.com
Alexandra V. Filippova (D.C. Bar 1024609)
sasha.filippova@shearman.com
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
(202) 508-8000 (telephone)

*Attorneys for Plaintiffs*