# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
CATHLEEN COLVIN, *et al.*,                )
)
Plaintiffs,                )
)
v.                )    Civil Action No. 16-1423 (ABJ)
)
SYRIAN ARAB REPUBLIC,                )
)
Defendant.                )
_____)

## AMENDED MEMORANDUM OPINION

This case arises out of an intense artillery assault on the Baba Amr Media Center in Homs, Syria. Among those that died in the assault was Marie Colvin ("Colvin"), an American war journalist hailed by many as the greatest war correspondent of her generation, who was there covering the war between the Syrian government and rebel groups. Compl. [Dkt. # 1] ¶¶ 1, 21, 53. In their complaint, plaintiffs assert that Colvin was the victim of a targeted government policy to surveil, capture, and even kill journalists to prevent reporting on the Syrian government's suppression of the political opposition. *Id.* ¶¶ 43, 47, 79. In a comprehensive intelligence gathering effort, the Syrian government discovered that foreign journalists were broadcasting reports from a Media Center in Baba Amr. *Id.* ¶¶ 63–64. When the Syrian military uncovered the location of the Media Center, it launched an artillery attack against it, for the purpose of killing the journalists inside. *Id.* ¶¶ 65–71. Colvin was killed, as was a French photographer, Remi Ochlik. *Id.* ¶ 68. Other journalists, media personnel, and Syrian activists were wounded. *Id.*

Colvin's youngest sister, Cathleen Colvin,[1] niece Justine Araya-Colvin, and nephew Christopher Araya-Colvin,[2] (collectively, "plaintiffs") bring this case against the Syrian Arab Republic ("Syria"), asserting that Colvin's death constitutes an extrajudicial killing in violation of the Foreign Sovereign Immunities Act ("FSIA"). *See* Compl. ¶¶ 81–91. Plaintiffs effectuated service on February 6, 2017, *see* Affidavit Regarding Service [Dkt. # 28] ("Service Aff."), and on July 11, 2017 the Clerk of the Court entered default against Syria. *See* Clerk's Entry of Default [Dkt. # 31] ("Default Entry"). Now pending before the Court is plaintiffs' motion for default judgment. Because the Court finds that it has both personal and subject matter jurisdiction, and that plaintiffs have demonstrated with a satisfactory amount of evidence that Syria is liable for Colvin's death, the Court will grant plaintiffs' motion for default judgment and enter judgment in the amount of $302,511,836.00.

## BACKGROUND

This section details the factual background leading up to the attack and Marie Colvin's death. The summary below is based on allegations in the complaint, reports submitted by experts

---

1    Cathleen Colvin brings this action on her own behalf and on behalf of minor L.A.C., an heir-at-law and beneficiary of Marie Colvin's estate. *See* Min. Order (Mar. 27, 2018); Compl. ¶ 19.

2    All plaintiffs are heirs-at-law and beneficiaries of Marie Colvin's estate. Compl. ¶¶ 19–20.

on Syria,[3] and declarations from individuals including defectors from the Syrian government, activists who have personal knowledge of the relevant events, and those present at the attack.[4] The plaintiffs' briefing, with almost 1000 pages of attached exhibits, declarations, and expert reports, was comprehensive. Thus, an evidentiary hearing is unnecessary.

## I. Syria's Political Climate in 2011

### A. The Syrian Government's Response to the Arab Spring

Beginning in March 2011, Syria began to experience the effects of the "Arab Spring" – a wave of protests sweeping through the Middle East and North Africa against authoritarian governments. Brown Rpt. ¶¶ 24–26; Ford Rpt. ¶¶ 29–30; Compl. ¶ 25; Pls.' Mem. in Supp. of its

---

3   To establish the legal and factual bases for their claims, plaintiffs submitted as evidence three well-supported reports from qualified experts on Syrian politics, policies, and military structures and strategies. Ewan Brown, the plaintiffs' proffered expert on the structure of the Syrian military and its security forces, was a British Army officer, a military analyst with the United National International Criminal Tribunal for the Former Yugoslavia, a Senior Investigator with the International Criminal Court, and is currently a consultant with the Commission for International Justice and Accountability. Expert Report of Ewan Brown [Dkt. # 42-17] ("Brown Rpt.") ¶ 1. Since 2012, he has been "investigating violations of international criminal law in the current Syrian conflict." *Id.* at Ex. A. Plaintiffs' proffered expert on "practices adopted by the Syrian government toward journalists and other media workers after the start of the 2011 uprising," David Kaye, is the United Nations Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression. Expert Report of David Kaye [Dkt. # 42-15] ("Kaye Rpt."). He is a former attorney adviser with the Department of State and has published numerous articles relating to freedom of expression and international humanitarian law. *Id.* ¶¶ 5–9. Ambassador Robert Ford, the plaintiffs' proffered expert on the origins of the Assad regime and the regime's response to the anti-government uprising in Syria, has been a foreign service officer for over three decades. Expert Report of Robert Ford [Dkt. # 42-16] ("Ford Rpt.") ¶¶ 1–5. In addition to being the U.S. Ambassador to Syria from 2011 to 2014, he is currently a Senior Fellow at the Middle East Institute in Washington, D.C. and a Kissinger Fellow in Middle Eastern politics at Yale University. *Id.* Plaintiffs' also submit an additional expert report on economic damages: Dr. Maria Tsennykh is a Senior Director of FTI Consulting's Dispute Advisory Services, which provides valuation services in various litigation projects. Expert Report of Dr. Maria Tsennykh [Dkt. # 42-14] ("Tsennykh Rpt.") ¶ 8. She has been in the valuation field for over ten years and has participated in hundreds of valuation-related projects around the world. *Id.* ¶ 6. In other words, plaintiffs' experts are highly qualified and meet the requirements of Federal Rule of Evidence 702.

Mot. for Default J. [Dkt. # 42-1] ("Pls.' Mem.") at 4. The Arab Spring prompted both a non-violent movement as well as an armed insurrection, calling for government change and an end to corruption. Pls.' Mem. at 4; Ford Rpt. ¶ 28.

The Syrian government responded with a strategy to quash the dissent using military and intelligence forces, coordinated by a group established by President Bashar al-Assad called the Central Crisis Management Cell ("CCMC"). Pls.' Mem. at 4; Brown Rpt. ¶¶ 44–45. The CCMC was the highest national security body in the Syrian government, and it was comprised of senior members of the government, included the Minister of Defense, Deputy Minister of Defense, Minister of Interior, heads of the four Syrian intelligence agencies, and Maher al-Assad, brother of President al-Assad and commander of the Fourth Division of the Syrian Army. Brown Rpt. ¶¶ 26, 46; Barakat Decl. ¶¶ 11–12. Operating out of Damascus, the CCMC gathered all of the

---

4       Plaintiffs submitted two declarations from Syrian government defectors, who both have personal knowledge of the Syrian government's role in the attacks at issue. *See* Declaration of Ulysses [Dkt. # 42-5] ("Ulysses Decl."); Declaration of Abdel Majid Mohammed Abel Majid Barakat [Dkt. # 42-9] ("Barakat Decl."). The former individual used a pseudonym to protect his identity. Plaintiffs also supplied: six declarations from journalists, activists, or international observers who were either present at the attack or heard the attack, *see* Declaration of Paul Conroy [Dkt. # 42-6] ("Conroy Decl."), Declaration of Wael Fayez al-Omar [Dkt. # 42-7] ("al-Omar Decl."), Declaration of Abdelmalek Nouar [Dkt. # 42-8] ("Nouar Decl."), Declaration of John Doe [Dkt. # 42-10] ("Doe Decl."), Declaration of Adnan al-Hamid a.k.a. Khaled Abu Salah [Dkt. # 42-11] ("Salah Decl."), Declaration of Javier Antonio Espinosa Robles [Dkt. 42-13] ("Robles Decl."); one declaration from Colvin's editor, speaking to her career as a war correspondent, *see* Declaration of John Moore Witherow [Dkt. # 42-12] ("Witherow Decl."); and three declarations from each of the plaintiffs detailing their relationship with Colvin and the distress they suffered as a result of Colvin's death. *See* Declaration of Cathleen Colvin [Dkt. # 42-2] ("Colvin Decl."); Declaration of Justine Araya-Colvin [Dkt. # 42-3] ("J. Araya-Colvin Decl."); Declaration of Christopher Araya-Colvin [Dkt. # 42-4] ("C. Araya-Colvin Decl."). These declarations are credible and offer corroborating details of the events at issue. Thus, "no evidentiary hearing is necessary for further evaluation of the declarations submitted by plaintiffs, and the uncontroverted facts averred therein are taken as true." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 32 n.1 (finding that because the exhibits and expert reports were comprehensive, the Court did not need to conduct an evidentiary hearing); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits.").

military and intelligence reports from across Syria regarding the political opposition. Brown Rpt. ¶¶ 44, 47–48; Barakat Decl. ¶ 10, Compl. ¶ 27.

The CCMC used the reports it received from regional intelligence committees to inform President al-Assad's anti-opposition strategy. Barakat Decl. ¶ 15. Armed with information, the Syrian government engaged in widespread suppression of demonstrators and rebel groups, Compl. ¶ 28, and thousands were killed, detained, tortured, or kidnapped. Pls.' Mem. at 5; Ford Rpt. ¶¶ 37–40. The violence led to the formation of an armed opposition, called the Free Syrian Army ("FSA"), which consisted of civilians and defectors from the Syrian military and government. Ford Rpt. ¶ 36. By the end of 2011, the clash between the government and the FSA sent Syria into a full-scale armed conflict. Brown Rpt. ¶¶ 181–85; Kaye Rpt. ¶ 32.

**B. Suppression of the Media and the Rise of the Independent Media**

Suppression of traditional forms of media led to the rise of "independent media," in which "citizen journalists" disseminated news through social media networks. Salah Decl. ¶¶ 17–19; Kaye Rpt. ¶¶ 12–13. Babr Amr, a district in the city of Homs, was "the heart of the independent media movement." Pls.' Mem. at 6. There, a local activist named Khaled Abu Salah (a pseudonym he used to protect his identity) and a group of citizen journalists formed the Baba Amr Media Center, where they would document and broadcast demonstrations occurring throughout the country and the government's response, using proxy internet servers to hide their location. Salah Decl. ¶¶ 17–20; Doe Decl. ¶¶ 7–10. These individuals were not part of the formal opposition, and they did not participate in the hostilities. Salah Decl. ¶ 23.

The Syrian government considered media activists to be the biggest threat to the regime, because it was through the media that demonstrators could organize protests. Barakat Decl. ¶¶ 30–32. Thus, media activists and journalists became high priority targets. Ford Rpt. ¶¶ 62–64

(detailing examples of arrests, disappearances, and deaths of journalists in 2011 and 2012); Ulysses Decl. ¶ 14. In August 2011, the CCMC issued orders to government forces to "[l]aunch daily joint security-military campaigns" against "those who tarnish the image of Syria in foreign media and international organizations." Brown Rpt. ¶¶ 173–77. This policy resulted in a pattern and practice of targeting journalists and other media personnel, "subjecting them to . . . detention, torture, forced disappearance, extrajudicial killing, and other abuses." Kaye Rpt. ¶ 30; *see* Ford Rpt. ¶ 59; Ulysses Decl. ¶ 14.

## C. The Government's Focus on Baba Amr and its Media Center

By the end of 2011, "Homs had become a key center" of the revolution, and "intelligence services in Homs were tasked with suppressing the opposition movement and ending the massive anti-government protests." Ulysses Decl. ¶ 8. The Syrian government formed a committee with the sole purpose of coordinating the military and intelligence operations against the opposition in Homs, called the Homs Military Security Committee ("HMSC").[5] *Id.* ¶ 9. A leader of the HMSC, Major General Rafiq Shahadah, was involved in coordinating military and intelligence operations in the country's first battle of the Civil War: the siege of Baba Amr. *Id.* ¶ 24; Brown Rpt. ¶¶ 212–13. Baba Amr became a focal point in the war because of its "very active media center." Ulysses Decl. ¶ 25.

From December 2011 to February 2012, the CCMC directed the HMSC to isolate Baba Amr. Brown Rpt. ¶¶ 256–59 ("[T]he CCMC instructed that military and security commanders were to . . . wear[] down and drain[] the enemy."). Military surrounded the neighborhood, cutting off telecommunications, electricity, and food and water supplies. Ulysses Decl. ¶ 27. To protect

---

5       The CCMC oversaw the operations of the HMSC. Barakat Decl. ¶¶ 37–39; Brown Rpt. ¶¶ 196, 210.

themselves and civilians, rebel groups established a defensive perimeter around the neighborhood. *Id.* ¶¶ 26, 28; Doe Decl. ¶ 12; Brown Rpt. ¶¶ 252–54. The Syrian military shelled "the neighborhood on a daily basis with various forms of artillery, including . . . rocket launcher systems . . . and . . . mortars." Ulysses Decl. ¶¶ 29–30; *see* Salah Decl. ¶¶ 29–30 ("It was the most intense shelling I had ever experienced. It was constant."); Doe Decl. ¶ 16 ("The shelling was systematic, it happened every day."); Nouar Decl. ¶ 20 ("We visited this neighborhood every day, and every day we observed bombardments and sniper fire."). The level of violence was extreme – "bombs were being fired into densely populated areas," and snipers were "targeting and killing small children, women and other unarmed civilians." Brown Rpt. ¶¶ 261–62. The government's "official line was that Baba Amr was full of terrorists." Ulysses Decl. ¶ 32; *see* Nouar Decl. ¶¶ 27–32 (describing conversations with Syrian government officials where they referred to media activists as terrorists).

Through intelligence sources, such as drone surveillance and informants, the Syrian government learned that media activists had smuggled in satellite transmitters that gave them access to the internet, and foreign journalists in Baba Amr were "reporting on the siege, uploading videos to the Internet, and talking to international news agencies like CNN and al-Jazeera." Ulysses Decl. ¶ 33.

## II.     The Death of Marie Colvin

### A.  Marie Colvin and Her Assignment in Homs, Syria

Marie Colvin was a highly respected American war journalist, revered for her courage in reporting the humanitarian crises that result from war. Colvin Decl. ¶¶ 16–18. "Marie viewed it as her job to make the world aware of the impact war had on civilians, despite the risk. Occasionally, she also viewed it as her job to take action herself." *Id.* ¶ 18. She spent over twenty-

five years writing for the British newspaper, *The Sunday Times*, covering conflict zones in Iraq, Chechnya, the Balkans, East Timor, Sri Lanka, Sierra Leone, and Libya. Compl. ¶ 21. She was in Baghdad through the Gulf War bombing in 1991, witnessed the American bombing of Tripoli in 1992, and interviewed both Muammar Gaddafi of Libya and Yasser Arafat of Palestine. Witherow Decl. ¶ 22. When a grenade blinded her in one eye in Sri Lanka, she became known for wearing a signature black eye patch. *Id*. ¶ 24. Colvin received dozens of accolades for her reporting, including the British Press Awards' Foreign Reporter of the Year (2000, 2009, and 2012), the Foreign Press Association's Journalist of the Year (2000), and the International Women's Media Foundation's Courage in Journalism Award (2000). Colvin Decl. ¶ 26, n.18; Witherow Decl. ¶ 25. Her assignment in Syria was the last she had with *The Sunday Times*.

Colvin and British photographer, Paul Conroy, traveled together to Syria on February 13, 2012. Conroy Decl. ¶ 6. They entered the country with the help of members of the FSA and a pacifist named Wael Fayez al-Omar. *Id.*; al-Omar Decl. ¶ 15. Their journey took two days; they traveled to Homs through a smuggler's route, and in Homs, they used an underground water tunnel to reach the Baba Amr Media Center. Conroy Decl. ¶¶ 9, 11; al-Omar Decl. ¶¶ 15–16. The Media Center was located in an apartment building, offering foreign journalists a place to sleep and report. Conroy Decl. ¶ 13; al-Omar Decl. ¶ 16; Salah Decl. ¶ 20.

On February 16, the day after they arrived, Colvin and Conroy could hear the sound of randomized shelling throughout the neighborhood for most of the day. Conroy Decl. ¶ 14; al-Omar Decl. ¶ 17. Nonetheless, Colvin wanted to see the area and speak with the locals. With al-Omar's help, she visited an underground storage facility sheltering locals and an improvised field hospital located in an apartment building. Conroy Decl. ¶¶ 15–17; al-Omar Decl. ¶ 17.

That evening, rumors of an imminent invasion and possible gas attack forced Colvin and others to flee Baba Amr using the same tunnels through which they had arrived. Conroy Decl. ¶ 18; al-Omar Decl. ¶ 18. Colvin was able to dictate a story to *The Sunday Times* via satellite telephone. Conroy Decl. ¶ 19. The rumored invasion never transpired, and Colvin wanted to return to Baba Amr, despite being told that the government would likely capture the neighborhood. Pls.' Mem. at 14; al-Omar Decl. ¶ 19. Colvin and Conroy returned to the Media Center on February 20, 2012, but because the shelling on the district was even more intense than before, they were unable to explore the neighborhood. Al-Omar Decl. ¶ 21.

## B. Government Involvement in the Attack on the Baba Amr Media Center

The HMSC was aware that foreign journalists were traveling to Baba Amr and made it a priority to pin down the location of the Media Center. Ulysses Decl. ¶¶ 34–38. In January 2011, a memorandum circulated within the HMSC stating that it was aware that foreign journalists were entering Syria and Homs and directed military to "take all necessary measures" to capture them. *Id.* ¶¶ 35–36.

To trace the location of the journalists, Major General Shahadah directed intelligence to intercept the communications coming out of Baba Amr. *Id.* ¶ 39. A device that could intercept broadcasts from the signals of satellite phones was installed on a vehicle circling Baba Amr, and informants were recruited to spy on the Media Center to ascertain its location. *Id.* ¶¶ 39–40.

On February 21, 2012, the eve of the attack, an informant contacted ▉▉▉▉▉▉▉, a "middle-man" in charge of gathering intelligence for the HMSC. *Id.* ¶ 51. After ▉▉▉▉ spoke to the informant, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉, telling ▉▉ that ▉ had information on the location of the Media Center. *Id.* ¶ 53. ▉▉▉▉▉▉▉▉▉▉ the boss," and sometime after that ▉▉▉▉▉, Major General Shahadah ▉▉▉▉▉▉, asking him and the informant to

9

meet with him. *Id.* ¶¶ 53–54. After the meeting, the information was passed to the Computer and Signals Section of the Syrian Military Intelligence Department, to cross-check the purported location of the Media Center with the origination of the intercepted broadcasts. *Id.* ¶ 58. Later, ███ was told that there had been a broadcast "from the same location." *Id.* ¶ 60. That same evening, Colvin had given live interviews from within Baba Amr to BBC, CNN, and U.K. Channel 4. Witherow Decl. ¶ 14.

### C. The Attack on the Baba Amr Media Center

On the morning of February 22, 2012, Colvin, Conroy, and their guide al-Omar awoke to the sound of a series of blasts. Conroy Decl. ¶ 22. Both Conroy and al-Omar realized that the shelling was different than the usual daily shelling that was scattered in nature and occurred in waves. This shelling was concentrated in one area and had a pattern recognizable as an artillery technique for targeting a specific location, called "bracketing." *Id.* ¶¶ 23–24; al-Omar Decl. ¶ 23 ("I recognized this as an artillery targeting method I had learned in the [Syrian] army: we had been trained to direct multiple salvos of fire at a specific target and to correct course between salvos until the target was successfully hit."). The rockets also made a whistling sound that al-Omar recognized as the sound made by rockets used by the Syrian army. Al-Omar Decl. ¶ 24.

During the onslaught of rockets, journalists and activists ran to evacuate through the front hall of the Media Center. *Id*. ¶ 25. The evacuation was conducted in pairs: each pair would first run into the foyer of the building and then across the street, toward a building with an underground shelter. *Id.* ¶ 26. Al-Omar, Colvin, and French photographer, Remi Ochlik, held hands, awaiting their turn to run, but because they were a group of three, al-Omar was separated from them. *Id.* ¶ 27. Colvin and Ochlik started to run out of the building. But, before they could, a rocket hit the front of Media Center, and its blast killed both Colvin and Ochlik. Conroy Decl. ¶ 27. Those

who were not in the front of the building – Conroy, al-Omar, and another journalist, Edith Bouvier – were injured by the shock wave. Conroy Decl. ¶ 26; al-Omar Decl. ¶ 28.

Incoming artillery fire continued for more than seventeen minutes. Doe Decl. ¶¶ 25–27. The shelling eventually ceased, and Javier Espinosa Robles (a Spanish journalist who had made it across the street to the shelter) took a photo of the damaged façade of the Media Center showing its complete devastation. Robles Decl. ¶ 19, Ex. A. Salah, a founding member of the Media Center who had been in a nearby building during the attack arrived shortly after and dictated his observations to a cameraman filming the bodies of Colvin and Ochlik lying in rubble. Salah Decl. ¶¶ 38–39. Those that survived, Conroy, Bouvier, and al-Omar, were taken to a makeshift field clinic for treatment. Robles Decl. ¶ 22; Conroy Decl. ¶ 31. Eventually, they were able to leave the country with the help of the FSA. Robles Decl. ¶ 24; Conroy Decl. ¶¶ 32–33.

### D. The Celebration of the Attack by Syrian Government Officials

After the attack, the Homs Security Chief Major General Shahadah convened a group of military and intelligence officers to celebrate their success in locating and attacking the Media Center. Ulysses Decl. ¶ 62. Major General Shahadah thanked and congratulated them, and they drank to a successful operation. *Id.* ¶¶ 63–65. They specifically spoke about Colvin's death; Major General Shahadah stated, "Marie Colvin was a dog and now she's dead. Let the Americans help her now." *Id.* ¶ 65. ███████████████ Maher al-Assad, the president's brother and commander of the Fourth Division of the Syrian Army, gave him a new car as a reward for the successful attack. *Id.* ¶ 66. Major General Shahadah was later promoted and named the head of the Syrian Military Intelligence Department. *Id.* ¶ 67.

### III.   Procedural History

Plaintiffs brought this case against Syria on July 9, 2016 asserting that defendant committed an extrajudicial killing in violation of the FSIA.  Compl. ¶¶ 81–91.  After almost two years and several attempts to serve the defendant, plaintiffs filed proof of service.  *See* Service Aff.  The Clerk of the Court entered default against defendant on July 11, 2017.  *See* Default Entry.  On March 22, 2018, plaintiffs moved for default judgment.  Pls.' Mot. for Default J. [Dkt. # 42].

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 55(a) provides that the Clerk of the Court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."

Under the Foreign Sovereign Immunities Act, a court may not enter default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) ("[W]hen the defendant State fails to appear and the plaintiff seeks a default judgment, FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'").  Default judgment under the FSIA is identical to the standard for entry of default judgments against the United States under Federal Rule of Civil Procedure 55(d).  *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003), quoting H.R. Rep. No. 94-1487, at 26 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6625.

Given the considerations of sovereign immunity that pertain notwithstanding the default, a court must carefully scrutinize the plaintiff's allegations and "may not unquestioningly accept a complaint's unsupported allegations as true." *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d

204, 211 (D.D.C. 2012), citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). In a default proceeding under the FSIA, plaintiff may establish proof through testimony, documentation, and affidavits. *Spencer v. Islamic Republic of Iran*, 922 F. Supp. 2d 108, 109 (D.D.C. 2013), citing *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006).

## ANALYSIS

### I.     The Court has jurisdiction over plaintiff's claims under the FSIA.

At the outset, plaintiffs must demonstrate that the Court has jurisdiction to hear their claims and that Syria is not immune from suit. The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). A foreign state is typically immune from jurisdiction in U.S. courts. *See* 28 U.S.C. § 1604. But subject matter jurisdiction may exist if the defendant's conduct falls within one of the statutory exceptions to immunity. *See id.*; 28 U.S.C. § 1330(a). If the foreign state is not immune, a plaintiff can establish personal jurisdiction over the defendant if the plaintiff executes service in accordance with 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). Here, the defendant's conduct falls within the "state sponsor of terrorism" exception to immunity as set forth in Section 1605(A), and plaintiffs have established personal jurisdiction through service. *See* 28 U.S.C. § 1605(A).

#### A.  Subject Matter Jurisdiction

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). "Because 'subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity,

. . . even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act.'" *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65 (D.D.C. 2010), quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 495 n. 20 (1983).

The terrorism exception to immunity of the FSIA provides that:

"A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

28 U.S.C. § 1605A(a)(1). Because plaintiffs have demonstrated all of these elements, the Court finds that Syria is not immune from suit.

First, plaintiffs bring this case against the Syrian Arab Republic, a foreign state, seeking money damages for Colvin's death. *See* Compl. at 31–32. Second, plaintiffs allege that the defendant committed an extrajudicial killing when it launched an artillery strike against the Baba Amr Media Center knowing that it housed foreign journalists. Compl. ¶¶ 84–85.

Third, plaintiffs have adequately shown that defendant caused the attack. Claims brought under the FSIA do not require "but-for" causation. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 42 (D.D.C. 2009). In interpreting a provision under the FSIA, the D.C. Circuit found the causation element "to require only a showing of proximate cause." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004), citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536–38 (1995). "Proximate cause exists so long as there is some 'reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Brewer v. Islamic Republic of Iran*,

664 F. Supp. 2d 43, 54 (D.D.C. 2009), quoting *Kilburn*, 376 F.3d at 1128–29. In this case, plaintiffs have submitted declarations from individuals with personal knowledge of the inner working of the Syrian government during the attack at issue. *See generally*, Ulysses Decl.; Barakat Decl. They aver that the Syrian government was aware that foreign journalists were broadcasting from the Baba Amr district, that it adopted a policy of extreme suppression of the media, and that it held the city under siege, with a military perimeter. Ulysses Decl. ¶¶ 33–38; Barakat Decl. ¶¶ 38–39. The Syrian government uncovered the location of the Media Center through informants and launched an artillery attack at a time foreign journalists were inside, thereby causing Colvin's death. Ulysses Decl. ¶¶ 51–62. Plaintiffs have therefore sufficiently alleged causation and injury. *See Valore*, 700 F. Supp. 2d at 66 ("The FSIA does not restrict the personal injury or death element to injury or death suffered directly by the claimant; instead, such injury or death must merely be the bases of a claim for which money damages are sought.").

Because plaintiffs have adequately demonstrated that the terrorism exception to the FSIA applies, defendant is not entitled to sovereign immunity, and this Court has subject matter jurisdiction over the case.

### B. Additional Requirements under the FSIA

The FSIA lists a set of additional conditions that must be met before a federal district court may hear a claim: (i) the foreign country must be designated a "state sponsor of terrorism at the time [of] the act" giving rise to the claim, (ii) the "claimant or the victim" must be a "national of the United States," a member of the armed forces, or a government employee at the time of the act, and (iii) the claimant must have afforded "the foreign state has a reasonable opportunity to

arbitrate the claim in accordance with the accepted international rules of arbitration." 28 U.S.C. § 1605A(a)(2); *see Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015).

With respect to the first provision, the FSIA defines a "state sponsor of terrorism" as "a country the government of which the Secretary of State has determined . . . is a government that has repeatedly provided support for acts of international terrorism." 28 U.S.C. § 1605A(h)(6). Syria has been designated a state sponsor of terrorism since December 29, 1979. *See* 15 C.F.R. § 742.9(a)(2) (2013); *State Sponsors of Terrorism*, U.S. Department of State, https://www.state.gov/j/ct/list/c14151.htm (last visited Dec. 11, 2018).

Second, a "national of the United States" means "a citizen of the United States or . . . a person who . . . owes permanent allegiance to the United States." 8 U.S.C. § 1101(22); § 1605A(h)(5). Here, the plaintiffs and the decedent are citizens of the United States. Pls.' Mem. at 2–3.

Finally, plaintiffs offered to arbitrate with Syria pursuant to international rules of arbitration. Offer to Arbitrate [Dkt. # 2]; *see Arbitration Rules: Article IV*, International Chamber of Commerce Rules of Arbitration (March 1, 2017), https://iccwbo.org/dispute-resolution-services/arbitration/rules-of-arbitration/; *see also Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003) (holding that FSIA "does not require any particular form of offer to arbitrate, simply the extension of a reasonable opportunity").

### C. Personal Jurisdiction

Under 28 U.S.C. § 1330(b), "personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service

has been made under section 1608 of this title."[6]   The D.C. Circuit requires "strict adherence to the terms of 1608(a)." *Barot v. Embassy of Zam.*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Because no "special arrangement" existed between the parties, *see* § 1608(a)(1), Syria is not a party to any "international convention on service of judicial documents," *see* § 1608(a)(2), and plaintiffs could not effectuate service within 30 days, *see* § 1608(a)(3), plaintiffs sought to transmit the summons, complaint, and notice of suit through diplomatic channels as prescribed under section 1608(a)(4).  *See* Status Report, Oct. 28, 2016 [Dkt. # 21] ("10/28/16 SR") ¶ 5.

On September 27, 2016, the Clerk of the Court sent two copies of the summons, complaint, notice of suit, and translations to the Office of Legal Affairs at the State Department.  Certificate of Mailing [Dkt. # 20]; *see also* 10/28/16 SR ¶ 6.  The package eventually reached the Czech

---

6    Under 28 U.S.C. § 1608(a), there are four ways to serve a foreign state:

(1)  by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2)  if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3)  if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4)  if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services – and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

Republic Embassy[7] in Damascus, Syria. Status Report, Dec. 28, 2016 [Dkt. # 22] ¶ 2. On February 6, 2017, the Czech Embassy transmitted the package to the Syrian Ministry of Foreign Affairs, thereby effectuating service. Return of Service Affidavit [Dkt. # 25] ¶ 5. Plaintiffs confirmed service with an affidavit. *See* Service Aff. at 4. Thus, because service has been made in accordance with section 1608(a)(4), the Court has personal jurisdiction over Syria. 28 U.S.C. § 1330(b).

Plaintiffs have satisfied their burden to show that the Court may hear plaintiffs' claim, and the Court can proceed to the merits of plaintiffs' motion for default judgment.[8]

## II. The Court will grant plaintiffs' motion for default judgment because plaintiffs have successfully proven liability with evidence satisfactory to the Court.

Default judgment may not be entered against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Han Kim*, 774 F.3d at 1047. A court can rely upon plaintiff's "'uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence.'" *Valore*, 700 F. Supp. 2d at 59, quoting *Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001).

Under section 1605A(c), a foreign state is liable to (1) "a national of the United States" (2) "for personal injury or death [(3)] caused by" (4) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or provision of material support or resources for such an act," (5) committed by "that foreign state, or an official, employee, or agent of that foreign state" (6)

---

7      The Czech Republic represents the interests of the United States in Syria. Status Report, Dec. 28, 2016 [Dkt. # 22] ¶ 2.

8      The case also falls within the limitations period. All cases brought under section 1605A face a ten-year statute of limitations period, which begins to run as of the date on which the cause of action arose. 28 U.S.C. § 1605A(b). The attack occurred on February 22, 2012, and so this case is timely.

"for which the courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. §§ 1605A(c), (a)(1).  These elements are discussed in more detail below.

**A.  Plaintiffs are nationals of the United States.**

As noted above, *supra* at 16, all of the plaintiffs are nationals of the United States because, like the decedent, they are U.S. citizens.  Compl. ¶¶ 19, 20.

**B.  Defendant caused the death of Marie Colvin.**

As explained in Part I.A, *supra*, Syria coordinated and carried out a carefully planned attack on the Baba Amr Media Center.  Ulysses Decl. ¶¶ 50–62.  As a result of that attack, Marie Colvin was killed.

Elements 2 and 3 of this statutorily created federal cause of action, "[w]hen viewed together . . . require plaintiffs to prove a theory of liability under which defendants cause[d] the requisite injury or death."  *Valore*, 700 F. Supp. 2d at 73.  "[P]laintiffs in § 1605A action – whether seeking solely punitive damages or pursuing compensatory relief as well – must articulate the justification for such recovery, generally through the lens of civil tort liability."  *Rimkus*, 750 F. Supp. 2d at 175–76.

Plaintiffs advance two theories for recovery: wrongful death and intentional infliction of emotional distress.  Compl. ¶¶ 92–95.  Because the FSIA-created federal cause of action does not provide any guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages, courts have applied "general principles of tort law," rather than any particular state law, which "in effect instructs federal judges to find the relevant law, not to make it."  *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009), quoting *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).  With that instruction, courts in this district have "often looked to sources such as state decisional law, legal treatises, or the Restatements" to

determine the relevant law. *Heiser*, 659 F. Supp. 2d at 24; *see Valore*, 700 F. Supp. 2d at 76. The Court will analyze plaintiffs' theories of liability through this lens.

### i. Wrongful Death

All plaintiffs claim recovery under a theory of wrongful death. Compl. ¶ 92. Under section 1605A of FSIA, heirs-at-law and beneficiaries of the decedent's estate are entitled to recover compensatory damages resulting from a wrongful death. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998); *Valore*, 700 F. Supp. 2d at 78.

Here, plaintiffs Cathleen Colvin, on her own behalf and on behalf of minor L.A.C, Justine Araya-Colvin, and Christopher Araya-Colvin are suing in their capacity as heirs-at-law and beneficiaries of Marie Colvin's estate, and they seek to recover for Colvin's premature death. Compl. ¶¶ 19–21. As plaintiffs note, an extrajudicial killing under 1605A is a wrongful death:

> It is axiomatic that acts of terrorism under section 1605A—including extrajudicial killing or material support thereof—are, by definition, wrongful. Any deaths resulting from an act of terrorism under section 1605A are properly considered wrongful deaths, and a plaintiff's recovery under a wrongful death theory is appropriate. Thus, where a foreign state or an agency/instrumentality thereof is liable for an extrajudicial killing, or the provision fo material support thereof, it may be liable for the economic damages experienced by the decedents heirs under . . . FSIA.

*Shoham v. Islamic Republic of Iran*, No. 12-cv-508 (RCL), 2017 WL 2399454, at *18 (D.D.C. June 1, 2017). Thus, plaintiffs may recover damages under a wrongful death theory. The exact damages due to plaintiffs under the wrongful death theory will be discussed *infra*, Part III.A.

### ii. Intentional Infliction of Emotional Distress

Plaintiff Cathleen Colvin has asserted intentional infliction of emotional distress ("IIED") as a theory for recovery. Compl. ¶¶ 93–95. Syria could be liable under such a claim if it: (1) engaged in extreme and reckless conduct, (2) that was directed at a person or persons other than plaintiff, (3) which intentionally or recklessly caused severe emotional distress, (4) to immediate

family members who were present at the time the conduct occurred. Restatement (Second) of Torts § 46(1); *see also Bettis*, 315 F.3d at 333 ("[F]ederal courts in FSIA and Flatow Amendment cases have accepted § 46 of the Restatement (Second) of Torts as a proxy for state common law of intentional infliction of emotional distress."). The fourth requirement is referred to as "the presence requirement." *Bettis*, 315 F.3d at 333.

"Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009), citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002). Thus, the first element is easily established. Second, the attack was directed at the decedent, Marie Colvin, not the plaintiffs, which fulfills the second element.

Third, Syria intentionally carried out an attack that caused plaintiff Cathleen Colvin severe emotional distress. In her sworn declaration, Cathleen describes the grief she has experienced since losing her sister in considerable detail.[9] She talks about sleepless nights, anxiety over the welfare of her own children, and mental anguish over the loss of the person she was closest to in her family. Colvin Decl. ¶¶ 45–50. Even now, six years later, Cathleen cannot speak about Colvin's murder without tears, *id.* ¶ 12, and she thinks of Colvin every day. *Id.* ¶ 53. Compounding Cathleen's grief, Colvin's death and the attack were covered intensely by the media. *Id.* ¶ 50. Cathleen and her children were exposed to multiple images of Colvin's dead body, and Cathleen was forced to manage the difficult logistics involved in locating and transporting Colvin's remains. *Id.* All of this has understandably caused Cathleen severe emotional distress.

---

9    The Court discusses Cathleen's emotional distress in further detail in Part III.B, *infra*, when evaluating solatium damages.

Fourth, because plaintiff Cathleen Colvin is Marie Colvin's sister,[10] she is an "immediate family member." *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001) (defining immediate family members to mean "spouse, parents, siblings, and children"); *see also Heiser*, 659 F. Supp. 2d at 28.

Finally, while Marie Colvin's relatives were not personally at the scene at the time of the attack, that does not mean that Cathleen cannot establish the presence requirement. Commentators on the Restatement have agreed that "[i]f the defendant's conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present, no rule, nor any essential reason of logic or policy prevents liability." Dan B. Dobbs, The Law of Torts § 389 (2d ed. 2018). As another court in this district noted, "[t]errorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily." *Heiser*, 659 F. Supp. 2d at 27. One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result. *Valore*, 700 F. Supp. 2d at 80 (finding that plaintiffs, though not present at the Beirut bombing, may recovery for emotional injuries they suffered as a result of the attack).

Thus, the Court concludes that plaintiff Cathleen Colvin may recovery under a theory of intentional infliction of emotional distress. The damages due to Cathleen for intentional infliction of emotional distress will be discussed *infra*, in Part III.B.

---

10     Only Cathleen Colvin claims recovery under IIED, and only Cathleen would be able to recover under IIED because the other plaintiffs, the decedent's niece and nephew, are not "immediate family members." *See Bettis*, 315 F.3d at 337 ("To define 'immediate family' to embrace nieces and nephews who do not live in the immediate household or have any legal obligation to the victim would stretch the term too far.").

**C. Marie Colvin's death was an extrajudicial killing attributable to Syria.**

Finally, to establish liability under the FSIA, plaintiffs must assert "an act" such as "torture, extrajudicial killing, aircraft sabotage, hostage taking, or provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). Here, plaintiffs assert that Colvin's death was an extrajudicial killing.

An extrajudicial killing is defined as the "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act 1991, Pub. L. No. 102–256, § 3(a), 106 Stat. 73, 73 (1992); § 1605A(h)(7). The term "does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." *Id.* Here, Colvin's death satisfies the definition of an extrajudicial killing.

A "deliberated killing" has been recognized by a court in this jurisdiction as one that is "arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 163 (D.D.C. 2016), citing *People v. Wright*, 703 P.2d 1106, 1113–14 (Ca. 1985). In cases where attacks were found to have resulted in extrajudicial killings, courts have noted the foreign state's planning, timing, and intention in carrying out those attacks. *See, e.g.*, *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 325 (D.D.C. 2014) (finding extrajudicial killings occurred where Hezbollah "careful[ly] plan[ed]" the Beirut bombing); *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 260 (D.D.C. 2016) ("[The bombings] were also 'deliberated': it is clear from the careful timing and magnitude of the bombings that the killers planned their actions carefully and intended those actions to result in death.").

Here, plaintiffs have provided satisfactory evidence to show that Marie Colvin's killing was "deliberated." The individual who provided a declaration under the name Ulysses is a defector from the Syrian intelligence services. Ulysses Decl. ¶¶ 2, 4. Throughout 2011 and 2012, he reviewed intelligence memoranda, reports, and surveillance orders as part of his job, and he regularly attended meetings with officers assigned to monitor the opposition in the city of Homs. *Id.* ¶ 11. ████████████████████████████████████ *Id.* ¶¶ 50–60. ████████████ an informant's tip relaying the location of the Media Center to Syrian military officials, █████████████████████████████████████████ ████████████████████████████ *Id.* ████████████ verbal confirmation of Marie Colvin's death and ████████ the celebration that followed. *Id.* ¶¶ 62–67. Thus, the Ulysses declaration, read in conjunction with reports of those present at the attack, shows that officials at the highest level of the Syrian government carefully planned and executed the artillery assault on the Baba Amr Media Center for the specific purpose of killing the journalists inside.

The timing of the attack is also relevant and reinforces the conclusion that this was a "deliberated" killing. The Syrian government launched the attack the morning immediately after it received an informant's tip as to the location of the Media Center, and after Colvin conducted live broadcasts which were intercepted and helped to verify the Media Center's location. *Id.* ¶ 60; Witherow Decl. ¶ 14.

Also, two individuals present at the attack, Paul Conroy and Wael al-Omar, described the pattern of the shelling on the Media Center as consistent with a technique used "to ensure that shells hit their intended target." Conroy Decl. ¶ 24. Both Conroy and al-Omar were former soldiers trained in artillery and reconnaissance and were aware of this technique. *Id.*; al-Omar

Decl. ¶ 23. Indeed, al-Omar learned this technique during his time in the Syrian Army. Al-Omar Decl. ¶ 23.

Reports detailing Syria's long-standing policy of violence towards media activists provide additional evidence of the "deliberated" nature of the attack. Media personnel were often targets and labeled enemies of the state and terrorists. Kaye Rpt. ¶¶ 25–30; Ford Rpt. ¶¶ 62–66; Brown Rpt. ¶¶ 66, 169–78. Senior government officials openly announced, in diplomatic discussions, their intention to target the Baba Amr Media Center because it hosted foreign journalists. Nouar Decl. ¶¶ 28–32. The CCMC also authorized joint military-security campaigns against those who "tarnish[ed] the image of Syria in the foreign media and international organizations." Brown Rpt. ¶ 117, Ex. C-40. Taking all of this into account, the Court finds that Marie Colvin's death was a "deliberated" killing.

Finally, Colvin's death was not lawful in any way. It was not authorized by a judgment pronounced by any court. Syria did not charge Marie Colvin with any crime nor was she ever called to appear or stand trial before any court in Syria. And, this killing was not lawfully carried out under the authority of the foreign nation pursuant to international law. *See, e.g., Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) ("Whatever policy options exist for a foreign country, it has no 'discretion' to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national or international law.").

Considering the very detailed affidavits, declarations, and expert reports filed by plaintiffs, this Court finds that plaintiffs have provided more than satisfactory evidence to demonstrate that the death of Marie Colvin resulted from an extrajudicial killing committed by defendant.

### III. The Court will award plaintiffs economic, solatium, and punitive damages.

In creating a private right of action in Section 1605A(c), Congress provided that foreign states are liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (internal quotation marks omitted). In determining a "reasonable estimate," courts may look to expert testimony and prior awards for comparable injury. *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29–30 (D.D.C. 2008).

The consequences of Syria's actions were certainly known. The government perpetrated an artillery assault that was reasonably certain – and, indeed, intended – to kill Marie Colvin and other journalists. Thus, all that remains is an evaluation of the amount of damages.

#### A. Economic Damages

All plaintiffs, as heirs-at-law and beneficiaries of Marie Colvin's estate, seek economic damages for Colvin's wrongful death. Under a wrongful death theory, plaintiffs are entitled to monetary damages for both reasonable funeral expenses and the loss of prospective income, benefits, and retirement pay "reasonabl[y] estimate[d]" by an expert and based on well-founded assumptions. *See Thuneibat*, 167 F. Supp. 3d at 48; *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 87–88 (D.D.C. 2002).

Maria Tsennykh, PhD, the plaintiffs' proffered expert on valuation,[11] estimates that the "economic loss associated with Marie Colvin's death on February 22, 2012 based on projections relating to Ms. Colvin's employment with *The Sunday Times* . . . is $2,370,640." Tsennykh Rpt. ¶ 44. To determine that value, Dr. Tsennykh took into account Colvin's salary, benefits, and post-retirement pension plans.[12] *Id.* ¶ 24. She created a gross earnings model that incorporated information about Colvin's earnings for the three years prior to her death, projected future earnings based on documents provided by *The Sunday Times*, Colvin's estate, and witness declarations regarding Colvin's health and risk factors involved in her job. *Id.* ¶¶ 33–35. Dr. Tsennykh also considered "fringe benefits" such as health insurance and retirement plan contributions, as well as pension income from the News International Pension Plan. *Id.* ¶¶ 36–38.

Dr. Tsennykh then reasonably assumed a retirement age of 70 and a lifespan of 84 based on a 2012 Life Table published by the U.S. National Center for Health Statistics. *Id.* ¶¶ 28–30. While the typical retirement age is 65, both Colvin's sister and editor indicated that the 56-year-old journalist had no plans to retire at 65. *See* Colvin Decl. ¶¶ 26, 29; Witherow Decl. ¶¶ 35, 37. The expert used these ages to determine when Colvin would have stopped drawing a salary from *The Sunday Times* and when she would have stopped receiving any income at all. Tsennykh Rpt.

---

11    Dr. Maria Tsennykh is a Senior Director of Forensics Technologies International (FTI) Consulting's Dispute Advisory Services, which provides valuation services in various litigation projects. Tsennykh Rpt. ¶ 8. She received the U.S. equivalent of a doctorate degree in economics from the Russian University of Economics in Moscow. *Id.* ¶ 7. She has been in the valuation field for over ten years and has participated in hundreds of valuation-related projects around the world. *Id.* ¶ 6.

12    Dr. Tsennykh took a conservative approach in determining expected income; she did not account for prospective professional earnings beyond employment at *The Sunday Times*, because "it was not possible" for her to quantify with "a reasonable degree of certainty" any future book deals or film contracts that Marie could have received. Tsennykh Rpt. ¶ 21.

¶ 25. Colvin's total amount of lost wages was then adjusted to account for the risky nature of her job (the "probability of survival") and the time value of money, resulting in a total economic loss of $2,370,640. *Id.* ¶¶ 39–41, App'x D, Schedule 1.

To calculate funeral expenses, Dr. Tsennykh examined materials provided by Colvin's estate and factored in the costs of the service, memorial, and travel, and then adjusted the amount for the time value of money and exchange rates. *Id.* ¶ 43; *see Elahi*, 124 F. Supp. 2d at 109 (finding that the cost of the burial plot, the gravestone, and cost of travel were "appropriately incurred and should be recovered as part of the compensatory damage award"). Funeral expenses amounted to a total of $11,836. Tsennykh Rpt. ¶ 43.

What plaintiffs' expert does not account for in calculating economic damages, however, is Colvin's expected "consumption costs."[13] "Consumption expenses account for the things that [the decedent] personally would be using, such as food, clothing, her own personal entertainment, her own personal health insurance or life insurance, things that are just related to her own personal expenditures." *Rhodes*, 967 F. Supp. 2d at 317–18. Requests for damages for claims brought under a wrongful death theory in the FSIA context have considered consumption costs when determining the exact amount of economic damages. For example, in *Stethem v. Islamic Republic of Iran*, the court found that "[l]oss of accretion damages are calculated by estimating a decedent's future earning potential based on the individual's work and education and adjusting

---

13      Consumption costs are only relevant in the context of a wrongful death. Where the claim is for lost income as a result of a personal injury, consumption costs "simply [do] not come into play" because the recovery will go to the injured party rather than its heirs. "[I]t makes no sense to deduct the plaintiff's own consumption costs from her award, as she is the one who will be using the lost wages for maintenance of herself." *Rhodes v. United States*, 967 F. Supp. 2d 246, 317 (D.D.C. 2013).

that amount to account for inflation, rise in productivity, job advancement, and *personal consumption*." 201 F. Supp. 2d at 87–88 (emphasis added). In *Thuneibat v. Syrian Arab Republic*, "[t]he forensic economist [] offset the potential income and benefit streams with estimates of personal consumption." 167 F. Supp. 3d at 49. Accounting for what the decedent "would have spent for direct personal consumption ('maintenance')," is important, "as that would not have been available to her estate." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 79 (D.D.C. 2011); *see also Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 268 (D.D.C. 2002) ("From this amount [the expert] deducted [the decedent's] estimated yearly expenses for personal consumption and payment of federal and state taxes.").

Because plaintiffs' expert only calculated lost income, without adjusting for Colvin's personal consumption costs, the Court finds that the estimated damages of $2,370,640 of economic harm is too high. The Court will assess the amount to be awarded for loss of income once an updated report has been provided that accounts for Colvin's consumption costs. It will, however, award $11,836 in funeral expenses.

### B. Solatium Recovery

Section 1605A explicitly provides for solatium recovery. 28 U.S.C. § 1605A(c). Here, only Cathleen Colvin seeks solatium damages. Courts have granted such awards to plaintiffs who experience severe distress over the death of a sibling with whom they had a "close personal relationship." *Belkin*, 667 F. Supp. 2d at 22. "Solatium claims under the FSIA are functionally identical to claims for intentional infliction of emotional distress." *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 21 (D.D.C. 2016). "They are intended to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort."

*Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015) (internal quotation marks omitted). "As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain claims for solatium." *Bluth*, 203 F. Supp. 3d at 21.

Cathleen and Marie Colvin had a very close relationship; Colvin was more than a sister to Cathleen, she was her best friend, idol, and confidant. Colvin Decl. ¶ 12. Because Colvin was nine years older than Cathleen, she became a sort of second mother, always looking out for Cathleen. *Id.* ¶ 9. For example, when their father died, Colvin had Cathleen live with her at Yale for a few weeks. *Id.* ¶ 10. Cathleen was Colvin's emergency contact for most of her career, and despite Colvin's demanding career, they talked as often as they could. *Id*. ¶ 11. The record presented shows that the February 22, 2012 attack and the death of Marie Colvin has caused and continue to cause Cathleen Colvin significant mental anguish and emotional distress. *Id.* ¶ 45. After Colvin's death, Cathleen was "barely functioning" and "suffered through many sleepless nights." *Id.* ¶ 46. The intense and graphic media coverage in the aftermath of Colvin's death made the loss even more painful. *Id.* ¶ 50. Also, while grieving, she had to attend to her children's grief as well, and she feels intense guilt and anguish for not being able to be there for them more. *Id.* ¶ 47–50. She feels her sister's lack of presence intensely – Cathleen thinks of Colvin every day. *Id.* ¶¶ 50, 52–53.

"Solatium damages, like damages for pain and suffering, are by their very nature unquantifiable." *Moradi*, 77 F. Supp. 3d at 72. Courts in this district generally begin with a baseline award of $2.5 million for the death of a sibling. *Heiser*, 466 F. Supp. 2d at 269. The Court can then "deviate in order to compensate for specific circumstances." *Thuneibat*, 167 F. Supp. 3d at 51. "For example, enhancements may be awarded where 'evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the

normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is present]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing.'" *Id.*, quoting *Roth*, 78 F. Supp. 3d at 403.[14]

In this case, while the Court is impressed by the genuinely close relationship Cathleen enjoyed with her globetrotting sister, and it does not doubt the sincerity of Cathleen's declaration in any way, it will award the $2.5 million solatium award in the absence of the sorts of unique aggravating circumstances or medical evidence that have led to upward adjustments in other cases. This decision is not intended to minimize or obscure the vicious circumstances surrounding Marie Colvin's death or the depth of her sister's suffering; it is an attempt to be true to the case law governing this issue. Thus, the Court will award $2.5 million in solatium damages for the loss that can never be adequately quantified or compensating.

---

[14] For example, in *Kilburn v. Islamic Republic of Iran*, the court increased an award of $2.5 million to $5 million for four reasons: (1) the decedent was held for a prolonged period of time, approximately 503 days, thus exacerbating a family member's anguish; (2) the decedent and plaintiff were very close; (3) the plaintiff was informed that the decedent would be released, only to hear that he had been murdered during the midst of negotiations for his release, and (4) the decedent suffered from a number of health problems that likely compounded his suffering during captivity. 699 F. Supp. 2d 136, 158 (D.D.C. 2010). In *Thuneibat v. Syrian Arab Republic*, the court awarded a 25% upward adjustment in solatium damages because the death caused "uniquely acute suffering" in that plaintiffs were quite young when their sibling died, and it negatively affected their development. 167 F. Supp. 3d at 52–53. In *Flanagan v. Islamic Republic of Iran*, the court awarded a 25% upward adjustment in solatium damages because the decedent was the center of his family, the decedent suffered greatly before his death, and plaintiffs submitted medical evidence related to their emotional distress. 87 F. Supp. 3d 93, 118–19 (D.D.C. 2015). Finally, in *Valore v. Islamic Republic of Iran*, the court awarded an upward departure of 25% to the decedent's sister where she presented evidence of having several nervous breakdowns, one of which required hospitalization. 700 F. Supp. 2d at 86.

## C. Punitive Damages

Section 1605A authorizes punitive damages to be assessed against foreign state sponsors of terrorism. 28 U.S.C. § 1605A(c). Punitive damages, unlike compensatory damages, are intended to "punish and deter" defendants for their bad acts. *Valore*, 700 F. Supp. 2d at 87. Courts calculate punitive damages by considering the following four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 27 (D.D.C. 2017).

All four factors weigh in favor of awarding punitive damages against the defendant. First, a targeted attack on a media center hosting foreign journalists that resulted in two fatalities and multiple injuries, is an unconscionable act. Second, the harm to plaintiffs was significant: Cathleen lost a sister and second mother, and Justine and Christopher lost a beloved aunt. The plaintiffs continue to feel the effects of this loss. J. Araya-Colvin Decl. ¶ 13; C. Araya-Colvin ¶ 8. Third, as courts of this district have repeatedly held, the need for deterrence for terrorist acts is high. "[O]nly a large amount of punitive damages can serve as an effective deterrent against future terrorist acts." *Bodoff*, 424 F. Supp. 2d at 88, citing *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 278 (D.D.C. 2003). And fourth, Syria is a sovereign that has substantial wealth. *See, e.g.*, *Thuneibat*, 167 F. Supp. 3d at 54; *see also Cohen*, 268 F. Supp. 3d at 27 (finding that Iran as a sovereign has substantial wealth).

Courts have taken varying approaches to determine punitive damages. One approach is to calculate the total award based on the ratio between punitive and compensatory damages used in earlier cases, "if similar conduct has been previously litigated." *Thuneibat*, 167 F. Supp. 3d at 54; *see, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 105 (D.D.C. 2017); *Spencer v.*

*Islamic Republic of Iran*, 71 F. Supp. 3d 23, 31 (D.D.C. 2014); *Goldberg–Botvin v. Islamic Republic of Iran*, 938 F. Supp. 2d 1, 11–12 (D.D.C. 2013). Another approach, in cases of exceptionally deadly attacks with multiple victims, is to multiply the defendant state's annual expenditure on terrorism by a factor of three to five. *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 87 (D.D.C. 2017); *Baker*, 775 F. Supp. 2d at 85, citing *Valore*, 700 F.Supp.2d at 88–90; *Heiser*, 659 F. Supp. 2d at 30–31; *Acosta*, 574 F. Supp. 2d at 31. Finally, a third approach is to award a fixed amount per victim.

Because this attack does not fall within what courts have described as "exceptionally deadly" terrorist acts that have resulted in multiple deaths, and because this conduct has not been the subject of litigation before, the Court finds that the appropriate method to determine punitive damages would be to impose a fixed amount per decedent.[15] Typically, an award consists of $150 million per decedent. *See Thuneibat*, 167 F. Supp. 3d 22, 54 (awarding $150 million to each of the estates of the two victims); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 233 (D.D.C. 2012) (awarding $300 million in total to the estates of two victims and their families); *Baker*, 775 F. Supp. 2d at 86 (awarding $150 million to each family of three deceased victims, for a total of $450 million in punitive damages); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2014) (awarding $150 million each to the estates of two victims).

However, the Court notes that other courts have awarded punitive damages in the amount of $300 million in some cases involving a single victim, because the victim was targeted by the

---

15      This method is appropriate for the additional reason that if the Court were to adopt the terrorism expenditure times three formula, the total punitive damages would be $1.8 billion, *see Thuneibat*, 167 F. Supp. 3d at 54. This amount would exceed the amount of punitive damages that this Court has ever awarded against the Syrian government by $1.5 billion. *Id.* Because the amount of punitive damages must comport with due process and should be commensurate with awards in other FSIA cases, this would be inappropriate. *Baker*, 775 F. Supp. 2d at 85–86.

foreign state for a particular reason. For example, higher awards were imposed where the victim was a high ranking official, a dissenter, or an individual conducting humanitarian services. *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56–57 (D.D.C. 2012) (finding that a street assassination of a high-ranking official was an act of "extreme depravity" and "among the most heinous the Court can fathom," and awarding $300 million in punitive damages); *Kim*, 87 F. Supp. 3d at 291 (awarding $300 million in punitive damages upon finding that the State's torture and killing of a missionary for his humanitarian efforts towards defectors and refugees was "awful and worthy of the greatest condemnation" warranting "significant deterrence"); *Elahi*, 124 F. Supp. 2d at 102, 114 (awarding $300 million in punitive damages based on finding that assassination of a dissident "for his outspoken criticism of the Iranian regime" was part of "intentional, premeditated, malicious, and cruel" strategy "to decapitate the opposition" and thus warranted the "substantial punitive damages awarded" because it "violate[d] fundamental precepts of international law" and because of a need to "recognize society's interest in the free expression of political ideas").

Additionally, when calculating punitive damages, the Court may consider whether the foreign state itself conducted the attack, or whether it funded a third-party terrorist organization to carry out the attack. *See Cohen*, 268 F. Supp. 3d at 28 (considering that "outsized punitive damages award is also less justified when the perpetrator funded the terrorist activities rather than carried them out himself").

An award of punitive damages must be "reasonably predictable in its severity . . . so that [a] . . . 'bad man' can look ahead with some ability to know what the stakes are in choosing one course of action or another." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008). While $150 million is the typical award per decedent, the Court must also consider the fact that Marie Colvin was a journalist who was killed by the Syrian government while reporting on the atrocities

occurring during civil war. She was specifically targeted because of her profession, for the purpose of silencing those reporting on the growing opposition movement in the country. The Court agrees with plaintiffs that the murder of journalists acting in their professional capacity could have a chilling effect on reporting such events worldwide. Pls.' Mem. at 40. As the court observed in *Anderson v. Islamic Republic of Iran*, targeted attacks on journalists "inhibit the gathering and reporting of news" in warzones and warrant punitive damages in order "to vindicate the interest of society at-large in the collection and dissemination of complete and accurate information about world conflicts." 90 F. Supp. 2d 107, 114 (D.D.C. 2000). By perpetrating a directed attack against the Media Center, Syria intended to intimidate journalists, inhibit newsgathering and the dissemination of information, and suppress dissent. A targeted murder of an American citizen, whose courageous work was not only important, but vital to our understanding of warzones and of wars generally, is outrageous, and therefore a punitive damages award that multiples the impact on the responsible state is warranted. This is particularly true given that Syria itself carried out the attack – it did not fund a third-party terrorist organization to do so. Considering all these circumstances, this Court will award $300 million in punitive damages to plaintiffs.

## CONCLUSION

For the reasons outlined above, plaintiffs' motion for default judgment is granted. The plaintiff has established to the Court's satisfaction, pursuant to 28 U.S.C. § 1608(e), that the defendant, the Syrian Arab Republic, engaged in an act of extrajudicial killing of a United States national by planning and executing an attack on the Baba Amr Media Center, and is liable to plaintiffs for the resulting injuries. Plaintiffs are awarded monetary damages in the following amounts:

Funeral Expenses                    $11,836

| | |
|---|---|
| <u>Solatium – Cathleen Colvin</u> | $2,500,000 |
| | |
| <u>Punitive Damages</u> | $300,000,000 |

The amount of compensatory damages remains to be determined. A separate order will issue.

**SO ORDERED**.


AMY BERMAN JACKSON
United States District Judge

DATE: January 30, 2019